(Slip Opinion)          OCTOBER TERM, 2009          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MCDONALD ET AL. *v.* CITY OF CHICAGO, ILLINOIS, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 08–1521.   Argued March 2, 2010—Decided June 28, 2010

Two years ago, in *District of Columbia* v. *Heller*, 554 U. S. ___, this Court held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense and struck down a District of Columbia law that banned the possession of handguns in the home.  Chicago (hereinafter City) and the village of Oak Park, a Chicago suburb, have laws effectively banning handgun possession by almost all private citizens.  After *Heller*, petitioners filed this federal suit against the City, which was consolidated with two related actions, alleging that the City's handgun ban has left them vulnerable to criminals.  They sought a declaration that the ban and several related City ordinances violate the Second and Fourteenth Amendments.  Rejecting petitioners' argument that the ordinances are unconstitutional, the court noted that the Seventh Circuit previously had upheld the constitutionality of a handgun ban, that *Heller* had explicitly refrained from opining on whether the Second Amendment applied to the States, and that the court had a duty to follow established Circuit precedent.  The Seventh Circuit affirmed, relying on three 19th-century cases—*United States* v. *Cruikshank*, 92 U. S. 542, *Presser* v. *Illinois*, 116 U. S. 252, and *Miller* v. *Texas*, 153 U. S. 535— which were decided in the wake of this Court's interpretation of the Fourteenth Amendment's Privileges or Immunities Clause in the *Slaughter-House Cases,* 16 Wall. 36.

*Held:* The judgment is reversed, and the case is remanded.

567 F. 3d 856, reversed and remanded.

JUSTICE ALITO delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, III–A, and III–B, concluding that the Four-

teenth Amendment incorporates the Second Amendment right, rec-
ognized in *Heller,* to keep and bear arms for the purpose of self-
defense. Pp. 5–9, 11–19, 19–33.

(a) Petitioners base their case on two submissions. Primarily, they
argue that the right to keep and bear arms is protected by the Privi-
leges or Immunities Clause of the Fourteenth Amendment and that
the *Slaughter-House Cases'* narrow interpretation of the Clause
should now be rejected. As a secondary argument, they contend that
the Fourteenth Amendment's Due Process Clause incorporates the
Second Amendment right. Chicago and Oak Park (municipal respon-
dents) maintain that a right set out in the Bill of Rights applies to
the States only when it is an indispensable attribute of *any* " 'civi-
lized' " legal system. If it is possible to imagine a civilized country
that does not recognize the right, municipal respondents assert, that
right is not protected by due process. And since there are civilized
countries that ban or strictly regulate the private possession of hand-
guns, they maintain that due process does not preclude such meas-
ures. Pp. 4–5.

(b) The Bill of Rights, including the Second Amendment, originally
applied only to the Federal Government, not to the States, see, *e.g.,
Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243, 247, but the
constitutional Amendments adopted in the Civil War's aftermath
fundamentally altered the federal system. Four years after the adop-
tion of the Fourteenth Amendment, this Court held in the *Slaughter-
House Cases*, that the Privileges or Immunities Clause protects only
those rights "which owe their existence to the Federal government,
its National character, its Constitution, or its laws," 16 Wall., at 79,
and that the fundamental rights predating the creation of the Fed-
eral Government were not protected by the Clause, *id.*, at 76. Under
this narrow reading, the Court held that the Privileges or Immunities
Clause protects only very limited rights. *Id.,* at 79–80. Subse-
quently, the Court held that the Second Amendment applies only to
the Federal Government in *Cruikshank,* 92 U. S. 542, *Presser,* 116
U. S. 252, and *Miller,* 153 U. S. 535, the decisions on which the Sev-
enth Circuit relied in this case. Pp. 5–9.

(c) Whether the Second Amendment right to keep and bear arms
applies to the States is considered in light of the Court's precedents
applying the Bill of Rights' protections to the States. Pp. 11–19.

(1) In the late 19th century, the Court began to hold that the Due
Process Clause prohibits the States from infringing Bill of Rights pro-
tections. See, *e.g., Hurtado* v. *California*, 110 U. S. 516. Five fea-
tures of the approach taken during the ensuing era are noted. First,
the Court viewed the due process question as entirely separate from
the question whether a right was a privilege or immunity of national

citizenship. See *Twining* v. *New Jersey*, 211 U. S. 78, 99. Second, the Court explained that the only rights due process protected against state infringement were those "of such a nature that they are included in the conception of due process of law." *Ibid.* Third, some cases during this era "can be seen as having asked . . . if a civilized system could be imagined that would not accord the particular protection" asserted therein. *Duncan* v. *Louisiana*, 391 U. S. 145, 149, n. 14. Fourth, the Court did not hesitate to hold that a Bill of Rights guarantee failed to meet the test for Due Process Clause protection, finding, *e.g.,* that freedom of speech and press qualified, *Gitlow* v. *New York*, 268 U. S. 652, 666; *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, but the grand jury indictment requirement did not, *Hurtado, supra.* Finally, even when such a right was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from those provided against abridgment by the Federal Government. Pp. 11–13.

(2) Justice Black championed the alternative theory that §1 of the Fourteenth Amendment totally incorporated all of the Bill of Rights' provisions, see, *e.g.*, *Adamson* v. *California*, 332 U. S. 46, 71–72 (Black, J., dissenting), but the Court never has embraced that theory. Pp. 13–15.

(3) The Court eventually moved in the direction advocated by Justice Black, by adopting a theory of selective incorporation by which the Due Process Clause incorporates particular rights contained in the first eight Amendments. See, *e.g.*, *Gideon* v. *Wainwright*, 372 U. S. 335, 341. These decisions abandoned three of the characteristics of the earlier period. The Court clarified that the governing standard is whether a particular Bill of Rights protection is fundamental to our Nation's particular scheme of ordered liberty and system of justice. *Duncan, supra*, at 149, n. 14. The Court eventually held that almost all of the Bill of Rights' guarantees met the requirements for protection under the Due Process Clause. The Court also held that Bill of Rights protections must "all . . . be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy* v. *Hogan*, 378 U. S. 1, 10. Under this approach, the Court overruled earlier decisions holding that particular Bill of Rights guarantees or remedies did not apply to the States. See, *e.g.*, *Gideon, supra,* which overruled *Betts* v. *Brady*, 316 U. S. 455. Pp. 15–19.

(d) The Fourteenth Amendment makes the Second Amendment right to keep and bear arms fully applicable to the States. Pp. 19–33.

(1) The Court must decide whether that right is fundamental to the Nation's scheme of ordered liberty, *Duncan* v. *Louisiana*, 391

U. S. 145, 149, or, as the Court has said in a related context, whether it is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg,* 521 U. S. 702, 721. *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present, and the *Heller* Court held that individual self-defense is "the central component" of the Second Amendment right. 554 U. S., at ___, ___. Explaining that "the need for defense of self, family, and property is most acute" in the home, *ibid.*, the Court found that this right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *id.*, at ___, ___–___. It thus concluded that citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.*, at ___. *Heller* also clarifies that this right is "deeply rooted in this Nation's history and traditions,*" Glucksberg, supra,* at 721. *Heller* explored the right's origins in English law and noted the esteem with which the right was regarded during the colonial era and at the time of the ratification of the Bill of Rights. This is powerful evidence that the right was regarded as fundamental in the sense relevant here. That understanding persisted in the years immediately following the Bill of Rights' ratification and is confirmed by the state constitutions of that era, which protected the right to keep and bear arms. Pp. 19–22.

(2) A survey of the contemporaneous history also demonstrates clearly that the Fourteenth Amendment's Framers and ratifiers counted the right to keep and bear arms among those fundamental rights necessary to the Nation's system of ordered liberty. Pp. 22–33.

(i) By the 1850's, the fear that the National Government would disarm the universal militia had largely faded, but the right to keep and bear arms was highly valued for self-defense. Abolitionist authors wrote in support of the right, and attempts to disarm "Free-Soilers" in "Bloody Kansas," met with outrage that the constitutional right to keep and bear arms had been taken from the people. After the Civil War, the Southern States engaged in systematic efforts to disarm and injure African Americans, see *Heller*, *supra,* at ___. These injustices prompted the 39th Congress to pass the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1866 to protect the right to keep and bear arms. Congress, however, ultimately deemed these legislative remedies insufficient, and approved the Fourteenth Amendment. Today, it is generally accepted that that Amendment was understood to provide a constitutional basis for protecting the rights set out in the Civil Rights Act. See *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 389. In Congressional debates on the proposed Amendment, its legislative proponents in the 39th Congress referred to the right to keep and bear arms as a fun-

damental right deserving of protection. Evidence from the period immediately following the Amendment's ratification confirms that that right was considered fundamental. Pp. 22–31.

(ii) Despite all this evidence, municipal respondents argue that Members of Congress overwhelmingly viewed §1 of the Fourteenth Amendment as purely an antidiscrimination rule. But while §1 does contain an antidiscrimination rule, *i.e.,* the Equal Protection Clause, it can hardly be said that the section does no more than prohibit discrimination. If what municipal respondents mean is that the Second Amendment should be singled out for special—and specially unfavorable—treatment, the Court rejects the suggestion. The right to keep and bear arms must be regarded as a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner. Pp. 30–33.

JUSTICE ALITO, joined by THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY, concluded, in Parts II–C, IV, and V, that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right recognized in *Heller.* Pp. 10–11, 33–44.

(a) Petitioners argue that that the Second Amendment right is one of the "privileges or immunities of citizens of the United States." There is no need to reconsider the Court's interpretation of the Privileges or Immunities Clause in the *Slaughter-House Cases* because, for many decades, the Court has analyzed the question whether particular rights are protected against state infringement under the Fourteenth Amendment's Due Process Clause. Pp. 10–11.

(b) Municipal respondents' remaining arguments are rejected because they are at war with *Heller*'s central holding. In effect, they ask the Court to hold the right to keep and bear arms as subject to a different body of rules for incorporation than the other Bill of Rights guarantees. Pp. 33–40.

(c) The dissents' objections are addressed and rejected. Pp. 41–44.

JUSTICE THOMAS agreed that the Fourteenth Amendment makes the Second Amendment right to keep and bear arms that was recognized in *District of Columbia* v. *Heller*, 554 U. S. \_\_\_, fully applicable to the States. However, he asserted, there is a path to this conclusion that is more straightforward and more faithful to the Second Amendment's text and history. The Court is correct in describing the Second Amendment right as "fundamental" to the American scheme of ordered liberty, *Duncan* v. *Louisiana*, 391 U. S. 145, 149, and "deeply rooted in this Nation's history and traditions," *Washington* v. *Glucksberg*, 521 U. S. 702, 721. But the Fourteenth Amendment's Due Process Clause, which speaks only to "process," cannot impose the type of substantive restraint on state legislation that the Court asserts. Rather, the right to keep and bear arms is enforceable

against the States because it is a privilege of American citizenship recognized by §1 of the Fourteenth Amendment, which provides, *inter alia:* "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." In interpreting this language, it is important to recall that constitutional provisions are " 'written to be understood by the voters.' " *Heller*, 554 U. S., at ___. The objective of this inquiry is to discern what "ordinary citizens" at the time of the Fourteenth Amendment's ratification would have understood that Amendment's Privileges or Immunities Clause to mean. *Ibid.* A survey of contemporary legal authorities plainly shows that, at that time, the ratifying public understood the Clause to protect constitutionally enumerated rights, including the right to keep and bear arms. Pp. 1–34.

ALITO, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, III–A, and III–B, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and an opinion with respect to Parts II–C, IV, and V, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., join. SCALIA, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed a dissenting opinion. BREYER, J., filed a dissenting opinion, in which GINSBURG and SO-TOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1521

OTIS McDONALD, ET AL., PETITIONERS *v.* CITY OF CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, III–A, and III–B, in which THE CHIEF JUSTICE, JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, and an opinion with respect to Parts II–C, IV, and V, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join.

Two years ago, in *District of Columbia* v. *Heller*, 554 U. S. ___ (2008), we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home. The city of Chicago (City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia's, but Chicago and Oak Park argue that their laws are constitutional because the Second Amendment has no application to the States. We have previously held that most of the provisions of the Bill of Rights apply with full force to both the Federal Government and the States. Applying the standard that is well established in our case law, we hold that the Second Amendment right is fully

applicable to the States.

I

Otis McDonald, Adam Orlov, Colleen Lawson, and David Lawson (Chicago petitioners) are Chicago residents who would like to keep handguns in their homes for self-defense but are prohibited from doing so by Chicago's firearms laws. A City ordinance provides that "[n]o person shall . . . possess . . . any firearm unless such person is the holder of a valid registration certificate for such firearm." Chicago, Ill., Municipal Code §8–20–040(a) (2009). The Code then prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City. §8–20–050(c). Like Chicago, Oak Park makes it "unlawful for any person to possess . . . any firearm," a term that includes "pistols, revolvers, guns and small arms . . . commonly known as handguns." Oak Park, Ill., Municipal Code §§27–2–1 (2007), 27–1–1 (2009).

Chicago enacted its handgun ban to protect its residents "from the loss of property and injury or death from firearms." See Chicago, Ill., Journal of Proceedings of the City Council, p. 10049 (Mar. 19, 1982). The Chicago petitioners and their *amici*, however, argue that the handgun ban has left them vulnerable to criminals. Chicago Police Department statistics, we are told, reveal that the City's handgun murder rate has actually increased since the ban was enacted[1] and that Chicago residents now face one of the highest murder rates in the country and rates of other violent crimes that exceed the average in comparable cities.[2]

––––––––––
[1] See Brief for Heartland Institute as *Amicus Curiae* 6–7 (noting that handgun murder rate was 9.65 in 1983 and 13.88 in 2008).

[2] Brief for Buckeye Firearms Foundation, Inc., et al. as *Amici Curiae* 8–9 ("In 2002 and again in 2008, Chicago had more murders than any other city in the U. S., including the much larger Los Angeles and New

Several of the Chicago petitioners have been the targets of threats and violence. For instance, Otis McDonald, who is in his late seventies, lives in a high-crime neighborhood. He is a community activist involved with alternative policing strategies, and his efforts to improve his neighborhood have subjected him to violent threats from drug dealers. App. 16–17; Brief for State Firearm Associations as *Amici Curiae* 20–21; Brief for State of Texas et al. as *Amici Curiae* 7–8. Colleen Lawson is a Chicago resident whose home has been targeted by burglars. "In Mrs. Lawson's judgment, possessing a handgun in Chicago would decrease her chances of suffering serious injury or death should she ever be threatened again in her home."[3] McDonald, Lawson, and the other Chicago petitioners own handguns that they store outside of the city limits, but they would like to keep their handguns in their homes for protection. See App. 16–19, 43–44 (McDonald), 20–24 (C. Lawson), 19, 36 (Orlov), 20–21, 40 (D. Lawson).

After our decision in *Heller*, the Chicago petitioners and two groups[4] filed suit against the City in the United States District Court for the Northern District of Illinois. They sought a declaration that the handgun ban and several related Chicago ordinances violate the Second and Fourteenth Amendments to the United States Constitution. Another action challenging the Oak Park law was filed in the same District Court by the National Rifle Association (NRA) and two Oak Park residents. In addition, the NRA and others filed a third action challenging the Chicago

—————

York" (internal quotation marks omitted)); see also Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* 17–21, and App. A (providing comparisons of Chicago's rates of assault, murder, and robbery to average crime rates in 24 other large cities).

[3] Brief for Women State Legislators et al. as *Amici Curiae* 2.

[4] The Illinois State Rifle Association and the Second Amendment Foundation, Inc.

ordinances. All three cases were assigned to the same District Judge.

The District Court rejected plaintiffs' argument that the Chicago and Oak Park laws are unconstitutional. See App. 83–84; *NRA, Inc.* v. *Oak Park*, 617 F. Supp. 2d 752, 754 (ND Ill. 2008). The court noted that the Seventh Circuit had "squarely upheld the constitutionality of a ban on handguns a quarter century ago," *id*., at 753 (citing *Quilici* v. *Morton Grove*, 695 F. 2d 261 (CA7 1982)), and that *Heller* had explicitly refrained from "opin[ing] on the subject of incorporation vel non of the Second Amendment," *NRA*, 617 F. Supp. 2d, at 754. The court observed that a district judge has a "duty to follow established precedent in the Court of Appeals to which he or she is beholden, even though the logic of more recent caselaw may point in a different direction." *Id.,* at 753.

The Seventh Circuit affirmed, relying on three 19th-century cases—*United States* v. *Cruikshank*, 92 U. S. 542 (1876), *Presser* v. *Illinois*, 116 U. S. 252 (1886), and *Miller* v. *Texas*, 153 U. S. 535 (1894)—that were decided in the wake of this Court's interpretation of the Privileges or Immunities Clause of the Fourteenth Amendment in the *Slaughter-House Cases,* 16 Wall. 36 (1873). The Seventh Circuit described the rationale of those cases as "defunct" and recognized that they did not consider the question whether the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right to keep and bear arms. *NRA, Inc.* v. *Chicago*, 567 F. 3d 856, 857, 858 (2009). Nevertheless, the Seventh Circuit observed that it was obligated to follow Supreme Court precedents that have "direct application," and it declined to predict how the Second Amendment would fare under this Court's modern "selective incorporation" approach. *Id.,* at 857–858 (internal quotation marks omitted).

We granted certiorari. 557 U. S. ___ (2009).

## II

## A

Petitioners argue that the Chicago and Oak Park laws violate the right to keep and bear arms for two reasons. Petitioners' primary submission is that this right is among the "privileges or immunities of citizens of the United States" and that the narrow interpretation of the Privileges or Immunities Clause adopted in the *Slaughter-House Cases*, *supra*, should now be rejected. As a secondary argument, petitioners contend that the Fourteenth Amendment's Due Process Clause "incorporates" the Second Amendment right.

Chicago and Oak Park (municipal respondents) maintain that a right set out in the Bill of Rights applies to the States only if that right is an indispensable attribute of *any* "'civilized'" legal system. Brief for Municipal Respondents 9. If it is possible to imagine a civilized country that does not recognize the right, the municipal respondents tell us, then that right is not protected by due process. *Ibid.* And since there are civilized countries that ban or strictly regulate the private possession of handguns, the municipal respondents maintain that due process does not preclude such measures. *Id.*, at 21–23. In light of the parties' far-reaching arguments, we begin by recounting this Court's analysis over the years of the relationship between the provisions of the Bill of Rights and the States.

## B

The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government. In *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243 (1833), the Court, in an opinion by Chief Justice Marshall, explained that this question was "of great importance" but "not of much difficulty." *Id.*, at 247. In less than four pages, the Court firmly rejected the proposition that the first eight Amendments operate as limitations on the

States, holding that they apply only to the Federal Government. See also *Lessee of Livingston* v. *Moore*, 7 Pet. 469, 551–552 (1833) ("[I]t is now settled that those amendments [in the Bill of Rights] do not extend to the states").

The constitutional Amendments adopted in the aftermath of the Civil War fundamentally altered our country's federal system. The provision at issue in this case, §1 of the Fourteenth Amendment, provides, among other things, that a State may not abridge "the privileges or immunities of citizens of the United States" or deprive "any person of life, liberty, or property, without due process of law."

Four years after the adoption of the Fourteenth Amendment, this Court was asked to interpret the Amendment's reference to "the privileges or immunities of citizens of the United States." The *Slaughter-House Cases*, *supra*, involved challenges to a Louisiana law permitting the creation of a state-sanctioned monopoly on the butchering of animals within the city of New Orleans. Justice Samuel Miller's opinion for the Court concluded that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.*, at 79. The Court held that other fundamental rights—rights that predated the creation of the Federal Government and that "the State governments were created to establish and secure"—were not protected by the Clause. *Id.*, at 76.

In drawing a sharp distinction between the rights of federal and state citizenship, the Court relied on two principal arguments. First, the Court emphasized that the Fourteenth Amendment's Privileges or Immunities Clause spoke of "the privileges or immunities of *citizens of the United States*," and the Court contrasted this phrasing with the wording in the first sentence of the Fourteenth Amendment and in the Privileges and Immunities Clause

of Article IV, both of which refer to *state* citizenship.[5]
(Emphasis added.) Second, the Court stated that a con-
trary reading would "radically chang[e] the whole theory
of the relations of the State and Federal governments to
each other and of both these governments to the people,"
and the Court refused to conclude that such a change had
been made "in the absence of language which expresses
such a purpose too clearly to admit of doubt." *Id.*, at 78.
Finding the phrase "privileges or immunities of citizens of
the United States" lacking by this high standard, the
Court reasoned that the phrase must mean something
more limited.

Under the Court's narrow reading, the Privileges or
Immunities Clause protects such things as the right

> "to come to the seat of government to assert any claim
> [a citizen] may have upon that government, to trans-
> act any business he may have with it, to seek its pro-
> tection, to share its offices, to engage in administering
> its functions . . . [and to] become a citizen of any State
> of the Union by a *bonâ fide* residence therein, with the
> same rights as other citizens of that State." *Id.*, at
> 79–80 (internal quotation marks omitted).

Finding no constitutional protection against state intru-
sion of the kind envisioned by the Louisiana statute, the
Court upheld the statute. Four Justices dissented. Jus-
tice Field, joined by Chief Justice Chase and Justices
Swayne and Bradley, criticized the majority for reducing
the Fourteenth Amendment's Privileges or Immunities

---

[5]The first sentence of the Fourteenth Amendment makes "[a]ll per-
sons born or naturalized in the United States and subject to the juris-
diction thereof . . . citizens of the United States *and of the State wherein
they reside*." (Emphasis added.) The Privileges and Immunities Clause
of Article IV provides that "[t]he Citizens of each State shall be entitled
to all Privileges and Immunities of *Citizens in the several States*."
(Emphasis added.)

Clause to "a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage." *Id.*, at 96; see also *id.*, at 104. Justice Field opined that the Privileges or Immunities Clause protects rights that are "in their nature . . . fundamental," including the right of every man to pursue his profession without the imposition of unequal or discriminatory restrictions. *Id.*, at 96–97. Justice Bradley's dissent observed that "we are not bound to resort to implication . . . to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself." *Id.*, at 118. Justice Bradley would have construed the Privileges or Immunities Clause to include those rights enumerated in the Constitution as well as some unenumerated rights. *Id.*, at 119. Justice Swayne described the majority's narrow reading of the Privileges or Immunities Clause as "turn[ing] . . . what was meant for bread into a stone." *Id.*, at 129 (dissenting opinion).

Today, many legal scholars dispute the correctness of the narrow *Slaughter-House* interpretation. See, *e.g.*, *Saenz* v. *Roe*, 526 U. S. 489, 522, n. 1, 527 (1999) (THOMAS, J., dissenting) (scholars of the Fourteenth Amendment agree "that the Clause does not mean what the Court said it meant in 1873"); Amar, Substance and Method in the Year 2000, 28 Pepperdine L. Rev. 601, 631, n. 178 (2001) ("Virtually no serious modern scholar—left, right, and center—thinks that this [interpretation] is a plausible reading of the Amendment"); Brief for Constitutional Law Professors as *Amici Curiae* 33 (claiming an "overwhelming consensus among leading constitutional scholars" that the opinion is "egregiously wrong"); C. Black, A New Birth of Freedom 74–75 (1997).

Three years after the decision in the *Slaughter-House Cases,* the Court decided *Cruikshank,* the first of the three 19th-century cases on which the Seventh Circuit relied.

92 U. S. 542. In that case, the Court reviewed convictions stemming from the infamous Colfax Massacre in Louisiana on Easter Sunday 1873. Dozens of blacks, many unarmed, were slaughtered by a rival band of armed white men.[6] Cruikshank himself allegedly marched unarmed African-American prisoners through the streets and then had them summarily executed.[7] Ninety-seven men were indicted for participating in the massacre, but only nine went to trial. Six of the nine were acquitted of all charges; the remaining three were acquitted of murder but convicted under the Enforcement Act of 1870, 16 Stat. 140, for banding and conspiring together to deprive their victims of various constitutional rights, including the right to bear arms.[8]

The Court reversed all of the convictions, including those relating to the deprivation of the victims' right to bear arms. *Cruikshank*, 92 U. S., at 553, 559. The Court wrote that the right of bearing arms for a lawful purpose "is not a right granted by the Constitution" and is not "in any manner dependent upon that instrument for its existence." *Id.*, at 553. "The second amendment," the Court continued, "declares that it shall not be infringed; but this . . . means no more than that it shall not be infringed by Congress." *Ibid.* "Our later decisions in *Presser* v. *Illinois,* 116 U. S. 252, 265 (1886), and *Miller* v. *Texas,* 153 U. S. 535, 538 (1894), reaffirmed that the Second Amendment applies only to the Federal Government." *Heller*, 554 U. S., at ___, n. 23 (slip op., at 48, n. 23).

--------

[6] See C. Lane, The Day Freedom Died 265–266 (2008); see also Brief for NAACP Legal Defense & Education Fund, Inc., as *Amicus Curiae* 3, and n. 2.

[7] See Lane, *supra*, at 106.

[8] *United States* v. *Cruikshank*, 92 U. S. 542, 544–545 (statement of the case), 548, 553 (opinion of the Court) (1875); Lawrence, Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes, 67 Tulane L. Rev. 2113, 2153 (1993).

## C

As previously noted, the Seventh Circuit concluded that *Cruikshank*, *Presser*, and *Miller* doomed petitioners' claims at the Court of Appeals level. Petitioners argue, however, that we should overrule those decisions and hold that the right to keep and bear arms is one of the "privileges or immunities of citizens of the United States." In petitioners' view, the Privileges or Immunities Clause protects all of the rights set out in the Bill of Rights, as well as some others, see Brief for Petitioners 10, 14, 15–21, but petitioners are unable to identify the Clause's full scope, Tr. of Oral Arg. 5–6, 8–11. Nor is there any consensus on that question among the scholars who agree that the *Slaughter-House Cases'* interpretation is flawed. See *Saenz*, *supra*, at 522, n. 1 (THOMAS, J., dissenting).

We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the *Slaughter-House* holding.

At the same time, however, this Court's decisions in *Cruikshank*, *Presser*, and *Miller* do not preclude us from considering whether the Due Process Clause of the Fourteenth Amendment makes the Second Amendment right binding on the States. See *Heller*, 554 U. S., at ___, n. 23 (slip op., at 48, n. 23). None of those cases "engage[d] in the sort of Fourteenth Amendment inquiry required by our later cases." *Ibid.* As explained more fully below, *Cruikshank*, *Presser*, and *Miller* all preceded the era in which the Court began the process of "selective incorporation" under the Due Process Clause, and we have never previously addressed the question whether the right to keep and bear arms applies to the States under that theory.

Indeed, *Cruikshank* has not prevented us from holding that other rights that were at issue in that case are binding on the States through the Due Process Clause. In *Cruikshank*, the Court held that the general "right of the people peaceably to assemble for lawful purposes," which is protected by the First Amendment, applied only against the Federal Government and not against the States. See 92 U. S., at 551–552. Nonetheless, over 60 years later the Court held that the right of peaceful assembly was a "fundamental righ[t] . . . safeguarded by the due process clause of the Fourteenth Amendment." *De Jonge* v. *Oregon*, 299 U. S. 353, 364 (1937). We follow the same path here and thus consider whether the right to keep and bear arms applies to the States under the Due Process Clause.

## D

### 1

In the late 19th century, the Court began to consider whether the Due Process Clause prohibits the States from infringing rights set out in the Bill of Rights. See *Hurtado* v. *California*, 110 U. S. 516 (1884) (due process does not require grand jury indictment); *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897) (due process prohibits States from taking of private property for public use without just compensation). Five features of the approach taken during the ensuing era should be noted.

First, the Court viewed the due process question as entirely separate from the question whether a right was a privilege or immunity of national citizenship. See *Twining* v. *New Jersey*, 211 U. S. 78, 99 (1908).

Second, the Court explained that the only rights protected against state infringement by the Due Process Clause were those rights "of such a nature that they are included in the conception of due process of law." *Ibid.* See also, *e.g.*, *Adamson* v. *California*, 332 U. S. 46 (1947); *Betts* v. *Brady*, 316 U. S. 455 (1942); *Palko* v. *Connecticut,*

302 U. S. 319 (1937); *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936); *Powell* v. *Alabama*, 287 U. S. 45 (1932). While it was "possible that some of the personal rights safeguarded by the first eight Amendments against National action [might] also be safeguarded against state action," the Court stated, this was "not because those rights are enumerated in the first eight Amendments." *Twining, supra,* at 99.

The Court used different formulations in describing the boundaries of due process. For example, in *Twining*, the Court referred to "immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." 211 U. S., at 102 (internal quotation marks omitted). In *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934), the Court spoke of rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." And in *Palko*, the Court famously said that due process protects those rights that are "the very essence of a scheme of ordered liberty" and essential to "a fair and enlightened system of justice." 302 U. S., at 325.

Third, in some cases decided during this era the Court "can be seen as having asked, when inquiring into whether some particular procedural safeguard was required of a State, if a civilized system could be imagined that would not accord the particular protection." *Duncan* v. *Louisiana*, 391 U. S. 145, 149, n. 14 (1968). Thus, in holding that due process prohibits a State from taking private property without just compensation, the Court described the right as "a principle of natural equity, recognized by all temperate and civilized governments, from a deep and universal sense of its justice." *Chicago, B. & Q. R. Co., supra,* at 238. Similarly, the Court found that due process did not provide a right against compelled incrimination in part because this right "has no place in the jurisprudence of civilized and free countries outside

the domain of the common law." *Twining, supra*, at 113.

Fourth, the Court during this era was not hesitant to hold that a right set out in the Bill of Rights failed to meet the test for inclusion within the protection of the Due Process Clause. The Court found that some such rights qualified. See, *e.g.*, *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925) (freedom of speech and press); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931) (same); *Powell, supra* (assistance of counsel in capital cases); *De Jonge, supra* (freedom of assembly); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (free exercise of religion). But others did not. See, *e.g.*, *Hurtado, supra* (grand jury indictment requirement); *Twining, supra* (privilege against self-incrimination).

Finally, even when a right set out in the Bill of Rights was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from the protection or remedies provided against abridgment by the Federal Government. To give one example, in *Betts* the Court held that, although the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, the Due Process Clause required appointment of counsel in state criminal proceedings only where "want of counsel in [the] particular case . . . result[ed] in a conviction lacking in . . . fundamental fairness." 316 U. S., at 473. Similarly, in *Wolf* v. *Colorado*, 338 U. S. 25 (1949), the Court held that the "core of the Fourth Amendment" was implicit in the concept of ordered liberty and thus "enforceable against the States through the Due Process Clause" but that the exclusionary rule, which applied in federal cases, did not apply to the States. *Id.*, at 27–28, 33.

2

An alternative theory regarding the relationship be-

tween the Bill of Rights and §1 of the Fourteenth Amendment was championed by Justice Black. This theory held that §1 of the Fourteenth Amendment totally incorporated all of the provisions of the Bill of Rights. See, *e.g.*, *Adamson*, *supra*, at 71–72 (Black, J., dissenting); *Duncan*, *supra*, at 166 (Black, J., concurring). As Justice Black noted, the chief congressional proponents of the Fourteenth Amendment espoused the view that the Amendment made the Bill of Rights applicable to the States and, in so doing, overruled this Court's decision in *Barron*.[9] *Adamson*, 332 U. S., at 72 (dissenting opinion).[10] None-

———————

[9] Senator Jacob Howard, who spoke on behalf of the Joint Committee on Reconstruction and sponsored the Amendment in the Senate, stated that the Amendment protected all of "the personal rights guaranteed and secured by the first eight amendments of the Constitution." Cong. Globe, 39th Cong., 1st Sess., 2765 (1866) (hereinafter 39th Cong. Globe). Representative John Bingham, the principal author of the text of §1, said that the Amendment would "arm the Congress . . . with the power to enforce the bill of rights as it stands in the Constitution today." *Id.*, at 1088; see also *id.*, at 1089–1090; A. Amar, The Bill of Rights: Creation and Reconstruction 183 (1998) (hereinafter Amar, Bill of Rights). After ratification of the Amendment, Bingham maintained the view that the rights guaranteed by §1 of the Fourteenth Amendment "are chiefly defined in the first eight amendments to the Constitution of the United States." Cong. Globe, 42d Cong., 1st Sess., App. 84 (1871). Finally, Representative Thaddeus Stevens, the political leader of the House and acting chairman of the Joint Committee on Reconstruction, stated during the debates on the Amendment that "the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States." 39th Cong. Globe 2459; see also M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 112 (1986) (counting at least 30 statements during the debates in Congress interpreting §1 to incorporate the Bill of Rights); Brief for Constitutional Law Professors as *Amici Curiae* 20 (collecting authorities and stating that "[n]ot a single senator or representative disputed [the incorporationist] understanding" of the Fourteenth Amendment).

[10] The municipal respondents and some of their *amici* dispute the significance of these statements. They contend that the phrase "privi-

theless, the Court never has embraced Justice Black's "total incorporation" theory.

3

While Justice Black's theory was never adopted, the Court eventually moved in that direction by initiating what has been called a process of "selective incorporation," *i.e.*, the Court began to hold that the Due Process Clause fully incorporates particular rights contained in the first eight Amendments. See, *e.g.*, *Gideon* v. *Wainwright*, 372 U. S. 335, 341 (1963); *Malloy* v. *Hogan*, 378 U. S. 1, 5–6

——————

leges or immunities" is not naturally read to mean the rights set out in the first eight Amendments, see Brief for Historians et al. as *Amici Curiae* 13–16, and that "there is 'support in the legislative history for no fewer than four interpretations of the . . . Privileges or Immunities Clause.'" Brief for Municipal Respondents 69 (quoting Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406 (2008); brackets omitted). They question whether there is sound evidence of "'any strong public awareness of nationalizing the *entire* Bill of Rights.'" Brief for Municipal Respondents 69 (quoting Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L. J. 1509, 1600 (2007)). Scholars have also disputed the total incorporation theory. See, *e.g.*, Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5 (1949); Berger, Incorporation of the Bill of Rights in the Fourteenth Amendment: A Nine-Lived Cat, 42 Ohio St. L. J. 435 (1981).

Proponents of the view that §1 of the Fourteenth Amendment makes all of the provisions of the Bill of Rights applicable to the States respond that the terms privileges, immunities, and rights were used interchangeably at the time, see, *e.g.*, Curtis, *supra*, at 64–65, and that the position taken by the leading congressional proponents of the Amendment was widely publicized and understood, see, *e.g.*, Wildenthal, *supra*, at 1564–1565, 1590; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L. Rev. 695 (2009). A number of scholars have found support for the total incorporation of the Bill of Rights. See Curtis, *supra*, at 57–130; Aynes, On Misreading John Bingham and the Fourteenth Amendment, 103 Yale L. J. 57, 61 (1993); see also Amar, Bill of Rights 181–230. We take no position with respect to this academic debate.

(1964); *Pointer* v. *Texas*, 380 U. S. 400, 403–404 (1965); *Washington* v. *Texas*, 388 U. S. 14, 18 (1967); *Duncan*, 391 U. S., at 147–148; *Benton* v. *Maryland*, 395 U. S. 784, 794 (1969).

The decisions during this time abandoned three of the previously noted characteristics of the earlier period.[11] The Court made it clear that the governing standard is not whether *any* "civilized system [can] be imagined that would not accord the particular protection." *Duncan*, 391 U. S., at 149, n. 14. Instead, the Court inquired whether a particular Bill of Rights guarantee is fundamental to *our* scheme of ordered liberty and system of justice. *Id*., at 149, and n. 14; see also *id.,* at 148 (referring to those "fundamental principles of liberty and justice which lie at the base of all *our* civil and political institutions" (emphasis added; internal quotation marks omitted)).

The Court also shed any reluctance to hold that rights guaranteed by the Bill of Rights met the requirements for protection under the Due Process Clause. The Court eventually incorporated almost all of the provisions of the Bill of Rights.[12] Only a handful of the Bill of Rights pro-

―――――――

[11] By contrast, the Court has never retreated from the proposition that the Privileges or Immunities Clause and the Due Process Clause present different questions. And in recent cases addressing unenumerated rights, we have required that a right also be "implicit in the concept of ordered liberty." See, *e.g.*, *Washington* v. *Glucksberg*, 521 U. S. 702, 721 (1997) (internal quotation marks omitted).

[12] With respect to the First Amendment, see *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947) (Establishment Clause); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (Free Exercise Clause); *De Jonge* v. *Oregon*, 299 U. S. 353 (1937) (freedom of assembly); *Gitlow* v. *New York*, 268 U. S. 652 (1925) (free speech); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931) (freedom of the press).

With respect to the Fourth Amendment, see *Aguilar* v. *Texas*, 378 U. S. 108 (1964) (warrant requirement); *Mapp* v. *Ohio*, 367 U. S. 643 (1961) (exclusionary rule); *Wolf* v. *Colorado*, 338 U. S. 25 (1949) (freedom from unreasonable searches and seizures).

With respect to the Fifth Amendment, see *Benton* v. *Maryland*, 395

tections remain unincorporated.[13]

Finally, the Court abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court." *Malloy*, 378 U. S., at 10–11 (internal quotation marks omitted). Instead, the Court decisively held that incorporated Bill of

––––––––

U. S. 784 (1969) (Double Jeopardy Clause); *Malloy* v. *Hogan*, 378 U. S. 1 (1964) (privilege against self-incrimination); *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897) (Just Compensation Clause).

With respect to the Sixth Amendment, see *Duncan* v. *Louisiana*, 391 U. S. 145 (1968) (trial by jury in criminal cases); *Washington* v. *Texas*, 388 U. S. 14 (1967) (compulsory process); *Klopfer* v. *North Carolina*, 386 U. S. 213 (1967) (speedy trial); *Pointer* v. *Texas*, 380 U. S. 400 (1965) (right to confront adverse witness); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (assistance of counsel); *In re Oliver*, 333 U. S. 257 (1948) (right to a public trial).

With respect to the Eighth Amendment, see *Robinson* v. *California*, 370 U. S. 660 (1962) (cruel and unusual punishment); *Schilb* v. *Kuebel*, 404 U. S. 357 (1971) (prohibition against excessive bail).

[13] In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict, see n. 14, *infra*), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause. See *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 276, n. 22 (1989) (declining to decide whether the excessive-fines protection applies to the States); see also *Engblom* v. *Carey*, 677 F. 2d 957, 961 (CA2 1982) (holding as a matter of first impression that the "Third Amendment is incorporated into the Fourteenth Amendment for application to the states").

Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation.

Rights protections "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.*, at 10; see also *Mapp* v. *Ohio*, 367 U. S. 643, 655–656 (1961); *Ker* v. *California*, 374 U. S. 23, 33–34 (1963); *Aguilar* v. *Texas*, 378 U. S. 108, 110 (1964); *Pointer*, 380 U. S., at 406; *Duncan, supra*, at 149, 157–158; *Benton*, 395 U. S., at 794–795; *Wallace* v. *Jaffree*, 472 U. S. 38, 48–49 (1985).[14]

Employing this approach, the Court overruled earlier decisions in which it had held that particular Bill of Rights

---

[14] There is one exception to this general rule. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials. See *Apodaca* v. *Oregon*, 406 U. S. 404 (1972); see also *Johnson* v. *Louisiana*, 406 U. S. 356 (1972) (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials). But that ruling was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation. In *Apodaca*, eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. See *Johnson, supra*, at 395 (Brennan, J., dissenting). Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, *Apodaca*, 406 U. S., at 406 (plurality opinion), and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials, *id.*, at 414–415 (Stewart, J., dissenting); *Johnson, supra*, at 381–382 (Douglas, J., dissenting). Justice Powell's concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases. *Apodaca*, therefore, does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government. See *Johnson, supra*, at 395–396 (Brennan, J., dissenting) (footnote omitted) ("In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States, the Sixth Amendment's jury trial guarantee, however it is to be construed, has identical application against both State and Federal Governments").

guarantees or remedies did not apply to the States. See, *e.g.*, *Mapp*, *supra* (overruling in part *Wolf*, 338 U. S. 25); *Gideon*, 372 U. S. 335 (overruling *Betts*, 316 U. S. 455); *Malloy*, *supra* (overruling *Adamson*, 332 U. S. 46, and *Twining*, 211 U. S. 78); *Benton, supra*, at 794 (overruling *Palko*, 302 U. S. 319).

## III

With this framework in mind, we now turn directly to the question whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process. In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan,* 391 U. S., at 149, or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997) (internal quotation marks omitted).

## A

Our decision in *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day,[15] and in *Heller,* we held that individual self-defense is "the *central component*" of the Second Amendment right. 554 U. S., at \_\_\_ (slip op., at 26); see also *id.*, at \_\_\_ (slip op., at 56) (stating that the "inherent right of self-defense has been central to the Second Amendment right"). Explaining that "the need for defense of self, family, and property is most acute" in the home, *ibid.*, we found that this right applies to handguns because they are "the most preferred

_____

[15] Citing Jewish, Greek, and Roman law, Blackstone wrote that if a person killed an attacker, "the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame." 4 W. Blackstone, Commentaries on the Laws of England 182 (reprint 1992).

firearm in the nation to 'keep' and use for protection of one's home and family," *id.*, at ___ (slip op., at 57) (some internal quotation marks omitted); see also *id.*, at ___ (slip op., at 56) (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense); *id.*, at ___ (slip op., at 57) ("[T]he American people have considered the handgun to be the quintessential self-defense weapon"). Thus, we concluded, citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.*, at ___ (slip op., at 58).

*Heller* makes it clear that this right is "deeply rooted in this Nation's history and tradition.*" Glucksberg, supra,* at 721 (internal quotation marks omitted). *Heller* explored the right's origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U. S., at ___–___ (slip op., at 19–20), and that by 1765, Blackstone was able to assert that the right to keep and bear arms was "one of the fundamental rights of Englishmen," *id.*, at ___ (slip op., at 20).

Blackstone's assessment was shared by the American colonists. As we noted in *Heller*, King George III's attempt to disarm the colonists in the 1760's and 1770's "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms."[16] *Id.*, at ___ (slip op., at 21); see also L. Levy, Origins of the Bill of Rights 137–143 (1999) (hereinafter Levy).

The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of

-------

[16] For example, an article in the Boston Evening Post stated: "For it is certainly beyond human art and sophistry, to prove the British subjects, to whom the privilege of possessing arms is expressly recognized by the Bill of Rights, and, who live in a province where the law requires them to be equip'd with arms, &c. are guilty of an illegal act, in calling upon one another to be provided with them, as the law directs." Boston Evening Post, Feb. 6, 1769, in Boston Under Military Rule 1768–1769, p. 61 (1936) (emphasis deleted).

Rights. "During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric." *Heller*, *supra*, at \_\_\_ (slip op., at 25) (citing Letters from the Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti-Federalist 234, 242 (H. Storing ed. 1981)); see also Federal Farmer: An Additional Number of Letters to the Republican, Letter XVIII (Jan. 25, 1788), in 17 Documentary History of the Ratification of the Constitution 360, 362–363 (J. Kaminski & G. Saladino eds. 1995); S. Halbrook, The Founders' Second Amendment 171–278 (2008). Federalists responded, not by arguing that the right was insufficiently important to warrant protection but by contending that the right was adequately protected by the Constitution's assignment of only limited powers to the Federal Government. *Heller*, *supra*, at \_\_\_ (slip op., at 25–26); cf. The Federalist No. 46, p. 296 (C. Rossiter ed. 1961) (J. Madison). Thus, Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government. See Levy 143–149; J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 155–164 (1994). But those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution. See 1 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 327–331 (2d ed. 1854); 3 *id.*, at 657–661; 4 *id.*, at 242–246, 248–249; see also Levy 26–34; A. Kelly & W. Harbison, The American Constitution: Its Origins and Development 110, 118 (7th ed. 1991). This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here.

This understanding persisted in the years immediately following the ratification of the Bill of Rights. In addition

to the four States that had adopted Second Amendment analogues before ratification, nine more States adopted state constitutional provisions protecting an individual right to keep and bear arms between 1789 and 1820. *Heller*, *supra*, at ___ (slip op., at 27–30). Founding-era legal commentators confirmed the importance of the right to early Americans. St. George Tucker, for example, described the right to keep and bear arms as "the true palladium of liberty" and explained that prohibitions on the right would place liberty "on the brink of destruction." 1 Blackstone's Commentaries, Editor's App. 300 (S. Tucker ed. 1803); see also W. Rawle, A View of the Constitution of the United States of America, 125–126 (2d ed. 1829) (reprint 2009); 3 J. Story, Commentaries on the Constitution of the United States §1890, p. 746 (1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them").

## B

### 1

By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense. See M. Doubler, Civilian in Peace, Soldier in War 87–90 (2003); Amar, Bill of Rights 258–259. Abolitionist authors wrote in support of the right. See L. Spooner, The Unconstitutionality of Slavery 66 (1860) (reprint 1965); J. Tiffany, A Treatise on the Unconstitutionality of American Slavery 117–118 (1849) (reprint 1969). And when attempts were

made to disarm "Free-Soilers" in "Bloody Kansas," Senator Charles Sumner, who later played a leading role in the adoption of the Fourteenth Amendment, proclaimed that "[n]ever was [the rifle] more needed in just self-defense than now in Kansas." The Crime Against Kansas: The Apologies for the Crime: The True Remedy, Speech of Hon. Charles Sumner in the Senate of the United States 64–65 (1856). Indeed, the 1856 Republican Party Platform protested that in Kansas the constitutional rights of the people had been "fraudulently and violently taken from them" and the "right of the people to keep and bear arms" had been "infringed." National Party Platforms 1840–1972, p. 27 (5th ed. 1973).[17]

After the Civil War, many of the over 180,000 African Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks. See *Heller*, 554 U. S., at \_\_\_ (slip op., at 42); E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, p. 8 (1988) (hereinafter Foner). The laws of some States formally prohibited African Americans from possessing firearms. For example, a Mississippi law provided that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife." Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, §1, in 1 Documentary History of Reconstruction 289 (W. Fleming ed. 1950); see also Regulations for Freedmen in Louisiana, in *id.*, at 279–280; H. R. Exec.

---

[17]Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right. The 1864 Democratic Party Platform complained that the confiscation of firearms by Union troops occupying parts of the South constituted "the interference with and denial of the right of the people to bear arms in their defense." National Party Platforms 1840–1972, at 34.

Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866) (describing a Kentucky law); E. McPherson, The Political History of the United States of America During the Period of Reconstruction 40 (1871) (describing a Florida law); *id.*, at 33 (describing an Alabama law).[18]

Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves. In the first session of the 39th Congress, Senator Wilson told his colleagues: "In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country." 39th Cong. Globe 40 (1865). The Report of the Joint Committee on Reconstruction—which was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents shortly after Congress approved the Fourteenth Amendment[19]—contained numerous examples of such abuses. See, *e.g.*, Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, pp. 219, 229, 272, pt. 3,

———————

[18] In South Carolina, prominent black citizens held a convention to address the State's black code. They drafted a memorial to Congress, in which they included a plea for protection of their constitutional right to keep and bear arms: "'We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed . . . that the late efforts of the Legislature of this State to pass an act to deprive us [of] arms be forbidden, as a plain violation of the Constitution.'" S. Halbrook, Freedmen, The Fourteenth Amendment, and The Right to Bear Arms, 1866–1876, p. 9 (1998) (hereinafter Halbrook, Freedmen) (quoting 2 Proceedings of the Black State Conventions, 1840–1865, p. 302 (P. Foner & G. Walker eds. 1980)). Senator Charles Sumner relayed the memorial to the Senate and described the memorial as a request that black citizens "have the constitutional protection in keeping arms." 39th Cong. Globe 337.

[19] See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 265–266 (1914); *Adamson* v. *California*, 332 U. S. 46, 108–109 (1947) (appendix to dissenting opinion of Black, J.).

pp. 46, 140, pt. 4, pp. 49–50 (1866); see also S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 23–24, 26, 36 (1865). In one town, the "marshal [took] all arms from returned colored soldiers, and [was] very prompt in shooting the blacks whenever an opportunity occur[red]." H. R. Exec. Doc. No. 70, at 238 (internal quotation marks omitted). As Senator Wilson put it during the debate on a failed proposal to disband Southern militias: "There is one unbroken chain of testimony from all people that are loyal to this country, that the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description." 39th Cong. Globe 915 (1866).[20]

Union Army commanders took steps to secure the right of all citizens to keep and bear arms,[21] but the 39th Con-

——————

[20] Disarmament by bands of former Confederate soldiers eventually gave way to attacks by the Ku Klux Klan. In debates over the later enacted Enforcement Act of 1870, Senator John Pool observed that the Klan would "order the colored men to give up their arms; saying that everybody would be Kukluxed in whose house fire-arms were found." Cong. Globe, 41st Cong., 2d Sess., 2719 (1870); see also H. R. Exec. Doc. No. 268, 42d Cong., 2d Sess., 2 (1872).

[21] For example, the occupying Union commander in South Carolina issued an order stating that "[t]he constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed." General Order No. 1, Department of South Carolina, January 1, 1866, in 1 Documentary History of Reconstruction 208 (W. Fleming ed. 1950). Union officials in Georgia issued a similar order, declaring that "'[a]ll men, without the distinction of color, have the right to keep arms to defend their homes, families or themselves.'" Cramer, "This Right is Not Allowed by Governments That Are Afraid of The People": The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified, 17 Geo. Mason L. Rev. 823, 854 (2010) (hereinafter Cramer) (quoting Right to Bear Arms, Christian Recorder, Feb. 24, 1866, pp. 1–2). In addition, when made aware of attempts by armed parties to disarm blacks, the head of the Freedmen's Bureau in Alabama "made public [his] determination to maintain the right of the negro to keep and to bear arms, and [his] disposition to send an armed force into any neighborhood in which that right should be systemati-

gress concluded that legislative action was necessary. Its efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental.

The most explicit evidence of Congress' aim appears in §14 of the Freedmen's Bureau Act of 1866, which provided that "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery." 14 Stat. 176–177 (emphasis added).[22] Section 14 thus explicitly guaranteed that "all the citizens," black and white, would have "the constitutional right to bear arms."

The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms.[23] Section 1 of the Civil Rights Act

————————

[22]The Freedmen's Bureau bill was amended to include an express reference to the right to keep and bear arms, see 39th Cong. Globe 654 (Rep. Thomas Eliot), even though at least some Members believed that the unamended version alone would have protected the right, see *id.*, at 743 (Sen. Lyman Trumbull).

[23]There can be do doubt that the principal proponents of the Civil Rights Act of 1866 meant to end the disarmament of African Americans in the South. In introducing the bill, Senator Trumbull described its purpose as securing to blacks the "privileges which are essential to freemen." *Id.*, at 474. He then pointed to the previously described Mississippi law that "prohibit[ed] any negro or mulatto from having fire-arms" and explained that the bill would "destroy" such laws. *Ibid.* Similarly, Representative Sidney Clarke cited disarmament of freedmen in Alabama and Mississippi as a reason to support the Civil Rights Act and to continue to deny Alabama and Mississippi representation in Congress: "I regret, sir, that justice compels me to say, to the disgrace

————————

cally interfered with." Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, p. 140 (1866).

guaranteed the "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." *Ibid.* This language was virtually identical to language in §14 of the Freedmen's Bureau Act, 14 Stat. 176–177 ("the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal"). And as noted, the latter provision went on to explain that one of the "laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal" was "the constitutional right to bear arms." *Ibid.* Representative Bingham believed that the Civil Rights Act protected the same rights as enumerated in the Freedmen's Bureau bill, which of course explicitly mentioned the right to keep and bear arms. 39th Cong. Globe 1292. The unavoidable conclusion is that the Civil Rights Act, like the Freedmen's Bureau Act, aimed to protect "the constitutional right to bear arms" and not simply to prohibit discrimination. See also Amar, Bill of Rights 264–265 (noting that one of the "core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances" of freedmen who had been stripped of their arms and to "affirm the full and equal right of every citizen to self-defense").

Congress, however, ultimately deemed these legislative

_____

of the Federal Government, that the 'reconstructed' State authorities of Mississippi were allowed to rob and disarm our veteran soldiers and arm the rebels fresh from the field of treasonable strife. Sir, the disarmed loyalists of Alabama, Mississippi, and Louisiana are powerless to-day, and oppressed by the pardoned and encouraged rebels of those States. They appeal to the American Congress for protection. In response to this appeal I shall vote for every just measure of protection, for I do not intend to be among the treacherous violators of the solemn pledge of the nation." *Id.*, at 1838–1839.

remedies insufficient. Southern resistance, Presidential
vetoes, and this Court's pre-Civil-War precedent per-
suaded Congress that a constitutional amendment was
necessary to provide full protection for the rights of
blacks.[24] Today, it is generally accepted that the Four-
teenth Amendment was understood to provide a constitu-
tional basis for protecting the rights set out in the Civil
Rights Act of 1866. See *General Building Contractors
Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 389 (1982); see
also Amar, Bill of Rights 187; Calabresi, Two Cheers for
Professor Balkin's Originalism, 103 Nw. U. L. Rev. 663,
669–670 (2009).

In debating the Fourteenth Amendment, the 39th Con-
gress referred to the right to keep and bear arms as a
fundamental right deserving of protection. Senator Sam-
uel Pomeroy described three "indispensable" "safeguards
of liberty under our form of Government." 39th Cong.
Globe 1182. One of these, he said, was the right to keep
and bear arms:

> "Every man . . . should have the right to bear arms
> for the defense of himself and family and his home-
> stead. And if the cabin door of the freedman is broken
> open and the intruder enters for purposes as vile as
> were known to slavery, then should a well-loaded
> musket be in the hand of the occupant to send the pol-
> luted wretch to another world, where his wretched-
> ness will forever remain complete." *Ibid.*

Even those who thought the Fourteenth Amendment
unnecessary believed that blacks, as citizens, "have equal

---

[24] For example, at least one southern court had held the Civil Rights
Act to be unconstitutional. That court did so, moreover, in the course of
upholding the conviction of an African-American man for violating
Mississippi's law against firearm possession by freedmen. See Decision
of Chief Justice Handy, Declaring the Civil Rights Bill Unconstitu-
tional, N. Y. Times, Oct. 26, 1866, p. 2, col. 3.

right to protection, and to keep and bear arms for self-defense." *Id.*, at 1073 (Sen. James Nye); see also Foner 258–259.[25]

Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental. In an 1868 speech addressing the disarmament of freedmen, Representative Stevens emphasized the necessity of the right: "Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty." "The fourteenth amendment, now so happily adopted, settles the whole question." Cong. Globe, 40th Cong., 2d Sess., 1967. And in debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South. See Halbrook, Freedmen 120–131. Finally, legal commentators from the period emphasized the fundamental nature of the right. See, *e.g.*, T. Farrar, Manual of the Constitution of the United States of America §118, p. 145 (1867) (reprint 1993); J. Pomeroy, An Introduction to the Constitutional Law of the United States §239, pp. 152–153 (3d ed. 1875).

The right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified. In 1868, 22 of the 37 States in the Union had state constitutional provisions

———————

[25] Other Members of the 39th Congress stressed the importance of the right to keep and bear arms in discussing other measures. In speaking generally on reconstruction, Representative Roswell Hart listed the "'right of the people to keep and bear arms'" as among those rights necessary to a "republican form of government." 39th Cong. Globe 1629. Similarly, in objecting to a bill designed to disarm southern militias, Senator Willard Saulsbury argued that such a measure would violate the Second Amendment. *Id.*, at 914–915. Indeed, the bill "ultimately passed in a form that disbanded militias but maintained the right of individuals to their private firearms." Cramer 858.

explicitly protecting the right to keep and bear arms. See Calabresi & Agudo, Individual Rights Under State Constitutions when the Fourteenth Amendment was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition? 87 Texas L. Rev. 7, 50 (2008).[26] Quite a few of these state constitutional guarantees, moreover, explicitly protected the right to keep and bear arms as an individual right to self-defense. See Ala. Const., Art. I, §28 (1868); Conn. Const., Art. I, §17 (1818); Ky. Const., Art. XIII, §25 (1850); Mich. Const., Art. XVIII, §7 (1850); Miss. Const., Art. I, §15 (1868); Mo. Const., Art. I, §8 (1865); Tex. Const., Art. I, §13 (1869); see also Mont. Const., Art. III, §13 (1889); Wash. Const., Art. I, §24 (1889); Wyo. Const., Art. I, §24 (1889); see also *State* v. *McAdams*, 714 P. 2d 1236, 1238 (Wyo. 1986). What is more, state constitutions adopted during the Reconstruction era by former Confederate States included a right to keep and bear arms. See, *e.g.*, Ark. Const., Art. I, §5 (1868); Miss. Const., Art. I, §15 (1868); Tex. Const., Art. I, §13 (1869). A clear majority of the States in 1868, therefore, recognized the right to keep and bear arms as being among the foundational rights necessary to our system of Government.[27]

---

[26] More generally worded provisions in the constitutions of seven other States may also have encompassed a right to bear arms. See Calabresi & Agudo, 87 Texas L. Rev., at 52.

[27] These state constitutional protections often reflected a lack of law enforcement in many sections of the country. In the frontier towns that did not have an effective police force, law enforcement often could not pursue criminals beyond the town borders. See Brief for Rocky Mountain Gun Owners et al. as *Amici Curiae* 15. Settlers in the West and elsewhere, therefore, were left to "repe[l] force by force when the intervention of society . . . [was] too late to prevent an injury." *District of Columbia* v. *Heller*, 554 U. S. ___ , ___ (2008) (slip op., at 21) (internal quotation marks omitted). The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded these state constitutional guarantees. See *id.*, at ___, ___, ___ (slip op, at 26,

In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.

2

Despite all this evidence, municipal respondents contend that Congress, in the years immediately following the Civil War, merely sought to outlaw "discriminatory measures taken against freedmen, which it addressed by adopting a non-discrimination principle" and that even an outright ban on the possession of firearms was regarded as acceptable, "so long as it was not done in a discriminatory manner." Brief for Municipal Respondents 7. They argue that Members of Congress overwhelmingly viewed §1 of the Fourteenth Amendment "as an antidiscrimination rule," and they cite statements to the effect that the section would outlaw discriminatory measures. *Id.*, at 64. This argument is implausible.

First, while §1 of the Fourteenth Amendment contains "an antidiscrimination rule," namely, the Equal Protection Clause, municipal respondents can hardly mean that §1 does no more than prohibit discrimination. If that were so, then the First Amendment, as applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion; the Fourth Amendment, as applied to the States, would not prohibit all unreasonable searches and seizures but only discriminatory searches and seizures—and so on. We assume that this is not municipal respondents' view, so what they must mean is that the Second Amendment should be singled out for special—and specially unfavorable—treatment. We reject that suggestion.

Second, municipal respondents' argument ignores the

36, 42).

clear terms of the Freedmen's Bureau Act of 1866, which acknowledged the existence of the right to bear arms. If that law had used language such as "the equal benefit of laws concerning the bearing of arms," it would be possible to interpret it as simply a prohibition of racial discrimination. But §14 speaks of and protects "the constitutional right to bear arms," an unmistakable reference to the right protected by the Second Amendment. And it protects the "full and equal benefit" of this right in the States. 14 Stat. 176–177. It would have been nonsensical for Congress to guarantee the full and equal benefit of a constitutional right that does not exist.

Third, if the 39th Congress had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers. In the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in the formal sense. Any such law—like the Chicago and Oak Park ordinances challenged here—presumably would have permitted the possession of guns by those acting under the authority of the State and would thus have left firearms in the hands of the militia and local peace officers. And as the Report of the Joint Committee on Reconstruction revealed, see *supra*, at 24–25, those groups were widely involved in harassing blacks in the South.

Fourth, municipal respondents' purely antidiscrimination theory of the Fourteenth Amendment disregards the plight of whites in the South who opposed the Black Codes. If the 39th Congress and the ratifying public had simply prohibited racial discrimination with respect to the bearing of arms, opponents of the Black Codes would have been left without the means of self-defense—as had abolitionists in Kansas in the 1850's.

Fifth, the 39th Congress' response to proposals to disband and disarm the Southern militias is instructive. Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them. See 39th Cong. Globe 914; Halbrook, Freedmen, *supra*, 20–21. Disarmament, it was argued, would violate the members' right to bear arms, and it was ultimately decided to disband the militias but not to disarm their members. See Act of Mar. 2, 1867, §6, 14 Stat. 485, 487; Halbrook, Freedmen 68–69; Cramer 858–861. It cannot be doubted that the right to bear arms was regarded as a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner.

## IV

Municipal respondents' remaining arguments are at war with our central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. Municipal respondents, in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.

Municipal respondents' main argument is nothing less than a plea to disregard 50 years of incorporation precedent and return (presumably for this case only) to a bygone era. Municipal respondents submit that the Due Process Clause protects only those rights "'recognized by all temperate and civilized governments, from a deep and universal sense of [their] justice.'" Brief for Municipal Respondents 9 (quoting *Chicago, B. & Q. R. Co.*, 166 U. S., at 238). According to municipal respondents, if it is possible to imagine *any* civilized legal system that does not recognize a particular right, then the Due Process Clause

does not make that right binding on the States. Brief for
Municipal Respondents 9. Therefore, the municipal re-
spondents continue, because such countries as England,
Canada, Australia, Japan, Denmark, Finland, Luxem-
bourg, and New Zealand either ban or severely limit
handgun ownership, it must follow that no right to possess
such weapons is protected by the Fourteenth Amendment.
*Id.*, at 21–23.

   This line of argument is, of course, inconsistent with the
long-established standard we apply in incorporation cases.
See *Duncan*, 391 U. S., at 149, and n. 14. And the pre-
sent-day implications of municipal respondents' argument
are stunning. For example, many of the rights that our
Bill of Rights provides for persons accused of criminal
offenses are virtually unique to this country.[28]    If *our*

———————

   [28] For example, the United States affords criminal jury trials far more
broadly than other countries. See, *e.g.*, Van Kessel, Adversary Excesses
in the American Criminal Trial, 67 Notre Dame L. Rev. 403 (1992);
Leib, A Comparison of Criminal Jury Decision Rules in Democratic
Countries, 5 Ohio St. J. Crim. L. 629, 630 (2008); Henderson, The
Wrongs of Victim's Rights, 37 Stan. L. Rev. 937, 1003, n. 296 (1985); see
also *Roper* v. *Simmons*, 543 U. S. 551, 624 (2005) (SCALIA, J., dissent-
ing) ("In many significant respects the laws of most other countries
differ from our law—including . . . such explicit provisions of our
Constitution as the right to jury trial"). Similarly, our rules governing
pretrial interrogation differ from those in countries sharing a similar
legal heritage. See Dept. of Justice, Office of Legal Policy, Report to the
Attorney General on the Law of Pretrial Interrogation: Truth in Crimi-
nal Justice Report No. 1 (Feb. 12, 1986), reprinted in 22 U. Mich. J. L.
Ref. 437, 534–542 (1989) (comparing the system envisioned by *Miranda*
v. *Arizona*, 384 U. S. 436 (1966), with rights afforded by England,
Scotland, Canada, India, France, and Germany). And the "Court-
pronounced exclusionary rule . . . is distinctively American." *Roper*,
*supra*, at 624 (SCALIA, J., dissenting) (citing *Bivens* v. *Six Unknown
Fed. Narcotics Agents*, 403 U. S. 388, 415 (1971) (Burger, C. J., dissent-
ing) (noting that exclusionary rule was "unique to American jurispru-
dence" (internal quotation marks omitted))); see also Sklansky, Anti-
Inquisitorialism, 122 Harv. L. Rev. 1634, 1648–1656, 1689–1693 (2009)
(discussing the differences between American and European confronta-

understanding of the right to a jury trial, the right against self-incrimination, and the right to counsel were necessary attributes of *any* civilized country, it would follow that the United States is the only civilized Nation in the world.

Municipal respondents attempt to salvage their position by suggesting that their argument applies only to substantive as opposed to procedural rights. Brief for Municipal Respondents 10, n. 3. But even in this trimmed form, municipal respondents' argument flies in the face of more than a half-century of precedent. For example, in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 8 (1947), the Court held that the Fourteenth Amendment incorporates the Establishment Clause of the First Amendment. Yet several of the countries that municipal respondents recognize as civilized have established state churches.[29] If we were to adopt municipal respondents' theory, all of this Court's Establishment Clause precedents involving actions taken by state and local governments would go by the boards.

Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a

—————

tion rules).

[29] England and Denmark have state churches. See Torke, The English Religious Establishment, 12 J. of Law & Religion 399, 417–427 (1995–1996) (describing legal status of Church of England); Constitutional Act of Denmark, pt. I, §4 (1953) ("The Evangelical Lutheran Church shall be the Established Church of Denmark"). The Evangelical Lutheran Church of Finland has attributes of a state church. See Christensen, Is the Lutheran Church Still the State Church? An Analysis of Church-State Relations in Finland, 1995 B. Y. U. L. Rev. 585, 596–600 (describing status of church under Finnish law). The Web site of the Evangelical Lutheran Church of Finland states that the church may be usefully described as both a "state church" and a "folk church." See J. Seppo, The Current Condition of Church-State Relations in Finland, online at http://evl.fi/EVLen.nsf/Documents/838DDBEF 4A28712AC225730F001F7C67?OpenDocument&lang=EN (all Internet materials as visited June 23, 2010, and available in Clerk of Court's case file).

deadly implement and thus has implications for public safety. Brief for Municipal Respondents 11. And they note that there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. *Id.*, at 11, 13–17.

The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. See, *e.g.*, *Hudson* v. *Michigan*, 547 U. S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States* v. *Leon*, 468 U. S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker* v. *Wingo*, 407 U. S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda* v. *Arizona*, 384 U. S. 436, 517 (1966) (Harlan, J., dissenting); *id.*, at 542 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases . . . will return a killer, a rapist or other criminal to the streets . . . to repeat his crime"); *Mapp*, 367 U. S., at 659. Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications.

We likewise reject municipal respondents' argument that we should depart from our established incorporation methodology on the ground that making the Second Amendment binding on the States and their subdivisions is inconsistent with principles of federalism and will stifle experimentation. Municipal respondents point out—quite correctly—that conditions and problems differ from locality to locality and that citizens in different jurisdictions

have divergent views on the issue of gun control. Municipal respondents therefore urge us to allow state and local governments to enact any gun control law that they deem to be reasonable, including a complete ban on the possession of handguns in the home for self-defense. Brief for Municipal Respondents 18–20, 23.

There is nothing new in the argument that, in order to respect federalism and allow useful state experimentation, a federal constitutional right should not be fully binding on the States. This argument was made repeatedly and eloquently by Members of this Court who rejected the concept of incorporation and urged retention of the two-track approach to incorporation. Throughout the era of "selective incorporation," Justice Harlan in particular, invoking the values of federalism and state experimentation, fought a determined rearguard action to preserve the two-track approach. See, *e.g.*, *Roth* v. *United States*, 354 U. S. 476, 500–503 (1957) (Harlan, J., concurring in result in part and dissenting in part); *Mapp*, *supra*, at 678–680 (Harlan, J., dissenting); *Gideon*, 372 U. S., at 352 (Harlan, J., concurring); *Malloy*, 378 U. S., at 14–33 (Harlan, J., dissenting); *Pointer*, 380 U. S., at 408–409 (Harlan, J., concurring in result); *Washington*, 388 U. S., at 23–24 (Harlan, J., concurring in result); *Duncan*, 391 U. S., at 171–193 (Harlan, J., dissenting); *Benton*, 395 U. S., at 808–809 (Harlan, J., dissenting); *Williams* v. *Florida*, 399 U. S. 78, 117 (1970) (Harlan, J., dissenting in part and concurring in result in part).

Time and again, however, those pleas failed. Unless we turn back the clock or adopt a special incorporation test applicable only to the Second Amendment, municipal respondents' argument must be rejected. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless *stare decisis* counsels

otherwise,[30] that guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as *amici* supporting petitioners, "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." Brief for State of Texas et al. as *Amici Curiae* 23.

Municipal respondents and their *amici* complain that incorporation of the Second Amendment right will lead to extensive and costly litigation, but this argument applies with even greater force to constitutional rights and remedies that have already been held to be binding on the States. Consider the exclusionary rule. Although the exclusionary rule "is not an individual right," *Herring* v. *United States*, 555 U. S. ___ (2009) (slip op., at 5), but a "judicially created rule," *id.*, at ___ (slip op., at 4), this Court made the rule applicable to the States. See *Mapp*, *supra*, at 660. The exclusionary rule is said to result in "tens of thousands of contested suppression motions each year." Stuntz, The Virtues and Vices of the Exclusionary Rule, 20 Harv. J. Law & Pub. Pol'y, 443, 444 (1997).

––––––––––

[30] As noted above, see n. 13, *supra*, cases that predate the era of selective incorporation held that the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement do not apply to the States. See *Hurtado* v. *California*, 110 U. S. 516 (1884) (indictment); *Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211 (1916) (civil jury).

As a result of *Hurtado*, most States do not require a grand jury indictment in all felony cases, and many have no grand juries. See Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, State Court Organization 2004, pp. 213, 215–217 (2006) (Table 38), online at http://bjs.ojp.usdoj.gov/content/pub/pdf/sco04.pdf.

As a result of *Bombolis*, cases that would otherwise fall within the Seventh Amendment are now tried without a jury in state small claims courts. See, *e.g.*, *Cheung* v. *Eighth Judicial Dist. Court*, 121 Nev. 867, 124 P. 3d 550 (2005) (no right to jury trial in small claims court under Nevada Constitution).

Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to "interest-balancing" and have sustained a variety of restrictions. Brief for Municipal Respondents 23–31. In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, 554 U. S., at \_\_\_–\_\_\_ (slip op., at 62–63), and this Court decades ago abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," *Malloy, supra*, at 10–11 (internal quotation marks omitted).

As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting *amici* cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller*. Municipal respondents cite precisely one case (from the late 20th century) in which such a ban was sustained. See Brief for Municipal Respondents 26–27 (citing *Kalodimos* v. *Morton Grove*, 103 Ill. 2d 483, 470 N. E. 2d 266 (1984)); see also Reply Brief for Respondents NRA et al. 23, n. 7 (asserting that no other court has ever upheld a complete ban on the possession of handguns). It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U. S., at \_\_\_ (slip op., at 54). We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying

of firearms in sensitive places such as schools and gov-
ernment buildings, or laws imposing conditions and quali-
fications on the commercial sale of arms." *Id.*, at ___–___
(slip op., at 54–55). We repeat those assurances here.
Despite municipal respondents' doomsday proclamations,
incorporation does not imperil every law regulating
firearms.

Municipal respondents argue, finally, that the right to
keep and bear arms is unique among the rights set out in
the first eight Amendments "because the reason for codify-
ing the Second Amendment (to protect the militia) differs
from the purpose (primarily, to use firearms to engage in
self-defense) that is claimed to make the right implicit in
the concept of ordered liberty." Brief for Municipal Re-
spondents 36–37. Municipal respondents suggest that the
Second Amendment right differs from the rights hereto-
fore incorporated because the latter were "valued for
[their] own sake." *Id.*, at 33. But we have never previ-
ously suggested that incorporation of a right turns on
whether it has intrinsic as opposed to instrumental value,
and quite a few of the rights previously held to be incorpo-
rated—for example the right to counsel and the right to
confront and subpoena witnesses—are clearly instrumen-
tal by any measure. Moreover, this contention repackages
one of the chief arguments that we rejected in *Heller*, *i.e.*,
that the scope of the Second Amendment right is defined
by the immediate threat that led to the inclusion of that
right in the Bill of Rights. In *Heller*, we recognized that
the codification of this right was prompted by fear that the
Federal Government would disarm and thus disable the
militias, but we rejected the suggestion that the right was
valued only as a means of preserving the militias. 554
U. S., at ___ (slip op., at 26). On the contrary, we stressed
that the right was also valued because the possession of
firearms was thought to be essential for self-defense. As
we put it, self-defense was "the *central component* of the

right itself." *Ibid.*

## V

## A

We turn, finally, to the two dissenting opinions. JUSTICE STEVENS' eloquent opinion covers ground already addressed, and therefore little need be added in response. JUSTICE STEVENS would "'ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments.'" *Post,* at 8 (quoting *Malloy*, 378 U. S., at 24 (Harlan, J., dissenting)). The question presented in this case, in his view, "is whether the particular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom." *Post*, at 27. He would hold that "[t]he rights protected against state infringement by the Fourteenth Amendment's Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights." *Post*, at 9.

As we have explained, the Court, for the past half-century, has moved away from the two-track approach. If we were now to accept JUSTICE STEVENS' theory across the board, decades of decisions would be undermined. We assume that this is not what is proposed. What is urged instead, it appears, is that this theory be revived solely for the individual right that *Heller* recognized, over vigorous dissents.

The relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle. It is far too late to exhume what Justice Brennan, writing for the Court 46 years ago, derided as "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *Malloy*, *supra*, at 10–11 (internal quotation marks omitted).

## B

JUSTICE BREYER's dissent makes several points to which we briefly respond. To begin, while there is certainly room for disagreement about *Heller*'s analysis of the history of the right to keep and bear arms, nothing written since *Heller* persuades us to reopen the question there decided. Few other questions of original meaning have been as thoroughly explored.

JUSTICE BREYER's conclusion that the Fourteenth Amendment does not incorporate the right to keep and bear arms appears to rest primarily on four factors: First, "there is no popular consensus" that the right is fundamental, *post*, at 9; second, the right does not protect minorities or persons neglected by those holding political power, *post*, at 10; third, incorporation of the Second Amendment right would "amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the States and the Federal Government" and preventing local variations, *post*, at 11; and fourth, determining the scope of the Second Amendment right in cases involving state and local laws will force judges to answer difficult empirical questions regarding matters that are outside their area of expertise, *post*, at 11–16. Even if we believed that these factors were relevant to the incorporation inquiry, none of these factors undermines the case for incorporation of the right to keep and bear arms for self-defense.

First, we have never held that a provision of the Bill of Rights applies to the States only if there is a "popular consensus" that the right is fundamental, and we see no basis for such a rule. But in this case, as it turns out, there is evidence of such a consensus. An *amicus* brief submitted by 58 Members of the Senate and 251 Members of the House of Representatives urges us to hold that the right to keep and bear arms is fundamental. See Brief for Senator Kay Bailey Hutchison et al. as *Amici Curiae* 4.

Another brief submitted by 38 States takes the same position. Brief for State of Texas et al. as *Amici Curiae* 6.

Second, petitioners and many others who live in high-crime areas dispute the proposition that the Second Amendment right does not protect minorities and those lacking political clout. The plight of Chicagoans living in high-crime areas was recently highlighted when two Illinois legislators representing Chicago districts called on the Governor to deploy the Illinois National Guard to patrol the City's streets.[31] The legislators noted that the number of Chicago homicide victims during the current year equaled the number of American soldiers killed during that same period in Afghanistan and Iraq and that 80% of the Chicago victims were black.[32] *Amici* supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime.[33] If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials.

---

[31] See Mack & Burnette, 2 Lawmakers to Quinn: Send the Guard to Chicago, Chicago Tribune, Apr. 26, 2010, p. 6.

[32] Janssen & Knowles, Send in Troops? Chicago Sun-Times, Apr. 26, 2010, p. 2; see also Brief for NAACP Legal Defense & Education Fund, Inc., as *Amicus Curiae* 5, n. 4 (stating that in 2008, almost three out of every four homicide victims in Chicago were African Americans); *id.*, at 5–6 (noting that "each year [in Chicago], many times more African Americans are murdered by assailants wielding guns than were killed during the Colfax massacre" (footnote omitted)).

[33] See Brief for Women State Legislators et al. as *Amici Curiae* 9–10, 14–15; Brief for Jews for the Preservation of Firearms Ownership as *Amicus Curiae* 3–4; see also Brief for Pink Pistols et al. as *Amici Curiae* in *District of Columbia* v. *Heller*, O. T. 2007, No. 07–290, pp. 5–11.

Third, JUSTICE BREYER is correct that incorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U. S., at __ (slip op., at 64). This conclusion is no more remarkable with respect to the Second Amendment than it is with respect to all the other limitations on state power found in the Constitution.

Finally, JUSTICE BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. See *supr*a, at 38–39. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, *supra*, at ___ (slip op., at 62–63).

\*     \*     \*

In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. See *Duncan*, 391 U. S., at 149, and n. 14. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. The judgment of the

Opinion of ALITO, J.

Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1521

_____

OTIS MCDONALD, ET AL., PETITIONERS *v.* CITY OF
CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE SCALIA, concurring.

I join the Court's opinion. Despite my misgivings about
Substantive Due Process as an original matter, I have
acquiesced in the Court's incorporation of certain guaran-
tees in the Bill of Rights "because it is both long estab-
lished and narrowly limited." *Albright* v. *Oliver*, 510 U. S.
266, 275 (1994) (SCALIA, J., concurring). This case does
not require me to reconsider that view, since straightfor-
ward application of settled doctrine suffices to decide it.

I write separately only to respond to some aspects of
JUSTICE STEVENS' dissent. Not that aspect which dis-
agrees with the majority's application of our precedents to
this case, which is fully covered by the Court's opinion.
But much of what JUSTICE STEVENS writes is a broad
condemnation of the theory of interpretation which under-
lies the Court's opinion, a theory that makes the traditions
of our people paramount. He proposes a different theory,
which he claims is more "cautiou[s]" and respectful of
proper limits on the judicial role. *Post*, at 57. It is that
claim I wish to address.

I

A

After stressing the substantive dimension of what he

has renamed the "liberty clause," *post*, at 4–7,[1] JUSTICE
STEVENS proceeds to urge readoption of the theory of
incorporation articulated in *Palko* v. *Connecticut*, 302
U. S. 319, 325 (1937), see *post*, at 14–20.  But in fact he
does not favor application of that theory at all.   For
whether *Palko* requires only that "a fair and enlightened
system of justice would be impossible without" the right
sought to be incorporated, 302 U. S., at 325, or requires in
addition that the right be rooted in the "traditions and
conscience of our people," *ibid.* (internal quotation marks
omitted), many of the rights JUSTICE STEVENS thinks are
incorporated could not pass muster under either test:
abortion, *post*, at 7 (citing *Planned Parenthood of South-
eastern Pa.* v. *Casey*, 505 U. S. 833, 847 (1992)); homosex-
ual sodomy, *post*, at 16 (citing *Lawrence* v. *Texas*, 539
U. S. 558, 572 (2003)); the right to have excluded from
criminal trials evidence obtained in violation of the Fourth
Amendment, *post*, at 18 (citing *Mapp* v. *Ohio*, 367 U. S.
643, 650, 655–657 (1961)); and the right to teach one's
children foreign languages, *post*, at 7 (citing *Meyer* v.
*Nebraska*, 262 U. S. 390, 399–403 (1923)), among others.

That JUSTICE STEVENS is not applying any version of
*Palko* is clear from comparing, on the one hand, the rights
he believes *are* covered, with, on the other hand, his con-
clusion that the right to keep and bear arms is *not* cov-
ered.   Rights that pass his test include not just those
"relating to marriage, procreation, contraception, family
relationships, and child rearing and education," but also
rights against "[g]overnment action that shocks the con-

_____

[1] I do not entirely understand JUSTICE STEVENS' renaming of the Due
Process Clause.  What we call it, of course, does not change what the
Clause says, but shorthand should not obscure what it says.  Accepting
for argument's sake the shift in emphasis—from avoiding certain
deprivations without that "process" which is "due," to avoiding the
deprivations themselves—the Clause applies not just to deprivations of
"liberty," but also to deprivations of "life" and even "property."

science, pointlessly infringes settled expectations, tres-
passes into sensitive private realms or life choices without
adequate justification, [or] perpetrates gross injustice."
*Post*, at 23 (internal quotation marks omitted).  Not *all*
such rights are in, however, since only "*some* fundamental
aspects of personhood, dignity, and the like" are protected,
*post*, at 24 (emphasis added).  Exactly what is covered is
not clear.  But whatever else is in, he *knows* that the right
to keep and bear arms is out, despite its being as "deeply
rooted in this Nation's history and tradition," *Washington*
v. *Glucksberg*, 521 U. S. 702, 721 (1997) (internal quota-
tion marks omitted), as a right can be, see *District of
Columbia* v. *Heller*, 554 U. S. ___, ___–___, ___–___, ___–
___ (2008) (slip op., at 20–21, 26–30, 41–44).  I can find no
other explanation for such certitude except that JUSTICE
STEVENS, despite his forswearing of "personal and private
notions," *post*, at 21 (internal quotation marks omitted),
deeply believes it should be out.

The subjective nature of JUSTICE STEVENS' standard is
also apparent from his claim that it is the courts' preroga-
tive—indeed their *duty*—to update the Due Process Clause
so that it encompasses new freedoms the Framers were
too narrow-minded to imagine, *post*, at 19–20, and n. 21.
Courts, he proclaims, must "do justice to [the Clause's]
urgent call and its open texture" by exercising the "inter-
pretive discretion the latter embodies." *Post*, at 21. (Why
the *people* are not up to the task of deciding what new
rights to protect, even though it is *they* who are authorized
to make changes, see U. S. Const., Art. V, is never ex-
plained.[2])  And it would be "judicial abdication" for a judge
to "tur[n] his back" on *his* task of determining what the

--------

[2] JUSTICE STEVENS insists that he would not make courts the *sole*
interpreters of the "liberty clause"; he graciously invites "[a]ll Ameri-
cans" to ponder what the Clause means to them today. *Post*, at 20, n.
22.  The problem is that in his approach the people's ponderings do not
matter, since whatever the people decide, courts have the last word.

Fourteenth Amendment covers by "outsourc[ing]" the job
to "historical sentiment," *post*, at 20—that is, by being
guided by what the American people throughout our his-
tory have thought. It is only we judges, exercising our
"own reasoned judgment," *post*, at 15, who can be en-
trusted with deciding the Due Process Clause's scope—
which rights serve the Amendment's "central values," *post*,
at 23—which basically means picking the rights we want
to protect and discarding those we do not.

## B

JUSTICE STEVENS resists this description, insisting that
his approach provides plenty of "guideposts" and "con-
straints" to keep courts from "injecting excessive subjectiv-
ity" into the process.[3] *Post*, at 21. Plenty indeed—and
that alone is a problem. The ability of omnidirectional
guideposts to constrain is inversely proportional to their
number. But even individually, each lodestar or limitation
he lists either is incapable of restraining judicial whimsy
or cannot be squared with the precedents he seeks to
preserve.

He begins with a brief nod to history, *post*, at 21, but as

---

[3] JUSTICE BREYER is not worried by that prospect. His interpretive
approach applied to incorporation of the Second Amendment includes
consideration of such factors as "the extent to which incorporation will
further other, perhaps more basic, constitutional aims; and the extent
to which incorporation will advance or hinder the Constitution's struc-
tural aims"; whether recognizing a particular right will "further the
Constitution's effort to ensure that the government treats each individ-
ual with equal respect" or will "help maintain the democratic form of
government"; whether it is "inconsistent . . . with the Constitution's
efforts to create governmental institutions well suited to the carrying
out of its constitutional promises"; whether it fits with "the Framers'
basic reason for believing the Court ought to have the power of judicial
review"; courts' comparative advantage in answering empirical ques-
tions that may be involved in applying the right; and whether there is a
"strong offsetting justification" for removing a decision from the democ-
ratic process. *Post*, at 7, 11–17 (dissenting opinion).

he has just made clear, he thinks historical inquiry unavailing, *post*, at 19–20. Moreover, trusting the meaning of the Due Process Clause to what has historically been protected is circular, see *post*, at 19, since that would mean no *new* rights could get in.

JUSTICE STEVENS moves on to the "most basic" constraint on subjectivity his theory offers: that he would "esche[w] attempts to provide any all-purpose, top-down, totalizing theory of 'liberty.'" *Post*, at 22. The notion that the absence of a coherent theory of the Due Process Clause will somehow *curtail* judicial caprice is at war with reason. Indeterminacy means opportunity for courts to impose whatever rule they like; it is the problem, not the solution. The idea that interpretive pluralism would *reduce* courts' ability to impose their will on the ignorant masses is not merely naïve, but absurd. If there are no right answers, there are no wrong answers either.

JUSTICE STEVENS also argues that requiring courts to show "respect for the democratic process" should serve as a constraint. *Post*, at 23. That is true, but JUSTICE STEVENS would have them show respect in an extraordinary manner. In his view, if a right "is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate." *Ibid.* In other words, a right, such as the right to keep and bear arms, that has long been recognized but on which the States are considering restrictions, apparently deserves *less* protection, while a privilege the political branches (instruments of the democratic process) have withheld entirely and continue to withhold, deserves *more*. That topsy-turvy approach conveniently accomplishes the objective of ensuring that the rights this Court held protected in *Casey*, *Lawrence*, and other such cases fit the theory—but at the cost of insulting rather than respecting the democratic process.

The next constraint JUSTICE STEVENS suggests is harder

to evaluate.  He describes as "an important tool for guiding judicial discretion" "sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society."  *Post*, at 24.  I cannot say whether that sensitivity will really guide judges because I have no idea what it is.  Is it some sixth sense instilled in judges when they ascend to the bench?  Or does it mean judges are more constrained when they agonize about the cosmic conflict between liberty and its potentially harmful consequences?  Attempting to give the concept more precision, JUSTICE STEVENS explains that "sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution."  *Ibid.*  Both traits are undeniably admirable, though what relation they bear to sensitivity is a mystery.  But it makes no difference, for the first case JUSTICE STEVENS cites in support, see *ibid.*, *Casey*, 505 U. S., at 849, dispels any illusion that he has a meaningful form of judicial modesty in mind.

JUSTICE STEVENS offers no examples to illustrate the next constraint: *stare decisis*, *post*, at 25.  But his view of it is surely not very confining, since he holds out as a "canonical" exemplar of the proper approach, see *post*, at 16, 54, *Lawrence*, which overruled a case decided a mere 17 years earlier, *Bowers* v. *Hardwick*, 478 U. S. 186 (1986), see 539 U. S., at 578 (it "was not correct when it was decided, and it is not correct today").  Moreover, JUSTICE STEVENS would apply that constraint unevenly: He apparently approves those Warren Court cases that adopted jot-for-jot incorporation of procedural protections for criminal defendants, *post*, at 11, but would abandon those Warren Court rulings that undercut his approach to substantive rights, on the basis that we have "cut back" on cases from that era before, *post*, at 12.

JUSTICE STEVENS also relies on the requirement of a "careful description of the asserted fundamental liberty interest" to limit judicial discretion.  *Post*, at 25 (internal

quotation marks omitted). I certainly agree with that requirement, see *Reno* v. *Flores*, 507 U. S. 292, 302 (1993), though some cases JUSTICE STEVENS approves have not applied it seriously, see, *e.g.*, *Lawrence*, *supra*, at 562 ("The instant case involves liberty of the person both in its spatial and in its more transcendent dimensions"). But if the "careful description" requirement is used in the manner we have hitherto employed, then the enterprise of determining the Due Process Clause's "conceptual core," *post*, at 23, is a waste of time. In the cases he cites we sought a careful, specific description of the right at issue in order to determine *whether that right, thus narrowly defined, was fundamental.* See, *e.g.*, *Glucksberg*, 521 U. S., at 722–728; *Reno*, *supra*, at 302–306; *Collins* v. *Harker Heights*, 503 U. S. 115, 125–129 (1992); *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 269–279 (1990); see also *Vacco* v. *Quill*, 521 U. S. 793, 801–808 (1997). The threshold step of defining the asserted right with precision is entirely unnecessary, however, if (as JUSTICE STEVENS maintains) the "conceptual core" of the "liberty clause," *post*, at 23, includes a number of capacious, hazily defined categories. There is no need to define the right with much precision in order to conclude that it pertains to the plaintiff's "ability independently to define [his] identity," his "right to make certain unusually important decisions that will affect his own, or his family's, destiny," or some aspect of his "[s]elf-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity [or] respect." *Ibid.* (internal quotation marks omitted). JUSTICE STEVENS must therefore have in mind some other use for the careful-description requirement—perhaps just as a means of ensuring that courts "procee[d] slowly and incrementally," *post*, at 25. But that could be achieved just as well by

having them draft their opinions in longhand.[4]

## II

If JUSTICE STEVENS' account of the constraints of his approach did not demonstrate that they do not exist, his application of that approach to the case before us leaves no doubt. He offers several reasons for concluding that the Second Amendment right to keep and bear arms is not fundamental enough to be applied against the States.[5] None is persuasive, but more pertinent to my purpose, each is either intrinsically indeterminate, would preclude incorporation of rights we have already held incorporated, or both. His approach therefore does nothing to stop a judge from arriving at any conclusion he sets out to reach.

JUSTICE STEVENS begins with the odd assertion that

_____

[4]After defending the careful-description criterion, JUSTICE STEVENS quickly retreats and cautions courts not to apply it too stringently. *Post*, at 26. Describing a right *too* specifically risks robbing it of its "universal valence and a moral force it might otherwise have," *ibid.*, and "loads the dice against its recognition," *post*, at 26, n. 25 (internal quotation marks omitted). *That* must be avoided, since it endangers rights JUSTICE STEVENS *does* like. See *ibid.* (discussing *Lawrence* v. *Texas*, 539 U. S. 558 (2003)). To make sure *those* rights get in, we must leave leeway in our description, so that a right that has not itself been recognized as fundamental can ride the coattails of one that has been.

[5]JUSTICE STEVENS claims that I mischaracterize his argument by referring to the Second Amendment right to keep and bear arms, instead of "the interest in keeping a firearm of one's choosing in the home," the right he says petitioners assert. *Post*, at 38, n. 36. But it is precisely the "Second Amendment right to keep and bear arms" that petitioners argue is incorporated by the Due Process Clause. See, *e.g.*, Pet. for Cert. i. Under JUSTICE STEVENS' own approach, that should end the matter. See *post*, at 26 ("[W]e must pay close attention to the precise liberty interest the litigants have asked us to vindicate"). In any event, the demise of watered-down incorporation, see *ante*, at 17–19, means that we no longer subdivide Bill of Rights guarantees into their theoretical components, only some of which apply to the States. The First Amendment freedom of speech is incorporated—not the freedom to speak on Fridays, or to speak about philosophy.

"firearms have a fundamentally ambivalent relationship to liberty," since sometimes they are used to cause (or sometimes accidentally produce) injury to others. *Post*, at 35. The source of the rule that only nonambivalent liberties deserve Due Process protection is never explained—proof that judges applying JUSTICE STEVENS' approach can add new elements to the test as they see fit. The criterion, moreover, is inherently manipulable. Surely JUSTICE STEVENS does not mean that the Clause covers only rights that have *zero* harmful effect on *anyone*. Otherwise even the First Amendment is out. Maybe what he means is that the right to keep and bear arms imposes *too great* a risk to others' physical well-being. But as the plurality explains, *ante*, at 35–36, other rights we have already held incorporated pose similarly substantial risks to public safety. In all events, JUSTICE STEVENS supplies neither a standard for how severe the impairment on others' liberty must be for a right to be disqualified, nor (of course) any method of measuring the severity.

JUSTICE STEVENS next suggests that the Second Amendment right is not fundamental because it is "different in kind" from other rights we have recognized. *Post*, at 37. In one respect, of course, the right to keep and bear arms *is* different from some other rights we have held the Clause protects and he would recognize: It is deeply grounded in our nation's history and tradition. But JUSTICE STEVENS has a different distinction in mind: Even though he does "not doubt for a moment that many Americans . . . see [firearms] as critical to their way of life as well as to their security," he pronounces that owning a handgun is not "critical to leading a life of autonomy, dignity, or political equality."[6] *Post*, at 37–38. Who says?

_____

[6] JUSTICE STEVENS goes a step farther still, suggesting that the right to keep and bear arms is not protected by the "liberty clause" because it is not really a liberty at all, but a "property right." *Post*, at 38. Never

Deciding what is essential to an enlightened, liberty-filled life is an inherently political, moral judgment—the antithesis of an objective approach that reaches conclusions by applying neutral rules to verifiable evidence.[7]

No determination of what rights the Constitution of the United States covers would be complete, of course, without a survey of what *other* countries do. *Post*, at 40–41. When it comes to guns, JUSTICE STEVENS explains, our Nation is *already* an outlier among "advanced democracies"; not even our "oldest allies" protect as robust a right as we do, and we should not widen the gap. *Ibid.* Never mind that he explains neither which countries qualify as "advanced democracies" nor why others are irrelevant. For there is an even clearer indication that this criterion lets judges pick which rights States must respect and those they can ignore: As the plurality shows, *ante*, at 34–35, and nn. 28–29, this follow-the-foreign-crowd requirement would fore-

―――――――――

mind that the right to bear arms sounds mighty like a liberty; and never mind that the "liberty clause" is really a Due Process Clause which explicitly protects "property," see *United States* v. *Carlton*, 512 U. S. 26, 41–42 (1994) (SCALIA, J., concurring in judgment). JUSTICE STEVENS' theory cannot explain why the Takings Clause, which unquestionably protects property, has been incorporated, see *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 241 (1897), in a decision he appears to accept, *post*, at 14, n. 14.

[7] As JUSTICE STEVENS notes, see *post*, at 51–52, I accept as a matter of *stare decisis* the requirement that to be fundamental for purposes of the Due Process Clause, a right must be "implicit in the concept of ordered liberty," *Lawrence*, *supra*, at 593, n. 3 (SCALIA, J., dissenting) (internal quotation marks omitted). But that inquiry provides infinitely less scope for judicial invention when conducted under the Court's approach, since the field of candidates is *immensely* narrowed by the prior requirement that a right be rooted in this country's traditions. JUSTICE STEVENS, on the other hand, is free to scan the universe for rights that he thinks "implicit in the concept, etc." The point JUSTICE STEVENS makes here is merely one example of his demand that an historical approach to the Constitution prove itself, not merely much better than his in restraining judicial invention, but utterly perfect in doing so. See Part III, *infra.*

close rights that we have held (and JUSTICE STEVENS accepts) are incorporated, but that other "advanced" nations do not recognize—from the exclusionary rule to the Establishment Clause. A judge applying JUSTICE STEVENS' approach must either throw all of those rights overboard or, as cases JUSTICE STEVENS approves have done in considering unenumerated rights, simply ignore foreign law when it undermines the desired conclusion, see, *e.g.*, *Casey,* 505 U. S. 833 (making no mention of foreign law).

JUSTICE STEVENS also argues that since the right to keep and bear arms was *codified* for the purpose of "prevent[ing] elimination of the militia," it should be viewed as "'a federalism provision'" logically incapable of incorporation. *Post*, at 41–42 (quoting *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 45 (2004) (THOMAS, J., concurring in judgment); some internal quotation marks omitted). This criterion, too, evidently applies only when judges want it to. The opinion JUSTICE STEVENS quotes for the "federalism provision" principle, JUSTICE THOMAS's concurrence in *Newdow*, argued that incorporation of the Establishment Clause "makes little sense" because that Clause was originally understood as a limit on congressional interference with state establishments of religion. *Id.*, at 49–51. JUSTICE STEVENS, of course, has no problem with applying the Establishment Clause to the States. See, *e.g.*, *id.*, at 8, n. 4 (opinion for the Court by STEVENS, J.) (acknowledging that the Establishment Clause "appl[ies] to the States by incorporation into the Fourteenth Amendment"). While he insists *that* Clause is not a "federalism provision," *post*, at 42, n. 40, he does not explain why *it* is not, but the right to keep and bear arms *is* (even though only the latter refers to a "right of the people"). The "federalism" argument prevents the incorporation of only *certain* rights.

JUSTICE STEVENS next argues that even if the right to

keep and bear arms is "deeply rooted in some important senses," the roots of States' efforts to regulate guns run just as deep. *Post*, at 44 (internal quotation marks omitted). But this too is true of other rights we have held incorporated. No fundamental right—not even the First Amendment—is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character. At least that is what they show (JUSTICE STEVENS would agree) for *other* rights. Once again, principles are applied selectively.

JUSTICE STEVENS' final reason for rejecting incorporation of the Second Amendment reveals, more clearly than any of the others, the game that is afoot. Assuming that there is a "plausible constitutional basis" for holding that the right to keep and bear arms is incorporated, he asserts that we ought not to do so *for prudential reasons*. *Post*, at 47. Even if we had the authority to withhold rights that are within the Constitution's command (and we assuredly do not), two of the reasons JUSTICE STEVENS gives for abstention show just how much power he would hand to judges. The States' "right to experiment" with solutions to the problem of gun violence, he says, is at its apex here because "the best solution is far from clear." *Post*, at 47–48 (internal quotation marks omitted). That is true of most serious social problems—whether, for example, "the best solution" for rampant crime is to admit confessions unless they are affirmatively shown to have been coerced, but see *Miranda* v. *Arizona*, 384 U. S. 436, 444–445 (1966), or to permit jurors to impose the death penalty without a requirement that they be free to consider "any relevant mitigating factor," see *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982), which in turn leads to the conclusion that defense counsel has provided inadequate defense if he has not conducted a "reasonable investigation" into potentially mitigating factors, see, *e.g.*, *Wiggins* v. *Smith*, 539 U. S. 510, 534 (2003), inquiry into which question tends to

destroy any prospect of prompt justice, see, *e.g.*, *Wong* v. *Belmontes*, 558 U. S. \_\_\_ (2009) *(per curiam)* (reversing grant of habeas relief for sentencing on a crime committed in 1981). The obviousness of the optimal answer is in the eye of the beholder. The implication of JUSTICE STEVENS' call for abstention is that if We The Court conclude that They The People's answers to a problem are silly, we are free to "interven[e]," *post*, at 47, but if we too are uncertain of the right answer, or merely think the States may be on to something, we can loosen the leash.

A second reason JUSTICE STEVENS says we should abstain is that the States have shown they are "capable" of protecting the right at issue, and if anything have protected it too much. *Post*, at 49. That reflects an assumption that judges can distinguish between a *proper* democratic decision to leave things alone (which we should honor), and a case of democratic market failure (which we should step in to correct). I would not—and no judge should—presume to have that sort of omniscience, which seems to me far more "arrogant," *post*, at 41, than confining courts' focus to our own national heritage.

## III

JUSTICE STEVENS' response to this concurrence, *post*, at 51–56, makes the usual rejoinder of "living Constitution" advocates to the criticism that it empowers judges to eliminate or expand what the people have prescribed: The traditional, historically focused method, he says, reposes discretion in judges as well.[8] Historical analysis can be

_____

[8] JUSTICE STEVENS also asserts that his approach is "more faithful to this Nation's constitutional history" and to "the values and commitments of the American people, as they stand today," *post*, at 54. But what he asserts to be the proof of this is that his approach aligns (no surprise) with those cases he approves (and dubs "canonical," *ibid.*). Cases he disfavors are discarded as "hardly bind[ing]" "excesses," *post*, at 12, or less "enduring," *post*, at 17, n. 16. Not proven. Moreover, whatever relevance JUSTICE STEVENS ascribes to current "values and

difficult; it sometimes requires resolving threshold ques-
tions, and making nuanced judgments about which evi-
dence to consult and how to interpret it.

I will stipulate to that.[9]  But the question to be decided
is not whether the historically focused method is a *perfect
means* of restraining aristocratic judicial Constitution-
writing; but whether it is the *best means available* in an
imperfect world.  Or indeed, even more narrowly than
that: whether it is demonstrably much better than what
JUSTICE STEVENS proposes.  I think it beyond all serious
dispute that it is much less subjective, and intrudes much
less upon the democratic process.  It is less subjective
because it depends upon a body of evidence susceptible of
reasoned analysis rather than a variety of vague ethico-
political First Principles whose combined conclusion can
be found to point in any direction the judges favor.  In the
most controversial matters brought before this Court—for
example, the constitutionality of prohibiting abortion,
assisted suicide, or homosexual sodomy, or the constitu-
tionality of the death penalty—*any* historical methodology,
under *any* plausible standard of proof, would lead to the
same conclusion.[10]  Moreover, the methodological differ-
ences that divide historians, and the varying interpretive

---

commitments of the American people" (and that is unclear, see *post*, at
48–49, n. 47), it is hard to see how it shows fidelity to them that he
disapproves a different subset of old cases than the Court does.

[9]That is not to say that every historical question on which there is
room for debate is indeterminate, or that every question on which
historians disagree is equally balanced.  Cf. *post*, at 52–53.  For exam-
ple, the historical analysis of the principal dissent in *Heller* is as valid
as the Court's only in a two-dimensional world that conflates length
and depth.

[10] By the way, JUSTICE STEVENS greatly magnifies the difficulty of an
historical approach by suggesting that it was *my* burden in *Lawrence* to
show the "ancient roots of proscriptions against sodomy," *post*, at 53
(internal quotation marks omitted).  *Au contraire*, it was *his* burden (in
the opinion he joined) to show the ancient roots of the right of sodomy.

assumptions they bring to their work, *post*, at 52–54, are nothing compared to the differences among the American people (though perhaps not among graduates of prestigious law schools) with regard to the moral judgments JUSTICE STEVENS would have courts pronounce. And whether or not special expertise is needed to answer historical questions, judges most certainly have no "comparative . . . advantage," *post*, at 24 (internal quotation marks omitted), in resolving moral disputes. What is more, his approach would not eliminate, but multiply, the hard questions courts must confront, since he would not *replace* history with moral philosophy, but would have courts consider *both*.

And the Court's approach intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with the assurance that their decision is not subject to judicial revision. JUSTICE STEVENS' approach, on the other hand, deprives the people of that power, since whatever the Constitution and laws may say, the list of protected rights will be whatever courts wish it to be. After all, he notes, the people have been wrong before, *post*, at 55, and courts may conclude they are wrong in the future. JUSTICE STEVENS abhors a system in which "majorities or powerful interest groups always get their way," *post*, at 56, but replaces it with a system in which unelected and life-tenured judges always get their way. That such usurpation is effected unabashedly, see *post*, at 53—with "the judge's cards . . . laid on the table," *ibid.*—makes it even worse. In a vibrant democracy, usurpation should have to be accomplished in the dark. It is JUSTICE STEVENS' approach, not the Court's, that puts democracy in peril.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1521

_____

OTIS MCDONALD, ET AL., PETITIONERS *v.* CITY OF CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in the Second Amendment "fully applicable to the States." *Ante*, at 1. I write separately because I believe there is a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment's text and history.

Applying what is now a well-settled test, the plurality opinion concludes that the right to keep and bear arms applies to the States through the Fourteenth Amendment's Due Process Clause because it is "fundamental" to the American "scheme of ordered liberty," *ante*, at 19 (citing *Duncan* v. *Louisiana*, 391 U. S. 145, 149 (1968)), and "'deeply rooted in this Nation's history and tradi-tion,'" *ante*, at 19 (quoting *Washington* v. *Glucksberg*, 521 U. S. 702, 721 (1997)). I agree with that description of the right. But I cannot agree that it is enforceable against the States through a clause that speaks only to "process." Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause.

I

In *District of Columbia* v. *Heller*, 554 U. S. ___ (2008), this Court held that the Second Amendment protects an individual right to keep and bear arms for the purpose of self-defense, striking down a District of Columbia ordinance that banned the possession of handguns in the home. *Id.*, at __ (slip op., at 64). The question in this case is whether the Constitution protects that right against abridgment by the States.

As the Court explains, if this case were litigated before the Fourteenth Amendment's adoption in 1868, the answer to that question would be simple. In *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243 (1833), this Court held that the Bill of Rights applied only to the Federal Government. Writing for the Court, Chief Justice Marshall recalled that the founding generation added the first eight Amendments to the Constitution in response to Antifederalist concerns regarding the extent of federal— not state—power, and held that if "the framers of these amendments [had] intended them to be limitations on the powers of the state governments," "they would have declared this purpose in plain and intelligible language." *Id.*, at 250. Finding no such language in the Bill, Chief Justice Marshall held that it did not in any way restrict state authority. *Id.*, at 248–250; see *Lessee of Livingston* v. *Moore*, 7 Pet. 469, 551–552 (1833) (reaffirming *Barron*'s holding); *Permoli* v. *Municipality No. 1 of New Orleans*, 3 How. 589, 609–610 (1845) (same).

Nearly three decades after *Barron*, the Nation was splintered by a civil war fought principally over the question of slavery. As was evident to many throughout our Nation's early history, slavery, and the measures designed to protect it, were irreconcilable with the principles of equality, government by consent, and inalienable rights proclaimed by the Declaration of Independence and embedded in our constitutional structure. See, *e.g.*, 3 Records

of the Federal Convention of 1787, p. 212 (M. Farrand ed. 1911) (remarks of Luther Martin) ("[S]lavery is inconsistent with the genius of republicanism, and has a tendency to destroy those principles on which it is supported, as it lessens the sense of the equal rights of mankind" (emphasis deleted)); A. Lincoln, Speech at Peoria, Ill. (Oct. 16, 1854), reprinted in 2 The Collected Works of Abraham Lincoln 266 (R. Basler ed. 1953) ("[N]o man is good enough to govern another man, *without that other's consent.* I say this is the leading principle—the sheet anchor of American republicanism. . . . Now the relation of masters and slaves is, *pro tanto*, a total violation of this principle").

After the war, a series of constitutional amendments were adopted to repair the Nation from the damage slavery had caused. The provision at issue here, §1 of the Fourteenth Amendment, significantly altered our system of government. The first sentence of that section provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This unambiguously overruled this Court's contrary holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that the Constitution did not recognize black Americans as citizens of the United States or their own State. *Id.*, at 405–406.

The meaning of §1's next sentence has divided this Court for many years. That sentence begins with the command that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." On its face, this appears to grant the persons just made United States citizens a certain collection of rights—*i.e.*, privileges or immunities—attributable to that status.

This Court's precedents accept that point, but define the relevant collection of rights quite narrowly. In the *Slaughter-House Cases*, 16 Wall. 36 (1873), decided just five years after the Fourteenth Amendment's adoption, the

Court interpreted this text, now known as the Privileges or Immunities Clause, for the first time. In a closely divided decision, the Court drew a sharp distinction between the privileges and immunities of state citizenship and those of federal citizenship, and held that the Privileges or Immunities Clause protected only the latter category of rights from state abridgment. *Id.*, at 78. The Court defined that category to include only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.*, at 79. This arguably left open the possibility that certain individual rights enumerated in the Constitution could be considered privileges or immunities of federal citizenship. See *ibid.* (listing "[t]he right to peaceably assemble" and "the privilege of the writ of *habeas corpus*" as rights potentially protected by the Privileges or Immunities Clause). But the Court soon rejected that proposition, interpreting the Privileges or Immunities Clause even more narrowly in its later cases.

Chief among those cases is *United States* v. *Cruikshank*, 92 U. S. 542 (1876). There, the Court held that members of a white militia who had brutally murdered as many as 165 black Louisianians congregating outside a courthouse had not deprived the victims of their privileges as American citizens to peaceably assemble or to keep and bear arms. *Ibid.;* see L. Keith, The Colfax Massacre 109 (2008). According to the Court, the right to peaceably assemble codified in the First Amendment was not a privilege of United States citizenship because "[t]he right . . . existed long *before* the adoption of the Constitution." 92 U. S., at 551 (emphasis added). Similarly, the Court held that the right to keep and bear arms was not a privilege of United States citizenship because it was not "in any manner dependent upon that instrument for its existence." *Id.*, at 553. In other words, the reason the Framers codified the right to bear arms in the Second Amendment—its nature

as an inalienable right that pre-existed the Constitution's adoption—was the very reason citizens could not enforce it against States through the Fourteenth.

That circular reasoning effectively has been the Court's last word on the Privileges or Immunities Clause.[1] In the intervening years, the Court has held that the Clause prevents state abridgment of only a handful of rights, such as the right to travel, see *Saenz* v. *Roe*, 526 U. S. 489, 503 (1999), that are not readily described as essential to liberty.

As a consequence of this Court's marginalization of the Clause, litigants seeking federal protection of fundamental rights turned to the remainder of §1 in search of an alternative fount of such rights. They found one in a most curious place—that section's command that every State guarantee "due process" to any person before depriving him of "life, liberty, or property." At first, litigants argued that this Due Process Clause "incorporated" certain procedural rights codified in the Bill of Rights against the States. The Court generally rejected those claims, however, on the theory that the rights in question were not sufficiently "fundamental" to warrant such treatment. See, *e.g.*, *Hurtado* v. *California*, 110 U. S. 516 (1884) (grand jury indictment requirement); *Maxwell* v. *Dow*, 176 U. S. 581 (1900) (12-person jury requirement); *Twining* v. *New Jersey*, 211 U. S. 78 (1908) (privilege against self-incrimination).

That changed with time. The Court came to conclude that certain Bill of Rights guarantees *were* sufficiently fundamental to fall within §1's guarantee of "due process." These included not only procedural protections listed in

——————

[1] In the two decades after *United States* v. *Cruikshank*, 92 U. S. 542 (1876), was decided, this Court twice reaffirmed its holding that the Privileges or Immunities Clause does not apply the Second Amendment to the States. *Presser* v. *Illinois*, 116 U. S. 252, 266–267 (1886); *Miller* v. *Texas*, 153 U. S. 535 (1894).

the first eight Amendments, see, *e.g.*, *Benton* v. *Maryland*, 395 U. S. 784 (1969) (protection against double jeopardy), but substantive rights as well, see, *e.g.*, *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925) (right to free speech); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 707 (1931) (same). In the process of incorporating these rights against the States, the Court often applied them differently against the States than against the Federal Government on the theory that only those "fundamental" aspects of the right required Due Process Clause protection. See, *e.g.*, *Betts* v. *Brady*, 316 U. S. 455, 473 (1942) (holding that the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, but that the Due Process Clause required appointment of counsel in state criminal cases only where "want of counsel . . . result[ed] in a conviction lacking in . . . fundamental fairness"). In more recent years, this Court has "abandoned the notion" that the guarantees in the Bill of Rights apply differently when incorporated against the States than they do when applied to the Federal Government. *Ante*, at 17–18 (opinion of the Court) (internal quotation marks omitted). But our cases continue to adhere to the view that a right is incorporated through the Due Process Clause only if it is sufficiently "fundamental," *ante*, at 37, 42–44 (plurality opinion)—a term the Court has long struggled to define.

While this Court has at times concluded that a right gains "fundamental" status only if it is essential to the American "scheme of ordered liberty" or "'deeply rooted in this Nation's history and tradition,'" *ante*, at 19 (plurality opinion) (quoting *Glucksberg*, 521 U. S., at 721), the Court has just as often held that a right warrants Due Process Clause protection if it satisfies a far less measurable range of criteria, see *Lawrence* v. *Texas*, 539 U. S. 558, 562 (2003) (concluding that the Due Process Clause protects

"liberty of the person both in its spatial and in its more transcendent dimensions"). Using the latter approach, the Court has determined that the Due Process Clause applies rights against the States that are not mentioned in the Constitution at all, even without seriously arguing that the Clause was originally understood to protect such rights. See, *e.g.*, *Lochner* v. *New York*, 198 U. S. 45 (1905); *Roe* v. *Wade*, 410 U. S. 113 (1973); *Lawrence*, *supra*.

All of this is a legal fiction. The notion that a constitutional provision that guarantees only "process" before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words. Moreover, this fiction is a particularly dangerous one. The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish "fundamental" rights that warrant protection from nonfundamental rights that do not. Today's decision illustrates the point. Replaying a debate that has endured from the inception of the Court's substantive due process jurisprudence, the dissents laud the "flexibility" in this Court's substantive due process doctrine, *post*, at 14 (STEVENS, J., dissenting); see *post*, at 6–8 (BREYER, J., dissenting), while the plurality makes yet another effort to impose principled restraints on its exercise, see *ante*, at 33–41. But neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification.

To be sure, the plurality's effort to cabin the exercise of judicial discretion under the Due Process Clause by focusing its inquiry on those rights deeply rooted in American history and tradition invites less opportunity for abuse than the alternatives. See *post*, at 7 (BREYER, J., dissenting) (arguing that rights should be incorporated against the States through the Due Process Clause if they are "well-suited to the carrying out of . . . constitutional prom-

ises"); *post*, at 22 (STEVENS, J., dissenting) (warning that there is no "all-purpose, top-down, totalizing theory of 'liberty'" protected by the Due Process Clause). But any serious argument over the scope of the Due Process Clause must acknowledge that neither its text nor its history suggests that it protects the many substantive rights this Court's cases now claim it does.

I cannot accept a theory of constitutional interpretation that rests on such tenuous footing. This Court's substantive due process framework fails to account for both the text of the Fourteenth Amendment and the history that led to its adoption, filling that gap with a jurisprudence devoid of a guiding principle. I believe the original meaning of the Fourteenth Amendment offers a superior alternative, and that a return to that meaning would allow this Court to enforce the rights the Fourteenth Amendment is designed to protect with greater clarity and predictability than the substantive due process framework has so far managed.

I acknowledge the volume of precedents that have been built upon the substantive due process framework, and I further acknowledge the importance of *stare decisis* to the stability of our Nation's legal system. But *stare decisis* is only an "adjunct" of our duty as judges to decide by our best lights what the Constitution means. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 963 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part). It is not "an inexorable command." *Lawrence*, *supra*, at 577. Moreover, as judges, we interpret the Constitution one case or controversy at a time. The question presented in this case is not whether our entire Fourteenth Amendment jurisprudence must be preserved or revised, but only whether, and to what extent, a particular clause in the Constitution protects the particular right at issue here. With the inquiry appropriately narrowed, I believe this case presents an opportunity

to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.

## II

"It cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury* v. *Madison*, 1 Cranch 137, 174 (1803) (Marshall, C. J.). Because the Court's Privileges or Immunities Clause precedents have presumed just that, I set them aside for the moment and begin with the text.

The Privileges or Immunities Clause of the Fourteenth Amendment declares that "[n]o State . . . shall abridge the privileges or immunities of citizens of the United States." In interpreting this language, it is important to recall that constitutional provisions are "'written to be understood by the voters.'" *Heller*, 554 U. S., at ___ (slip op., at 3) (quoting *United States* v. *Sprague*, 282 U. S. 716, 731 (1931)). Thus, the objective of this inquiry is to discern what "ordinary citizens" at the time of ratification would have understood the Privileges or Immunities Clause to mean. 554 U. S., at ___ (slip op., at 3).

### A
#### 1

At the time of Reconstruction, the terms "privileges" and "immunities" had an established meaning as synonyms for "rights." The two words, standing alone or paired together, were used interchangeably with the words "rights," "liberties," and "freedoms," and had been since the time of Blackstone. See 1 W. Blackstone, Commentaries *129 (describing the "rights and liberties" of Englishmen as "private immunities" and "civil privileges"). A number of antebellum judicial decisions used the terms in this manner. See, *e.g.*, *Magill* v. *Brown*, 16 F. Cas. 408, 428 (No. 8,952) (CC ED Pa. 1833) (Baldwin, J.) ("The words 'privi-

leges and immunities' relate to the rights of persons, place
or property; a privilege is a peculiar right, a private law,
conceded to particular persons or places"). In addition,
dictionary definitions confirm that the public shared this
understanding. See, *e.g.*, N. Webster, An American Dic-
tionary of the English Language 1039 (C. Goodrich & N.
Porter rev. 1865) (defining "privilege" as "a right or immu-
nity not enjoyed by others or by all" and listing among its
synonyms the words "immunity," "franchise," "right," and
"liberty"); *id.*, at 661 (defining "immunity" as "[f]reedom
from an obligation" or "particular privilege"); *id.*, at 1140
(defining "right" as "[p]rivilege or immunity granted by
authority").[2]

The fact that a particular interest was designated as a
"privilege" or "immunity," rather than a "right," "liberty,"
or "freedom," revealed little about its substance. Black-
stone, for example, used the terms "privileges" and "im-
munities" to describe both the inalienable rights of indi-
viduals and the positive-law rights of corporations. See 1
Commentaries, at *129 (describing "private immunities"
as a "*residuum* of natural liberty," and "civil privileges" as
those "which society has engaged to provide, in lieu of the
natural liberties so given up by individuals" (footnote
omitted)); *id.*, at *468 (stating that a corporate charter
enables a corporation to "establish rules and orders" that
serve as "the privileges and immunities . . . of the corpora-
tion"). Writers in this country at the time of Reconstruc-

_____

[2] See also 2 C. Richardson, A New Dictionary of the English Language
1512 (1839) (defining "privilege" as "an appropriate or peculiar law or
rule or right; a peculiar immunity, liberty, or franchise"); 1 *id.*, at 1056
(defining "immunity" as "[f]reedom or exemption, (from duties,) liberty,
privilege"); The Philadelphia School Dictionary; or Expositor of the
English Language 152 (3d ed. 1812) (defining "privilege" as a "peculiar
advantage"); *id.*, at 105 (defining "immunity" as "privilege, exemption");
Royal Standard English Dictionary 411 (1788) (defining "privilege" as
"public right; peculiar advantage").

tion followed a similar practice. See, *e.g.*, *Racine & Mississippi R. Co.* v. *Farmers' Loan & Trust Co.*, 49 Ill. 331, 334 (1868) (describing agreement between two railroad companies in which they agreed "'to fully merge and consolidate the[ir] capital stock, powers, privileges, immunities and franchises'"); *Hathorn* v. *Calef*, 53 Me. 471, 483–484 (1866) (concluding that a statute did not "modify any power, privileges, or immunity, pertaining to the franchise of any corporation"). The nature of a privilege or immunity thus varied depending on the person, group, or entity to whom those rights were assigned. See Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1256–1257 (2010) (surveying antebellum usages of these terms).

2

The group of rights-bearers to whom the Privileges or Immunities Clause applies is, of course, "citizens." By the time of Reconstruction, it had long been established that both the States and the Federal Government existed to preserve their citizens' inalienable rights, and that these rights were considered "privileges" or "immunities" of citizenship.

This tradition begins with our country's English roots. Parliament declared the basic liberties of English citizens in a series of documents ranging from the Magna Carta to the Petition of Right and the English Bill of Rights. See 1 B. Schwartz, The Bill of Rights: A Documentary History 8−16, 19−21, 41−46 (1971) (hereinafter Schwartz). These fundamental rights, according to the English tradition, belonged to all people but became legally enforceable only when recognized in legal texts, including acts of Parliament and the decisions of common-law judges. See B. Bailyn, The Ideological Origins of the American Revolution 77−79 (1967). These rights included many that later

would be set forth in our Federal Bill of Rights, such as the right to petition for redress of grievances, the right to a jury trial, and the right of "Protestants" to "have arms for their defence." English Bill of Rights (1689), reprinted in 1 Schwartz 41, 43.

As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen. They consistently claimed the rights of English citizenship in their founding documents, repeatedly referring to these rights as "privileges" and "immunities." For example, a Maryland law provided that

> "[A]ll the Inhabitants of this Province being Christians (Slaves excepted) Shall have and enjoy all such *rights liberties immunities priviledges and free customs* within this Province as any naturall born subject of England hath or ought to have or enjoy in the Realm of England . . . ." Md. Act for the Liberties of the People (1639), in *id.,* at 68 (emphasis added).[3]

---

[3] See also, *e.g.*, Charter of Va. (1606), reprinted in 7 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3783, 3788 (F. Thorpe ed. 1909) (hereinafter Thorpe) ("DECLAR[ING]" that "all and every the Persons being our Subjects, . . . shall HAVE and enjoy all Liberties, Franchises, and Immunities . . . as if they had been abiding and born, within this our Realm of *England*" (emphasis in original)); Charter of New England (1620), in 3 *id.,* at 1827, 1839 ("[A]ll and every the Persons, beinge our Subjects, . . . shall have and enjoy all Liberties, and ffranchizes, and Immunities of free Denizens and naturall subjects . . . as if they had been abidinge and born within this our Kingdome of England"); Charter of Mass. Bay (1629), in *id.* at 1846, 1856−1857 (guaranteeing that "all and every the Subjects of Us, . . . shall have and enjoy all liberties and Immunities of free and naturall Subjects . . . as yf they and everie of them were borne within the Realme of England"); Grant of the Province of Me. (1639), in *id.,* at 1625, 1635 (guaranteeing "Liberties Francheses and Immunityes of or belonging to any the naturall borne subjects of this our Kingdome of England"); Charter of Carolina (1663), in 5 *id.,* at 2743, 2747 (guaranteeing to all subjects "all liberties franchises and priviledges of this our kingdom of England"); Charter of R. I. and Providence Plantations (1663), in 6 *id.,* at 3211,

As tensions between England and the Colonies increased, the colonists adopted protest resolutions reasserting their claim to the inalienable rights of Englishmen. Again, they used the terms "privileges" and "immunities" to describe these rights. As the Massachusetts Resolves declared:

> "*Resolved*, That there are certain essential Rights of the *British* Constitution of Government, which are founded in the Law of God and Nature, and are the common Rights of Mankind—Therefore. . . . .
> "*Resolved,* That no Man can justly take the Property of another without his Consent: And that upon this *original* Principle the Right of Representation . . . is evidently founded. . . . *Resolved*, That this *inherent* Right, together with all other, essential *Rights, Liberties, Privileges and Immunities* of the People of *Great Britain,* have been fully confirmed to them by *Magna Charta.*" The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764−1766, p. 56 (E. Morgan ed. 1959) (some emphasis added).[4]

———————

3220 ("[A]ll and every the subjects of us . . . shall have and enjoye all libertyes and immunityes of ffree and naturall subjects within any the dominions of us, our heires, or successours, . . . as if they, and every of them, were borne within the realme of England"); Charter of Ga. (1732), in 2 *id.,* at 765, 773 ("[A]ll and every the persons which shall happen to be born within the said province . . . shall have and enjoy all liberties, franchises and immunities of free denizens and natural born subjects, within any of our dominions, to all intents and purposes, as if abiding and born within this our kingdom of Great-Britain").

[4] See also, *e.g.,* A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 174 (1968) (quoting 1774 Georgia resolution declaring that the colony's inhabitants were entitled to "'the same rights, privileges, and immunities with their fellow-subjects in *Great Britain*'" (emphasis in original)); The Virginia Resolves, The Resolutions as Printed in the Journal of the House of Burgesses, reprinted in Prologue to Revolution: Sources and Documents on the

In keeping with this practice, the First Continental Congress declared in 1774 that the King had wrongfully denied the colonists "the rights, liberties, and immunities of free and natural-born subjects . . . within the realm of England." 1 Journals of the Continental Congress 1774–1789, p. 68 (1904). In an address delivered to the inhabitants of Quebec that same year, the Congress described those rights as including the "great" "right[s]" of "trial by jury," "Habeas Corpus," and "freedom of the press." Address of the Continental Congress to the Inhabitants of Quebec (1774), reprinted in 1 Schwartz 221–223.

After declaring their independence, the newly formed States replaced their colonial charters with constitutions and state bills of rights, almost all of which guaranteed the same fundamental rights that the former colonists previously had claimed by virtue of their English heritage. See, *e.g.*, Pa. Declaration of Rights (1776), reprinted in 5 Thorpe 3081–3084 (declaring that "all men are born equally free and independent, and have certain natural, inherent and inalienable rights," including the "right to worship Almighty God according to the dictates of their own consciences" and the "right to bear arms for the defence of themselves and the state").[5]

Several years later, the Founders amended the Constitution to expressly protect many of the same fundamental rights against interference by the Federal Government. Consistent with their English heritage, the founding

─────────────

Stamp Act Crisis, 1764−1766, at 46, 48 ("[T]he Colonists aforesaid are declared entitled to all Liberties, Privileges, and Immunities of Denizens and natural Subjects, to all Intents and Purposes, as if they had been abiding and born within the Realm of *England*" (emphasis in original)).

[5] See also Va. Declaration of Rights (1776), reprinted in 1 Schwartz 234–236; Pa. Declaration of Rights (1776), in *id.*, at 263–275; Del. Declaration of Rights (1776), in *id.*, at 276–278; Md. Declaration of Rights (1776), in *id.*, at 280–285; N. C. Declaration of Rights (1776), in *id.*, 286–288.

generation generally did not consider many of the rights identified in these amendments as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution's text. See, *e.g.*, 1 Annals of Cong. 431−432, 436–437, 440–442 (1834) (statement of Rep. Madison) (proposing Bill of Rights in the first Congress); The Federalist No. 84, pp. 531−533 (B. Wright ed. 1961) (A. Hamilton); see also *Heller*, 554 U. S., at ___ (slip op., at 19) ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"). The Court's subsequent decision in *Barron*, however, made plain that the codification of these rights in the Bill made them legally enforceable only against the Federal Government, not the States. See 7 Pet., at 247.

3

Even though the Bill of Rights did not apply to the States, other provisions of the Constitution did limit state interference with individual rights. Article IV, §2, cl. 1 provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The text of this provision resembles the Privileges or Immunities Clause, and it can be assumed that the public's understanding of the latter was informed by its understanding of the former.

Article IV, §2 was derived from a similar clause in the Articles of Confederation, and reflects the dual citizenship the Constitution provided to all Americans after replacing that "league" of separate sovereign States. *Gibbons* v. *Ogden*, 9 Wheat. 1, 187 (1824); see 3 J. Story, Commentaries on the Constitution of the United States §1800, p. 675 (1833). By virtue of a person's citizenship in a particular State, he was guaranteed whatever rights and liberties that State's constitution and laws made available. Article IV, §2 vested citizens of each State with an additional

right: the assurance that they would be afforded the
"privileges and immunities" of citizenship in any of the
several States in the Union to which they might travel.

What were the "Privileges and Immunities of Citizens in
the several States"?  That question was answered perhaps
most famously by Justice Bushrod Washington sitting as
Circuit Justice in *Corfield* v. *Coryell*, 6 F. Cas. 546,
551−552 (No. 3,230) (CC ED Pa. 1825).  In that case, a
Pennsylvania citizen claimed that a New Jersey law pro-
hibiting nonresidents from harvesting oysters from the
State's waters violated Article IV, §2 because it deprived
him, as an out-of-state citizen, of a right New Jersey
availed to its own citizens.  *Id.*, at 550.  Justice Washing-
ton rejected that argument, refusing to "accede to the
proposition" that Article IV, §2 entitled "citizens of the
several states . . . to participate in *all* the rights which
belong exclusively to the citizens of any other particular
state."  *Id.*, at 552 (emphasis added).  In his view, Article
IV, §2 did not guarantee equal access to all public benefits
a State might choose to make available to its citizens.  See
*id.,* at 552.  Instead, it applied only to those rights "which
are, in their nature, *fundamental*; which belong, of right,
to the citizens of all free governments."  *Id.*, at 551 (em-
phasis added).  Other courts generally agreed with this
principle.  See, *e.g.*, *Abbott* v. *Bayley*, 23 Mass. 89, 92–93
(1827) (noting that the "privileges and immunities" of
citizens in the several States protected by Article IV, §2
are "qualified and not absolute" because they do not grant
a traveling citizen the right of "suffrage or of eligibility to
office" in the State to which he travels).

When describing those "fundamental" rights, Justice
Washington thought it "would perhaps be more tedious
than difficult to enumerate" them all, but suggested that
they could "be all comprehended under" a broad list of
"general heads," such as "[p]rotection by the government,"
"the enjoyment of life and liberty, with the right to acquire

and possess property of every kind," "the benefit of the writ of habeas corpus," and the right of access to "the courts of the state," among others.[6]  *Corfield*, *supra*, at 551–552.

Notably, Justice Washington did not indicate whether Article IV, §2 *required* States to recognize these fundamental rights in their own citizens and thus in sojourning citizens alike, or whether the Clause simply prohibited the States from discriminating against sojourning citizens with respect to whatever fundamental rights state law happened to recognize.  On this question, the weight of legal authorities at the time of Reconstruction indicated that Article IV, §2 prohibited States from discriminating against sojourning citizens when recognizing fundamental rights, but did not require States to recognize those rights and did not prescribe their content.  The highest courts of several States adopted this view, see, *e.g.*, *Livingston* v. *Van Ingen*, 9 Johns. 507, 561 (N. Y. Sup. Ct. 1812) (Yates, J.); *id.*, at 577 (Kent, J.); *Campbell* v. *Morris*, 3 H. & McH. 535, 553–554 (Md. Gen. Ct. 1797) (Chase, J.), as did several influential treatise-writers, see T. Cooley, A Treatise

_____

[6]Justice Washington's complete list was as follows:
"Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole.  The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised."  6 Fed. Cas., at 551–552.

on the Constitutional Limitations Which Rest Upon the Legislative Power of the State of the American Union 15–16, and n. 3 (1868) (reprint 1972) (describing Article IV, §2 as designed "to prevent discrimination by the several States against the citizens and public proceedings of other States"); 2 J. Kent, Commentaries on American Law 35 (11th ed. 1867) (stating that Article IV, §2 entitles sojourning citizens "to the privileges that persons of the same description are entitled to in the state to which the removal is made, and to none other"). This Court adopted the same conclusion in a unanimous opinion just one year after the Fourteenth Amendment was ratified. See *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869).

*          *          *

The text examined so far demonstrates three points about the meaning of the Privileges or Immunities Clause in §1. First, "privileges" and "immunities" were synonyms for "rights." Second, both the States and the Federal Government had long recognized the inalienable rights of their citizens. Third, Article IV, §2 of the Constitution protected traveling citizens against state discrimination with respect to the fundamental rights of state citizenship.

Two questions still remain, both provoked by the textual similarity between §1's Privileges or Immunities Clause and Article IV, §2. The first involves the nature of the rights at stake: Are the privileges or immunities of "citizens of the United States" recognized by §1 the same as the privileges and immunities of "citizens in the several States" to which Article IV, §2 refers? The second involves the restriction imposed on the States: Does §1, like Article IV, §2, prohibit only discrimination with respect to certain rights *if* the State chooses to recognize them, or does it require States to recognize those rights? I address each question in turn.

B

I start with the nature of the rights that §1's Privileges or Immunities Clause protects. Section 1 overruled *Dred Scott*'s holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy "the privileges and immunities of citizens" embodied in the Constitution. 19 How., at 417. The Court in *Dred Scott* did not distinguish between privileges and immunities of citizens of the United States and citizens in the several States, instead referring to the rights of citizens generally. It did, however, give examples of what the rights of citizens were—the constitutionally enumerated rights of "the full liberty of speech" and the right "to keep and carry arms." *Ibid.*

Section 1 protects the rights of citizens "of the United States" specifically. The evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution, including the right to keep and bear arms.

1

Nineteenth-century treaties through which the United States acquired territory from other sovereigns routinely promised inhabitants of the newly acquired territories that they would enjoy all of the "rights," "privileges," and "immunities" of United States citizens. See, *e.g.*, Treaty of Amity, Settlement, and Limits, Art. 6, Feb. 22, 1819, 8 Stat. 256–258, T. S. No. 327 (entered into force Feb. 19, 1821) (cession of Florida) ("The inhabitants of the territories which his Catholic Majesty cedes to the United States, by this Treaty, shall be incorporated in the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of *all the privileges, rights, and immunities, of*

*the citizens of the United States*" (emphasis added)).[7]

Commentators of the time explained that the rights and immunities of "citizens of the United States" recognized in these treaties "undoubtedly mean[t] those privileges that are common to all citizens of this republic." Marcus, An Examination of the Expediency and Constitutionality of Prohibiting Slavery in the State of Missouri 17 (1819). It is therefore altogether unsurprising that several of these treaties identify liberties enumerated in the Constitution as privileges and immunities common to all United States citizens.

For example, the Louisiana Cession Act of 1803, which codified a treaty between the United States and France culminating in the Louisiana Purchase, provided that

> "The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal constitution, to the enjoyments of *all the rights, advantages and immunities of citizens of the United States;* and in the mean time they shall be maintained and protected in *the free enjoyment of their liberty, property and the religion which they profess*." Treaty Between the United States of America

---

[7] See also Treaty Between the United States of America and the Ottawa Indians of Blanchard's Fork and Roche De Boeuf, June 24, 1862, 12 Stat. 1237 ("The Ottawa Indians of the United Bands of Blanchard's Fork and of Roche de Boeuf, having become sufficiently advanced in civilization, and being desirous of becoming citizens of the United States . . . [after five years from the ratification of this treaty] shall be deemed and declared to be citizens of the United States, to all intents and purposes, and shall be entitled to all the *rights, privileges, and immunities of such citizens*" (emphasis added)); Treaty Between the United States of America and Different Tribes of Sioux Indians, Art. VI, April 29, 1868, 15 Stat. 637 ("[A]ny Indian or Indians receiving a patent for land under the foregoing provisions, shall thereby and from thenceforth become and be a citizen of the United States, and be entitled to all the *privileges and immunities of such citizens*" (emphasis added)).

and the French Republic, Art. III, Apr. 30, 1803, 8 Stat. 202, T. S. No. 86 (emphasis added).[8]

The Louisiana Cession Act reveals even more about the privileges and immunities of United States citizenship because it provoked an extensive public debate on the meaning of that term. In 1820, when the Missouri Territory (which the United States acquired through the Cession Act) sought to enter the Union as a new State, a debate ensued over whether to prohibit slavery within Missouri as a condition of its admission. Some congressmen argued that prohibiting slavery in Missouri would deprive its inhabitants of the "privileges and immunities" they had been promised by the Cession Act. See, *e.g.*, 35 Annals of Cong. 1083 (1855) (remarks of Kentucky Rep. Hardin). But those who opposed slavery in Missouri argued that the right to hold slaves was merely a matter of state property law, not one of the privileges and immunities of United States citizenship guaranteed by the Act.[9]

––––––––––

[8]Subsequent treaties contained similar guarantees that the inhabitants of the newly acquired territories would enjoy the freedom to exercise certain constitutional rights. See Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Art. IX, Feb. 2, 1848, 9 Stat. 930, T. S. No. 207 (cession of Texas) (declaring that inhabitants of the Territory were entitled "to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction"); Treaty concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russians to the United States of America, Art. III, Mar. 30, 1867, 15 Stat. 542, T. S. No. 301 (June 20, 1867) (cession of Alaska) ("The inhabitants of the ceded territory, . . . if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion").

[9]See, *e.g.*, Speech of Mr. Joseph Hemphill (Pa.) on the Missouri Ques-

Daniel Webster was among the leading proponents of the antislavery position. In his "Memorial to Congress," Webster argued that "[t]he rights, advantages and immunities here spoken of [in the Cession Act] must . . . be such as are recognized or communicated by the Constitution of the United States," not the "rights, advantages and immunities, derived exclusively from the *State* governments . . . ." D. Webster, A Memorial to the Congress of the United States on the Subject of Restraining the Increase of Slavery in New States to be Admitted into the Union 15 (Dec. 15, 1819) (emphasis added). "The obvious meaning" of the Act, in Webster's view, was that "*the rights derived under the federal Constitution* shall be enjoyed by the inhabitants of [the territory]." *Id.*, at 15–16 (emphasis added). In other words, Webster articulated a distinction between the rights of United States citizenship and the rights of state citizenship, and argued that the former included those rights "recognized or communicated by the Constitution." Since the right to hold slaves was not mentioned in the Constitution, it was not a right of federal citizenship.

Webster and his allies ultimately lost the debate over slavery in Missouri and the territory was admitted as a slave State as part of the now-famous Missouri Compromise. Missouri Enabling Act of March 6, 1820, ch. 22, §8, 3 Stat. 548. But their arguments continued to inform public understanding of the privileges and immunities of

_____

tion in the House of the Representatives 16 (1820), as published in pamphlet form and reprinted in 22 Moore Pamphlets, p. 16 ("If the right to hold slaves is a federal right and attached merely to citizenship of the United States, [then slavery] could maintain itself against state authority, and on this principle the owner might take his slaves into any state he pleased, in defiance of the state laws, but this would be contrary to the constitution"); see also Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1288–1290 (2010) (collecting other examples).

United States citizenship. In 1854, Webster's Memorial was republished in a pamphlet discussing the Nation's next major debate on slavery—the proposed repeal of the Missouri Compromise through the Kansas-Nebraska Act, see The Nebraska Question: Comprising Speeches in the United States Senate: Together with the History of the Missouri Compromise 9–12 (1854). It was published again in 1857 in a collection of famous American speeches. See The Political Text-Book, or Encyclopedia: Containing Everything Necessary for the Reference of the Politicians and Statesmen of the United States 601–604 (M. Cluskey ed. 1857); see also Lash, 98 Geo. L. J., at 1294–1296 (describing Webster's arguments and their influence).

2

Evidence from the political branches in the years leading to the Fourteenth Amendment's adoption demonstrates broad public understanding that the privileges and immunities of United States citizenship included rights set forth in the Constitution, just as Webster and his allies had argued. In 1868, President Andrew Johnson issued a proclamation granting amnesty to former Confederates, guaranteeing "to all and to every person who directly or indirectly participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason . . . with restoration of *all rights, privileges, and immunities under the Constitution* and the laws which have been made in pursuance thereof." 15 Stat. 712.

Records from the 39th Congress further support this understanding.

a

After the Civil War, Congress established the Joint Committee on Reconstruction to investigate circumstances in the Southern States and to determine whether, and on what conditions, those States should be readmitted to the

Union.   See Cong. Globe, 39th Cong., 1st Sess., 6, 30
(1865) (hereinafter 39th Cong. Globe); M. Curtis, No State
Shall Abridge: The Fourteenth Amendment and the Bill of
Rights 57 (1986) (hereinafter Curtis).   That Committee
would ultimately recommend the adoption of the Four-
teenth Amendment, justifying its recommendation by
submitting a report to Congress that extensively cata-
logued the abuses of civil rights in the former slave States
and argued that "adequate security for future peace and
safety . . . can only be found in such changes of the organic
law as shall determine the civil rights and privileges of all
citizens in all parts of the republic."   See Report of the
Joint Committee on Reconstruction, S. Rep. No. 112, 39th
Cong., 1st Sess., p. 15 (1866); H. R. Rep. No. 30, 39th
Cong., 1st Sess., p.  XXI (1866).

   As the Court notes, the Committee's Report "was widely
reprinted in the press and distributed by members of the
39th Congress to their constituents."   *Ante*, at 24; B.
Kendrick, Journal of the Joint Committee of Fifteen on
Reconstruction 264–265 (1914) (noting that 150,000 copies
of the Report were printed and that it was widely distrib-
uted as a campaign document in the election of 1866).   In
addition, newspaper coverage suggests that the wider
public was aware of the Committee's work even before the
Report was issued.   For example, the Fort Wayne Daily
Democrat (which appears to have been unsupportive of the
Committee's work) paraphrased a motion instructing the
Committee to

> "enquire into [the] expediency of amending the Con-
> stitution of the United States so as to declare with
> greater certainty the power of Congress to enforce and
> determine by appropriate legislation all the guaran-
> tees contained in *that instrument*."   The Nigger Con-
> gress!, Fort Wayne Daily Democrat, Feb. 1, 1866, p. 4
> (emphasis added).

b

Statements made by Members of Congress leading up to, and during, the debates on the Fourteenth Amendment point in the same direction. The record of these debates has been combed before. See *Adamson* v. *California*, 332 U. S. 46, 92–110 (1947) (Appendix to dissenting opinion of Black, J.) (concluding that the debates support the conclusion that §1 was understood to incorporate the Bill of Rights against the States); *ante*, at 14, n. 9, 26–27, n. 23, (opinion of the Court) (counting the debates among other evidence that §1 applies the Second Amendment against the States). Before considering that record here, it is important to clarify its relevance. When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted. Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase. They can further assist to the extent there is evidence that these statements were disseminated to the public. In other words, this evidence is useful not because it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.

(1)

Three speeches stand out as particularly significant. Representative John Bingham, the principal draftsman of §1, delivered a speech on the floor of the House in February 1866 introducing his first draft of the provision. Bingham began by discussing *Barron* and its holding that the Bill of Rights did not apply to the States. He then argued that a constitutional amendment was necessary to provide "an express grant of power in Congress to enforce by penal enactment these great canons of the supreme law, secur-

ing to all the citizens in every State all the privileges and immunities of citizens, and to all the people all the sacred rights of person." 39th Cong. Globe 1089–1090 (1866). Bingham emphasized that §1 was designed "to arm the Congress of the United States, by the consent of the people of the United States, with the power to enforce the bill of rights as it stands in the Constitution today. It 'hath that extent—no more.'" *Id.*, at 1088.

Bingham's speech was printed in pamphlet form and broadly distributed in 1866 under the title, "One Country, One Constitution, and One People," and the subtitle, "In Support of the Proposed Amendment to Enforce the Bill of Rights."[10] Newspapers also reported his proposal, with the New York Times providing particularly extensive coverage, including a full reproduction of Bingham's first draft of §1 and his remarks that a constitutional amendment to "enforc[e]" the "immortal bill of rights" was "absolutely essential to American nationality." N. Y. Times, Feb. 27, 1866, p. 8.

Bingham's first draft of §1 was different from the version ultimately adopted. Of particular importance, the first draft granted Congress the "power to make all laws . . . necessary and proper to secure" the "citizens of each State all privileges and immunities of citizens in the several States," rather than restricting state power to "abridge" the privileges or immunities of citizens of the United States.[11] 39th Cong. Globe 1088.

--------

[10] One Country, One Constitution, and One People: Speech of Hon. John A. Bingham, of Ohio, In the House of Representatives, February 28, 1866, In Support of the Proposed Amendment to Enforce the Bill of Rights (Cong. Globe). The pamphlet was published by the official reporter of congressional debates, and was distributed presumably pursuant to the congressional franking privilege. See B. Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L. J. 1509, 1558, n. 167 (2007) (hereinafter Wildenthal).

[11] The full text of Bingham's first draft of §1 provided as follows:

That draft was met with objections, which the Times covered extensively. A front-page article hailed the "Clear and Forcible Speech" by Representative Robert Hale against the draft, explaining—and endorsing—Hale's view that Bingham's proposal would "confer upon Congress all the rights and power of legislation now reserved to the States" and would "in effect utterly obliterate State rights and State authority over their own internal affairs."[12] N. Y. Times, Feb. 28, 1866, p. 1.

Critically, Hale did *not* object to the draft insofar as it purported to protect constitutional liberties against state interference. Indeed, Hale stated that he believed (incorrectly in light of *Barron*) that individual rights enumerated in the Constitution were already enforceable against the States. See 39th Cong. Globe 1064 ("I have, somehow or other, gone along with the impression that there is that sort of protection thrown over us in some way, whether with or without the sanction of a judicial decision that we are so protected"); see N. Y. Times, Feb. 28, 1866, at 1. Hale's misperception was not uncommon among members of the Reconstruction generation. See *infra*, at 38–40. But that is secondary to the point that the Times' coverage of

_____

"The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." 39th Cong. Globe 1088.

[12] In a separate front-page article on the same day, the paper expounded upon Hale's arguments in even further detail, while omitting Bingham's chief rebuttals. N. Y. Times, Feb. 28, 1866, p. 1. The unbalanced nature of The New York Times' coverage is unsurprising. As scholars have noted, "[m]ost papers" during the time of Reconstruction "had a frank partisan slant . . . and the *Times* was no exception." Wildenthal 1559. In 1866, the paper "was still defending" President Johnson's resistance to Republican reform measures, as exemplified by the fact that it "supported Johnson's veto of the Civil Rights Act of 1866." *Ibid.*

this debate over §1's meaning suggests public awareness of its main contours—*i.e.*, that §1 would, at a minimum, enforce constitutionally enumerated rights of United States citizens against the States.

Bingham's draft was tabled for several months. In the interim, he delivered a second well-publicized speech, again arguing that a constitutional amendment was required to give Congress the power to enforce the Bill of Rights against the States. That speech was printed in pamphlet form, see Speech of Hon. John A. Bingham, of Ohio, on the Civil Rights Bill, Mar. 9, 1866 (Cong. Globe); see 39th Cong. Globe 1837 (remarks of Rep. Lawrence) (noting that the speech was "extensively published"), and the New York Times covered the speech on its front page. Thirty-Ninth Congress, N. Y. Times, Mar. 10, 1866, p. 1.

By the time the debates on the Fourteenth Amendment resumed, Bingham had amended his draft of §1 to include the text of the Privileges or Immunities Clause that was ultimately adopted. Senator Jacob Howard introduced the new draft on the floor of the Senate in the third speech relevant here. Howard explained that the Constitution recognized "a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, . . . some by the first eight amendments of the Constitution," and that "there is no power given in the Constitution to enforce and to carry out any of these guarantees" against the States. 39th Cong. Globe 2765. Howard then stated that "the great object" of §1 was to "restrain the power of the States and compel them at all times to respect these great fundamental guarantees." *Id.*, at 2766. Section 1, he indicated, imposed "a general prohibition upon all the States, as such, from abridging the privileges and immunities of the citizens of the United States." *Id.*, at 2765.

In describing these rights, Howard explained that they included "the privileges and immunities spoken of" in

Article IV, §2. *Id.,* at 2765. Although he did not catalogue the precise "nature" or "extent" of those rights, he thought "Corfield *v.* Coryell" provided a useful description. Howard then submitted that

> "[t]o these privileges and immunities, whatever they may be— . . . should be added *the personal rights guarantied and secured by the first eight amendments of the Constitution*; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, [and] . . . *the right to keep and to bear arms*." *Ibid.* (emphasis added).

News of Howard's speech was carried in major newspapers across the country, including the New York Herald, see N. Y. Herald, May 24, 1866, p. 1, which was the best-selling paper in the Nation at that time, see A. Amar, The Bill of Rights: Creation and Reconstruction 187 (1998) (hereinafter Amar).[13] The New York Times carried the speech as well, reprinting a lengthy excerpt of Howard's remarks, including the statements quoted above. N. Y. Times, May 24, 1866, p. 1. The following day's Times editorialized on Howard's speech, predicting that "[t]o this, the first section of the amendment, the Union party throughout the country will yield a ready acquiescence, and the South could offer no justifiable resistance," suggesting that Bingham's narrower second draft had not been met with the same objections that Hale had raised against the first. N. Y. Times, May 25, 1866, p. 4.

———————

[13] Other papers that covered Howard's speech include the following: Baltimore Gazette, May 24, 1866, p. 4; Boston Daily Journal, May 24, 1866, p. 4; Boston Daily Advertiser, May 24, 1866, p. 1; Daily National Intelligencer, May 24, 1866, p. 3. Springfield Daily Republican, May 24, 1866, p. 3; Charleston Daily Courier, May 28, 1866, p. 4; Charleston Daily Courier, May 29, 1866, p. 1; Chicago Tribune, May 29, 1866, p. 2; Philadelphia Inquirer, May 24, 1866, p. 8.

As a whole, these well-circulated speeches indicate that §1 was understood to enforce constitutionally declared rights against the States, and they provide no suggestion that any language in the section other than the Privileges or Immunities Clause would accomplish that task.

(2)

When read against this backdrop, the civil rights legislation adopted by the 39th Congress in 1866 further supports this view. Between passing the Thirteenth Amendment—which outlawed slavery alone—and the Fourteenth Amendment, Congress passed two significant pieces of legislation. The first was the Civil Rights Act of 1866, which provided that "all persons born in the United States" were "citizens of the United States" and that "such citizens, of every race and color, . . . shall have the same right" to, among other things, "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." Ch. 31, §1, 14 Stat. 27.

Both proponents and opponents of this Act described it as providing the "privileges" of citizenship to freedmen, and defined those privileges to include constitutional rights, such as the right to keep and bear arms. See 39th Cong. Globe 474 (remarks of Sen. Trumbull) (stating that the "the late slaveholding States" had enacted laws "depriving persons of African descent of privileges which are essential to freemen," including "prohibit[ing] any negro or mulatto from having fire-arms" and stating that "[t]he purpose of the bill under consideration is to destroy all these discriminations"); *id.*, at 1266–1267 (remarks of Rep. Raymond) (opposing the Act, but recognizing that to "[m]ake a colored man a citizen of the United States" would guarantee to him, *inter alia*, "a defined *status* . . . a right to defend himself and his wife and children; a right to bear arms").

Three months later, Congress passed the Freedmen's Bureau Act, which also entitled all citizens to the "full and equal benefit of all laws and proceedings concerning personal liberty" and "personal security." Act of July 16, 1866, ch. 200, §14, 14 Stat. 176. The Act stated expressly that the rights of personal liberty and security protected by the Act "includ[ed] the constitutional right to bear arms." *Ibid.*

### (3)

There is much else in the legislative record. Many statements by Members of Congress corroborate the view that the Privileges or Immunities Clause enforced constitutionally enumerated rights against the States. See Curtis 112 (collecting examples). I am not aware of any statement that directly refutes that proposition. That said, the record of the debates—like most legislative history—is less than crystal clear. In particular, much ambiguity derives from the fact that at least several Members described §1 as protecting the privileges and immunities of citizens "in the several States," harkening back to Article IV, §2. See *supra*, at 28–29 (describing Sen. Howard's speech). These statements can be read to support the view that the Privileges or Immunities Clause protects some or all the fundamental rights of "citizens" described in *Corfield*. They can also be read to support the view that the Privileges or Immunities Clause, like Article IV, §2, prohibits only state discrimination with respect to those rights it covers, but does not deprive States of the power to deny those rights to all citizens equally.

I examine the rest of the historical record with this understanding. But for purposes of discerning what the public most likely thought the Privileges or Immunities Clause to mean, it is significant that the most widely publicized statements by the legislators who voted on §1—Bingham, Howard, and even Hale—point unambiguously

toward the conclusion that the Privileges or Immunities Clause enforces at least those fundamental rights enumerated in the Constitution against the States, including the Second Amendment right to keep and bear arms.

3

Interpretations of the Fourteenth Amendment in the period immediately following its ratification help to establish the public understanding of the text at the time of its adoption.

Some of these interpretations come from Members of Congress. During an 1871 debate on a bill to enforce the Fourteenth Amendment, Representative Henry Dawes listed the Constitution's first eight Amendments, including "the right to keep and bear arms," before explaining that after the Civil War, the country "gave the most grand of all these rights, privileges, and immunities, by one single amendment to the Constitution, to four millions of American citizens" who formerly were slaves. Cong. Globe, 42d Cong., 1st Sess., 475–476 (1871). "It is all these," Dawes explained, "which are comprehended in the words 'American citizen.'" *Ibid.;* see also *id.*, at 334 (remarks of Rep. Hoar) (stating that the Privileges or Immunities Clause referred to those rights "declared to belong to the citizen by the Constitution itself"). Even opponents of Fourteenth Amendment enforcement legislation acknowledged that the Privileges or Immunities Clause protected constitutionally enumerated individual rights. See 2 Cong. Rec. 384–385 (1874) (remarks of Rep. Mills) (opposing enforcement law, but acknowledging, in referring to the Bill of Rights, that "[t]hese first amendments and some provisions of the Constitution of like import embrace the 'privileges and immunities' of citizenship as set forth in article 4, section 2 of the Constitution *and in the fourteenth amendment*" (emphasis added)); see Curtis 166–170 (collecting examples).

Legislation passed in furtherance of the Fourteenth Amendment demonstrates even more clearly this understanding. For example, Congress enacted the Civil Rights Act of 1871, 17 Stat. 13, which was titled in pertinent part "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States," and which is codified in the still-existing 42 U. S. C. §1983. That statute prohibits state officials from depriving citizens of "any rights, privileges, or immunities *secured by the Constitution*." Rev. Stat. 1979, 42 U. S. C. §1983 (emphasis added). Although the Judiciary ignored this provision for decades after its enactment, this Court has come to interpret the statute, unremarkably in light of its text, as protecting constitutionally enumerated rights. *Monroe* v. *Pape*, 365 U. S. 167, 171 (1961).

A Federal Court of Appeals decision written by a future Justice of this Court adopted the same understanding of the Privileges or Immunities Clause. See, *e.g.*, *United States* v. *Hall*, 26 F. Cas. 79, 82 (No. 15,282) (CC SD Ala. 1871) (Woods, J.) ("We think, therefore, that the . . . rights enumerated in the first eight articles of amendment to the constitution of the United States, are the privileges and immunities of citizens of the United States"). In addition, two of the era's major constitutional treatises reflected the understanding that §1 would protect constitutionally enumerated rights from state abridgment.[14] A third such treatise unambiguously indicates that the Privileges or

—————

[14] See J. Pomeroy, An Introduction to the Constitutional Law of the United States 155–156 (E. Bennett ed. 1886) (describing §1, which the country was then still considering, as a "needed" "remedy" for *Barron ex rel. Tiernan* v. *Mayor of Baltimore,* 7 Pet. 243 (1833), which held that the Bill of Rights was not enforceable against the States); T. Farrar, Manual of the Constitution of the United States of America 58–59, 145−146, 395–397 (1867) (reprint 1993); *id.*, at 546 (3d ed. 1872) (describing the Fourteenth Amendment as having "swept away" the "decisions of many courts" that "the popular rights guaranteed by the Constitution are secured only against [the federal] government").

Immunities Clause accomplished this task. G. Paschal, The Constitution of the United States 290 (1868) (explaining that the rights listed in §1 had "already been guarantied" by Article IV and the Bill of Rights, but that "[t]he new feature declared" by §1 was that these rights, "which had been construed to apply only to the national government, are thus imposed upon the States").

Another example of public understanding comes from United States Attorney Daniel Corbin's statement in an 1871 Ku Klux Klan prosecution. Corbin cited *Barron* and declared:

> "[T]he fourteenth amendment changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States—that, as Congress heretofore could not interfere with the right of the citizen to keep and bear arms, now, after the adoption of the fourteenth amendment, the State cannot interfere with the right of the citizen to keep and bear arms. The right to keep and bear arms is included in the fourteenth amendment, under 'privileges and immunities.'" Proceedings in the Ku Klux Trials at Columbia, S. C., in the United States Circuit Court, November Term, 1871, p. 147 (1872).

\* \* \*

This evidence plainly shows that the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights, including the right to keep and bear arms. As the Court demonstrates, there can be no doubt that §1 was understood to enforce the Second Amendment against the States. See *ante*, at 22–33. In my view, this is because the right to keep and bear arms was understood to be a privilege of American citizenship guaranteed by the Privileges or Immunities Clause.

## C

The next question is whether the Privileges or Immunities Clause merely prohibits States from discriminating among citizens if they recognize the Second Amendment's right to keep and bear arms, or whether the Clause requires States to recognize the right. The municipal respondents, Chicago and Oak Park, argue for the former interpretation. They contend that the Second Amendment, as applied to the States through the Fourteenth, authorizes a State to impose an outright ban on handgun possession such as the ones at issue here so long as a State applies it to all citizens equally.[15] The Court explains why this antidiscrimination-only reading of §1 as a whole is "implausible." *Ante*, at 31 (citing Brief for Municipal Respondents 64). I agree, but because I think it is the Privileges or Immunities Clause that applies this right to the States, I must explain why this Clause in particular protects against more than just state discrimination, and in fact establishes a minimum baseline of rights for all American citizens.

### 1

I begin, again, with the text. The Privileges or Immunities Clause opens with the command that "*No State shall*" abridge the privileges or immunities of citizens of the

––––––––––

[15] The municipal respondents and JUSTICE BREYER's dissent raise a most unusual argument that §1 prohibits discriminatory laws affecting only the right to keep and bear arms, but offers substantive protection to other rights enumerated in the Constitution, such as the freedom of speech. See *post*, at 24. Others, however, have made the more comprehensive—and internally consistent—argument that §1 bars discrimination alone and does not afford protection to any substantive rights. See, *e.g.*, R. Berger, Government By Judiciary: The Transformation of the Fourteenth Amendment (1997). I address the coverage of the Privileges or Immunities Clause only as it applies to the Second Amendment right presented here, but I do so with the understanding that my conclusion may have implications for the broader argument.

United States. Amdt. 14, §1 (emphasis added). The very same phrase opens Article I, §10 of the Constitution, which prohibits the States from "pass[ing] any Bill of Attainder" or "ex post facto Law," among other things. Article I, §10 is one of the few constitutional provisions that limits state authority. In *Barron*, when Chief Justice Marshall interpreted the Bill of Rights as lacking "plain and intelligible language" restricting state power to infringe upon individual liberties, he pointed to Article I, §10 as an example of text that would have accomplished that task. 7 Pet., at 250. Indeed, Chief Justice Marshall would later describe Article I, §10 as "a bill of rights for the people of each state." *Fletcher* v. *Peck*, 6 Cranch 87, 138 (1810). Thus, the fact that the Privileges or Immunities Clause uses the command "[n]o State shall"—which Article IV, §2 does not—strongly suggests that the former imposes a greater restriction on state power than the latter.

This interpretation is strengthened when one considers that the Privileges or Immunities Clause uses the verb "abridge," rather than "discriminate," to describe the limit it imposes on state authority. The Webster's dictionary in use at the time of Reconstruction defines the word "abridge" to mean "[t]o deprive; to cut off; . . . as, to *abridge* one of his rights." Webster, An American Dictionary of the English Language, at 6. The Clause is thus best understood to impose a limitation on state power to infringe upon pre-existing substantive rights. It raises no indication that the Framers of the Clause used the word "abridge" to prohibit only discrimination.

This most natural textual reading is underscored by a well-publicized revision to the Fourteenth Amendment that the Reconstruction Congress rejected. After several Southern States refused to ratify the Amendment, President Johnson met with their Governors to draft a compromise. N. Y. Times, Feb. 5, 1867, p. 5. Their proposal

eliminated Congress' power to enforce the Amendment (granted in §5), and replaced the Privileges or Immunities Clause in §1 with the following:

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the States in which they reside, and the Citizens of each State shall be entitled to all *the privileges and immunities of citizens in the several States*." Draft reprinted in 1 Documentary History of Reconstruction 240 (W. Fleming ed. 1950) (hereinafter Fleming).

Significantly, this proposal removed the "[n]o State shall" directive and the verb "abridge" from §1, and also changed the class of rights to be protected from those belonging to "citizens of the United States" to those of the "citizens in the several States." This phrasing is materially indistinguishable from Article IV, §2, which generally was understood as an antidiscrimination provision alone. See *supra*, at 15–18. The proposal thus strongly indicates that at least the President of the United States and several southern Governors thought that the Privileges or Immunities Clause, which they unsuccessfully tried to revise, prohibited more than just state-sponsored discrimination.

2

The argument that the Privileges or Immunities Clause prohibits no more than discrimination often is followed by a claim that public discussion of the Clause, and of §1 generally, was not extensive. Because of this, the argument goes, §1 must not have been understood to accomplish such a significant task as subjecting States to federal enforcement of a minimum baseline of rights. That argument overlooks critical aspects of the Nation's history that underscored the need for, and wide agreement upon,

federal enforcement of constitutionally enumerated rights against the States, including the right to keep and bear arms.

### a

I turn first to public debate at the time of ratification. It is true that the congressional debates over §1 were relatively brief. It is also true that there is little evidence of extensive debate in the States. Many state legislatures did not keep records of their debates, and the few records that do exist reveal only modest discussion. See Curtis 145. These facts are not surprising.

First, however consequential we consider the question today, the nationalization of constitutional rights was not the most controversial aspect of the Fourteenth Amendment at the time of its ratification. The Nation had just endured a tumultuous civil war, and §§2, 3, and 4—which reduced the representation of States that denied voting rights to blacks, deprived most former Confederate officers of the power to hold elective office, and required States to disavow Confederate war debts—were far more polarizing and consumed far more political attention. See Wildenthal 1600; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L. Rev. 695, 699 (2009).

Second, the congressional debates on the Fourteenth Amendment reveal that many representatives, and probably many citizens, believed that the Thirteenth Amendment, the 1866 Civil Rights legislation, or some combination of the two, had already enforced constitutional rights against the States. Justice Black's dissent in *Adamson* chronicles this point in detail. 332 U. S., at 107–108 (Appendix to dissenting opinion). Regardless of whether that understanding was accurate as a matter of constitutional law, it helps to explain why Congressmen had little to say during the debates about §1. See *ibid.*

Third, while *Barron* made plain that the Bill of Rights was not legally enforceable against the States, see *supra*, at 2, the significance of that holding should not be overstated. Like the Framers, see *supra*, at 14–15, many 19th-century Americans understood the Bill of Rights to declare inalienable rights that pre-existed all government. Thus, even though the Bill of Rights technically applied only to the Federal Government, many believed that it declared rights that no legitimate government could abridge.

Chief Justice Henry Lumpkin's decision for the Georgia Supreme Court in *Nunn* v. *State*, 1 Ga. 243 (1846), illustrates this view. In assessing state power to regulate firearm possession, Lumpkin wrote that he was "aware that it has been decided, that [the Second Amendment], like other amendments adopted at the same time, is a restriction upon the government of the United States, and does not extend to the individual States." *Id.*, at 250. But he still considered the right to keep and bear arms as "an unalienable right, which lies at the bottom of every free government," and thus found the States bound to honor it. *Ibid.* Other state courts adopted similar positions with respect to the right to keep and bear arms and other enumerated rights.[16] Some courts even suggested that the protections in the Bill of Rights were legally enforceable against the States, *Barron* notwithstanding.[17] A prominent treatise of the era took the same position. W. Rawle, A View of the Constitution of the United States of America

_____

[16] See, *e.g.*, *Raleigh & Gaston R. Co.* v. *Davis*, 19 N. C. 451, 458–462 (1837) (right to just compensation for government taking of property); *Rohan* v. *Swain*, 59 Mass. 281, 285 (1850) (right to be secure from unreasonable government searches and seizures); *State* v. *Buzzard*, 4 Ark. 18, 28 (1842) (right to keep and bear arms); *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (same); *Cockrum* v. *State*, 24 Tex. 394, 401–404 (1859) (same).

[17] See, *e.g.*, *People* v. *Goodwin*, 18 Johns. Cas. 187, 201 (N. Y. Sup. Ct. 1820); *Rhinehart* v. *Schulyer*, 7 Ill. 473, 522 (1845).

124–125 (2d ed. 1829) (reprint 2009) (arguing that certain
of the first eight Amendments "appl[y] to the state legisla-
tures" because those Amendments "form parts of the
declared rights of the people, of which neither the state
powers nor those of the Union can ever deprive them"); *id.*,
at 125−126 (describing the Second Amendment "right of
the people to keep and bear arms" as "a restraint on both"
Congress and the States); see also *Heller*, 554 U. S., at __
(slip op., at 34) (describing Rawle's treatise as "influen-
tial").  Certain abolitionist leaders adhered to this view as
well.  Lysander Spooner championed the popular aboli-
tionist argument that slavery was inconsistent with con-
stitutional principles, citing as evidence the fact that it
deprived black Americans of the "natural right of all men
'to keep and bear arms' for their personal defence," which
he believed the Constitution "prohibit[ed] both Congress
and the State governments from infringing."  L. Spooner,
The Unconstitutionality of Slavery 98 (1860).

    In sum, some appear to have believed that the Bill of
Rights *did* apply to the States, even though this Court had
squarely rejected that theory.  See, *e.g.*, *supra*, at 27–28
(recounting Rep. Hale's argument to this effect). Many
others believed that the liberties codified in the Bill of
Rights were ones that no State *should* abridge, even
though they understood that the Bill technically did not
apply to States.  These beliefs, combined with the fact that
most state constitutions recognized many, if not all, of the
individual rights enumerated in the Bill of Rights, made
the need for federal enforcement of constitutional liberties
against the States an afterthought.  See *ante*, at 29 (opin-
ion of the Court) (noting that, "[i]n 1868, 22 of the 37
States in the Union had state constitutional provisions
explicitly protecting the right to keep and bear arms").
That changed with the national conflict over slavery.

b

In the contentious years leading up to the Civil War, those who sought to retain the institution of slavery found that to do so, it was necessary to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists. Congressman Tobias Plants explained that slaveholders "could not hold [slaves] safely where dissent was permitted," so they decided that "all dissent must be suppressed by the strong hand of power." 39th Cong. Globe 1013. The measures they used were ruthless, repressed virtually every right recognized in the Constitution, and demonstrated that preventing only discriminatory state firearms restrictions would have been a hollow assurance for liberty. Public reaction indicates that the American people understood this point.

The overarching goal of pro-slavery forces was to repress the spread of abolitionist thought and the concomitant risk of a slave rebellion. Indeed, it is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures. Slaves and free blacks represented a substantial percentage of the population and posed a severe threat to Southern order if they were not kept in their place. According to the 1860 Census, slaves represented one quarter or more of the population in 11 of the 15 slave States, nearly half the population in Alabama, Florida, Georgia, and Louisiana, and *more* than 50% of the population in Mississippi and South Carolina. Statistics of the United States (Including Mortality, Property, &c.,) in 1860, The Eighth Census 336–350 (1866).

The Southern fear of slave rebellion was not unfounded. Although there were others, two particularly notable slave uprisings heavily influenced slaveholders in the South. In 1822, a group of free blacks and slaves led by Denmark Vesey planned a rebellion in which they would slay their masters and flee to Haiti. H. Aptheker, American Negro

Slave Revolts 268–270 (1983). The plan was foiled, leading to the swift arrest of 130 blacks, and the execution of 37, including Vesey. *Id.*, at 271. Still, slaveowners took notice—it was reportedly feared that as many as 6,600 to 9,000 slaves and free blacks were involved in the plot. *Id.*, at 272. A few years later, the fear of rebellion was realized. An uprising led by Nat Turner took the lives of at least 57 whites before it was suppressed. *Id.*, at 300–302.

The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense. Teaching slaves to read (even the Bible) was a criminal offense punished severely in some States. See K. Stampp, The Peculiar Institution: Slavery in the Ante-bellum South 208, 211 (1956). Virginia made it a crime for a member of an "abolition" society to enter the State and argue "that the owners of slaves have no property in the same, or advocate or advise the abolition of slavery." 1835–1836 Va. Acts ch. 66, p. 44. Other States prohibited the circulation of literature denying a master's right to property in his slaves and passed laws requiring postmasters to inspect the mails in search of such material. C. Eaton, The Freedom-of-Thought Struggle in the Old South 118–143, 199–200 (1964).

Many legislatures amended their laws prohibiting slaves from carrying firearms[18] to apply the prohibition to free blacks as well. See, *e.g.*, Act of Dec. 23, 1833, §7, 1833 Ga. Acts pp. 226, 228 (declaring that "it shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever"); H. Ap-

---

[18] See, *e.g.*, Black Code, ch. 33, §19, 1806 La. Acts pp. 160, 162 (prohibiting slaves from using firearms unless they were authorized by their master to hunt within the boundaries of his plantation); Act of Dec. 18, 1819, 1819 S. C. Acts pp. 29, 31 (same); An Act Concerning Slaves, §6, 1840 Tex. Laws pp. 42–43 (making it unlawful for "any slave to own firearms of any description").

theker, Nat Turner's Slave Rebellion 74–76, 83–94 (1966) (discussing similar Maryland and Virginia statutes); see also Act of Mar. 15, 1852, ch. 206, 1852 Miss. Laws p. 328 (repealing laws allowing free blacks to obtain firearms licenses); Act of Jan. 31, 1831, 1831 Fla. Acts p. 30 (same). Florida made it the "duty" of white citizen "patrol[s] to search negro houses or other suspected places, for fire arms." Act of Feb. 17, 1833, ch. 671, 1833 Fla. Acts pp. 26, 30. If they found any firearms, the patrols were to take the offending slave or free black "to the nearest justice of the peace," whereupon he would be "severely punished" by "whipping on the bare back, not exceeding thirty-nine lashes," unless he could give a "plain and satisfactory" explanation of how he came to possess the gun. *Ibid.*

Southern blacks were not alone in facing threats to their personal liberty and security during the antebellum era. Mob violence in many Northern cities presented dangers as well. Cottrol & Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L. J. 309, 340 (1991) (hereinafter Cottrol) (recounting a July 1834 mob attack against "churches, homes, and businesses of white abolitionists and blacks" in New York that involved "upwards of twenty thousand people and required the intervention of the militia to suppress"); *ibid.* (noting an uprising in Boston nine years later in which a confrontation between a group of white sailors and four blacks led "a mob of several hundred whites" to "attac[k] and severely beat every black they could find").

c

After the Civil War, Southern anxiety about an uprising among the newly freed slaves peaked. As Representative Thaddeus Stevens is reported to have said, "[w]hen it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in

hysterics." K. Stampp, The Era of Reconstruction, 1865–
1877, p. 104 (1965) (hereinafter Era of Reconstruction).

As the Court explains, this fear led to "systematic ef-
forts" in the "old Confederacy" to disarm the more than
180,000 freedmen who had served in the Union Army, as
well as other free blacks. See *ante*, at 23. Some States
formally prohibited blacks from possessing firearms. *Ante,*
at 23–24 (quoting 1865 Miss. Laws p. 165, §1, reprinted in
1 Fleming 289). Others enacted legislation prohibiting
blacks from carrying firearms without a license, a restric-
tion not imposed on whites. See, *e.g.*, La. Statute of 1865,
reprinted in *id.,* at 280. Additionally, "[t]hroughout the
South, armed parties, often consisting of ex-Confederate
soldiers serving in the state militias, forcibly took firearms
from newly freed slaves." *Ante*, at 24.

As the Court makes crystal clear, if the Fourteenth
Amendment "had outlawed only those laws that discrimi-
nate on the basis of race or previous condition of servitude,
African-Americans in the South would likely have re-
mained vulnerable to attack by many of their worst abus-
ers: the state militia and state peace officers." *Ante,* at 32.
In the years following the Civil War, a law banning fire-
arm possession outright "would have been nondiscrimina-
tory only in the formal sense," for it would have "left fire-
arms in the hands of the militia and local peace officers."
*Ibid.*

Evidence suggests that the public understood this at the
time the Fourteenth Amendment was ratified. The pub-
licly circulated Report of the Joint Committee on Recon-
struction extensively detailed these abuses, see *ante,* at
23–24 (collecting examples), and statements by citizens
indicate that they looked to the Committee to provide a
federal solution to this problem, see, *e.g.*, 39th Cong. Globe
337 (remarks of Rep. Sumner) (introducing "a memorial
from the colored citizens of the State of South Carolina"
asking for, *inter alia*, "constitutional protection in keeping

arms, in holding public assemblies, and in complete liberty of speech and of the press").

One way in which the Federal Government responded was to issue military orders countermanding Southern arms legislation. See, *e.g.*, Jan. 17, 1866, order from Major General D. E. Sickles, reprinted in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 37 (1871) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed"). The significance of these steps was not lost on those they were designed to protect. After one such order was issued, The Christian Recorder, published by the African Methodist Episcopal Church, published the following editorial:

> "'We have several times alluded to the fact that the Constitution of the United States, guaranties to every citizen the right to keep and bear arms. . . . All men, without the distinction of color, have the right to keep arms to defend their homes, families, or themselves.'
>
> "We are glad to learn that [the] Commissioner for this State . . . has given freedmen to understand that they have as good a right to keep fire arms as any other citizens. The Constitution of the United States is the supreme law of the land, and we will be governed by that at present." Right to Bear Arms, Christian Recorder (Phila.), Feb. 24, 1866, pp. 29–30.

The same month, The Loyal Georgian carried a letter to the editor asking "Have colored persons a right to own and carry fire arms?—A Colored Citizen." The editors responded as follows:

> "Almost every day, we are asked questions similar to the above. We answer *certainly* you have the *same* right to own and carry fire arms that *other* citizens have. You are not only free but citizens of the United States and, as such, entitled to the same privileges

granted to other citizens by the Constitution of the
United States.

> .        .        .        .        .

> " . . . Article II, of the amendments to the Constitution
> of the United States, gives the people the right to bear
> arms and states that this right shall not be infringed.
> . . . All men, without distinction of color, have the
> right to keep arms to defend their homes, families or
> themselves."   Letter to the Editor, Loyal Georgian
> (Augusta), Feb. 3, 1866, p. 3.

These statements are consistent with the arguments of
abolitionists during the antebellum era that slavery, and
the slave States' efforts to retain it, violated the constitu-
tional rights of individuals—rights the abolitionists de-
scribed as among the privileges and immunities of citizen-
ship.     See, *e.g.*, J. Tiffany, Treatise on the
Unconstitutionality of American Slavery 56 (1849) (reprint
1969) ("pledg[ing] . . . to see that all the rights, privileges,
and immunities, granted by the constitution of the United
States, are extended to all"); *id.*, at 99 (describing the
"right to keep and bear arms" as one of those rights se-
cured by "the constitution of the United States").   The
problem abolitionists sought to remedy was that, under
*Dred Scott*, blacks were not entitled to the privileges and
immunities of citizens under the Federal Constitution and
that, in many States, whatever inalienable rights state
law recognized did not apply to blacks.  See, *e.g.*, *Cooper* v.
*Savannah*, 4 Ga. 68, 72 (1848) (deciding, just two years
after Chief Justice Lumpkin's opinion in *Nunn* recognizing
the right to keep and bear arms, see *supra*, at 39, that
"[f]ree persons of color have never been recognized here as
citizens; they are not entitled to bear arms").

Section 1 guaranteed the rights of citizenship in the
United States and in the several States without regard to
race.  But it was understood that liberty would be assured

little protection if §1 left each State to decide which privileges or immunities of United States citizenship it would protect. As Frederick Douglass explained before §1's adoption, "the Legislatures of the South can take from him the right to keep and bear arms, as they can—they would not allow a negro to walk with a cane where I came from, they would not allow five of them to assemble together." In What New Skin Will the Old Snake Come Forth? An Address Delivered in New York, New York, May 10, 1865, reprinted in 4 The Frederick Douglass Papers 79, 83–84 (J. Blassingame & J. McKivigan eds., 1991) (footnote omitted). "Notwithstanding the provision in the Constitution of the United States, that the right to keep and bear arms shall not be abridged," Douglass explained that "the black man has never had the right either to keep or bear arms." *Id*., at 84. Absent a constitutional amendment to enforce that right against the States, he insisted that "the work of the Abolitionists [wa]s not finished." *Ibid.*

This history confirms what the text of the Privileges or Immunities Clause most naturally suggests: Consistent with its command that "[n]o State shall . . . abridge" the rights of United States citizens, the Clause establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them.[19]

### III

My conclusion is contrary to this Court's precedents, which hold that the Second Amendment right to keep and bear arms is not a privilege of United States citizenship.

---

[19] I conclude that the right to keep and bear arms applies to the States through the Privileges or Immunities Clause, which recognizes the rights of United States "citizens." The plurality concludes that the right applies to the States through the Due Process Clause, which covers all "person[s]." Because this case does not involve a claim brought by a noncitizen, I express no view on the difference, if any, between my conclusion and the plurality's with respect to the extent to which the States may regulate firearm possession by noncitizens.

See *Cruikshank*, 92 U. S., at 548–549, 551–553.  I must, therefore, consider whether *stare decisis* requires retention of those precedents.  As mentioned at the outset, my inquiry is limited to the right at issue here.  Thus, I do not endeavor to decide in this case whether, or to what extent, the Privileges or Immunities Clause applies any other rights enumerated in the Constitution against the States.[20]  Nor do I suggest that the *stare decisis* considerations surrounding the application of the right to keep and bear arms against the States would be the same as those surrounding another right protected by the Privileges or Immunities Clause.  I consider *stare decisis* only as it applies to the question presented here.

## A

This inquiry begins with the *Slaughter-House Cases*.  There, this Court upheld a Louisiana statute granting a monopoly on livestock butchering in and around the city of New Orleans to a newly incorporated company.  16 Wall. 36.  Butchers excluded by the monopoly sued, claiming that the statute violated the Privileges or Immunities Clause because it interfered with their right to pursue and "exercise their trade."  *Id.*, at 60.  This Court rejected the butchers' claim, holding that their asserted right was not a

————————

[20]I note, however, that I see no reason to assume that the constitutionally enumerated rights protected by the Privileges or Immunities Clause should consist of all the rights recognized in the Bill of Rights and no others.  Constitutional provisions outside the Bill of Rights protect individual rights, see, *e.g.,* Art. I, §9, cl. 2 (granting the "Privilege of the Writ of Habeas Corpus"), and there is no obvious evidence that the Framers of the Privileges or Immunities Clause meant to exclude them.  In addition, certain Bill of Rights provisions prevent federal interference in state affairs and are not readily construed as protecting rights that belong to individuals.  The Ninth and Tenth Amendments are obvious examples, as is the First Amendment's Establishment Clause, which "does not purport to protect individual rights."  *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 50 (2004) (THOMAS, J., concurring in judgment); see Amar 179–180.

privilege or immunity of American citizenship, but one governed by the States alone. The Court held that the Privileges or Immunities Clause protected only rights of *federal* citizenship—those "which owe their existence to the Federal government, its National character, its Constitution, or its laws," *id.*, at 79—and did not protect *any* of the rights of state citizenship, *id.*, at 74. In other words, the Court defined the two sets of rights as mutually exclusive.

After separating these two sets of rights, the Court defined the rights of state citizenship as "embrac[ing] nearly every civil right for the establishment and protection of which organized government is instituted"—that is, all those rights listed in *Corfield*. 16 Wall., at 76 (referring to "those rights" that "Judge Washington" described). That left very few rights of federal citizenship for the Privileges or Immunities Clause to protect. The Court suggested a handful of possibilities, such as the "right of free access to [federal] seaports," protection of the Federal Government while traveling "on the high seas," and even two rights listed in the Constitution. *Id.*, at 79 (noting "[t]he right to peaceably assemble" and "the privilege of the writ of *habeas corpus*"); see *supra*, at 4. But its decision to interpret the rights of state and federal citizenship as mutually exclusive led the Court in future cases to conclude that constitutionally enumerated rights were excluded from the Privileges or Immunities Clause's scope. See *Cruikshank*, *supra*.

I reject that understanding. There was no reason to interpret the Privileges or Immunities Clause as putting the Court to the extreme choice of interpreting the "privileges and immunities" of federal citizenship to mean either all those rights listed in *Corfield*, or almost no rights at all. 16 Wall., at 76. The record is scant that the public understood the Clause to make the Federal Government "a perpetual censor upon all legislation of the States" as

the *Slaughter-House* majority feared. *Id.*, at 78. For one thing, *Corfield* listed the "elective franchise" as one of the privileges and immunities of "citizens of the several states," 6 F. Cas., at 552, yet Congress and the States still found it necessary to adopt the Fifteenth Amendment— which protects "[t]he right of citizens of the United States to vote"—two years after the Fourteenth Amendment's passage. If the Privileges or Immunities Clause were understood to protect every conceivable civil right from state abridgment, the Fifteenth Amendment would have been redundant.

The better view, in light of the States and Federal Government's shared history of recognizing certain inalienable rights in their citizens, is that the privileges and immunities of state and federal citizenship overlap. This is not to say that the privileges and immunities of state and federal citizenship are the same. At the time of the Fourteenth Amendment's ratification, States performed many more functions than the Federal Government, and it is unlikely that, simply by referring to "privileges or immunities," the Framers of §1 meant to transfer every right mentioned in *Corfield* to congressional oversight. As discussed, "privileges" and "immunities" were understood only as synonyms for "rights." See *supra*, at 9–11. It was their attachment to a particular group that gave them content, and the text and history recounted here indicate that the rights of United States citizens were not perfectly identical to the rights of citizens "in the several States." Justice Swayne, one of the dissenters in *Slaughter-House*, made the point clear:

> "The citizen of a State has the *same* fundamental rights as a citizen of the United States, *and also certain others*, local in their character, arising from his relation to the State, and in addition, those which belong to the citizen of the United States, he being in

that relation also. There may thus be a double citizenship, each having some rights peculiar to itself. It is only over those which belong to the citizen of the United States that the category here in question throws the shield of its protection." 16 Wall., at 126 (emphasis added).

Because the privileges and immunities of American citizenship include rights enumerated in the Constitution, they overlap to at least some extent with the privileges and immunities traditionally recognized in citizens in the several States.

A separate question is whether the privileges and immunities of American citizenship include any rights besides those enumerated in the Constitution. The four dissenting Justices in *Slaughter-House* would have held that the Privileges or Immunities Clause protected the unenumerated right that the butchers in that case asserted. See *id.*, at 83 (Field, J., dissenting); *id.*, at 111 (Bradley, J., dissenting); *id.*, at 124 (Swayne, J., dissenting). Because this case does not involve an unenumerated right, it is not necessary to resolve the question whether the Clause protects such rights, or whether the Court's judgment in *Slaughter-House* was correct.

Still, it is argued that the mere possibility that the Privileges or Immunities Clause may enforce unenumerated rights against the States creates "'special hazards'" that should prevent this Court from returning to the original meaning of the Clause.[21] *Post*, at 3 (STEVENS, J., dissenting). Ironically, the same objection applies to the

_____

[21] To the extent JUSTICE STEVENS is concerned that reliance on the Privileges or Immunities Clause may invite judges to "write their personal views of appropriate public policy into the Constitution," *post*, at 3 (internal quotation marks omitted), his celebration of the alternative—the "flexibility," "transcend[ence]," and "dynamism" of substantive due process—speaks for itself, *post*, at 14–15, 20.

Court's substantive due process jurisprudence, which illustrates the risks of granting judges broad discretion to recognize individual constitutional rights in the absence of textual or historical guideposts. But I see no reason to assume that such hazards apply to the Privileges or Immunities Clause. The mere fact that the Clause does not expressly list the rights it protects does not render it incapable of principled judicial application. The Constitution contains many provisions that require an examination of more than just constitutional text to determine whether a particular act is within Congress' power or is otherwise prohibited. See, *e.g.*, Art. I, §8, cl. 18 (Necessary and Proper Clause); Amdt. 8 (Cruel and Unusual Punishments Clause). When the inquiry focuses on what the ratifying era understood the Privileges or Immunities Clause to mean, interpreting it should be no more "hazardous" than interpreting these other constitutional provisions by using the same approach. To be sure, interpreting the Privileges or Immunities Clause may produce hard questions. But they will have the advantage of being questions the Constitution asks us to answer. I believe those questions are more worthy of this Court's attention—and far more likely to yield discernable answers—than the substantive due process questions the Court has for years created on its own, with neither textual nor historical support.

Finding these impediments to returning to the original meaning overstated, I reject *Slaughter-House* insofar as it precludes any overlap between the privileges and immunities of state and federal citizenship. I next proceed to the *stare decisis* considerations surrounding the precedent that expressly controls the question presented here.

## B

Three years after *Slaughter-House*, the Court in *Cruikshank* squarely held that the right to keep and bear arms was not a privilege of American citizenship, thereby over-

turning the convictions of militia members responsible for the brutal Colfax Massacre. See *supra*, at 4–5. *Cruikshank* is not a precedent entitled to any respect. The flaws in its interpretation of the Privileges or Immunities Clause are made evident by the preceding evidence of its original meaning, and I would reject the holding on that basis alone. But, the consequences of *Cruikshank* warrant mention as well.

*Cruikshank*'s holding that blacks could look only to state governments for protection of their right to keep and bear arms enabled private forces, often with the assistance of local governments, to subjugate the newly freed slaves and their descendants through a wave of private violence designed to drive blacks from the voting booth and force them into peonage, an effective return to slavery. Without federal enforcement of the inalienable right to keep and bear arms, these militias and mobs were tragically successful in waging a campaign of terror against the very people the Fourteenth Amendment had just made citizens.

Take, for example, the Hamburg Massacre of 1876. There, a white citizen militia sought out and murdered a troop of black militiamen for no other reason than that they had dared to conduct a celebratory Fourth of July parade through their mostly black town. The white militia commander, "Pitchfork" Ben Tillman, later described this massacre with pride: "[T]he leading white men of Edgefield" had decided "to seize the first opportunity that the negroes might offer them to provoke a riot and teach the negroes a lesson by having the whites demonstrate their superiority by killing as many of them as was justifiable." S. Kantrowitz, Ben Tillman & the Reconstruction of White Supremacy 67 (2000) (ellipsis, brackets, and internal quotation marks omitted). None of the perpetrators of the Hamburg murders was ever brought to justice.[22]

—————

[22] Tillman went on to a long career as South Carolina's Governor and,

Organized terrorism like that perpetuated by Tillman and his cohorts proliferated in the absence of federal enforcement of constitutional rights. Militias such as the Ku Klux Klan, the Knights of the White Camellia, the White Brotherhood, the Pale Faces, and the '76 Association spread terror among blacks and white Republicans by breaking up Republican meetings, threatening political leaders, and whipping black militiamen. Era of Reconstruction, 199–200; Curtis 156. These groups raped, murdered, lynched, and robbed as a means of intimidating, and instilling pervasive fear in, those whom they despised. A. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction 28–46 (1995).

Although Congress enacted legislation to suppress these activities,[23] Klan tactics remained a constant presence in the lives of Southern blacks for decades. Between 1882 and 1968, there were at least 3,446 reported lynchings of blacks in the South. Cottrol 351–352. They were tortured and killed for a wide array of alleged crimes, without even the slightest hint of due process. Emmit Till, for example, was killed in 1955 for allegedly whistling at a white woman. S. Whitfield, A Death in the Delta: The Story of Emmett Till 15–31 (1988). The fates of other targets of mob violence were equally depraved. See, *e.g.*, Lynched Negro and Wife Were First Mutilated, Vicksburg (Miss.)

---

later, United States Senator. Tillman's contributions to campaign finance law have been discussed in our recent cases on that subject. See *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___ (2010) (STEVENS, J., dissenting) (slip. op., at 2, 42, 56, 87) (discussing at length the Tillman Act of 1907, 34 Stat. 864). His contributions to the culture of terrorism that grew in the wake of *Cruikshank* had an even more dramatic and tragic effect.

[23] In an effort to enforce the Fourteenth Amendment and halt this violence, Congress enacted a series of civil rights statutes, including the Force Acts, see Act of May 31, 1870, 16 Stat. 140; Act of Feb. 28, 1871, 16 Stat. 433, and the Ku Klux Klan Act, see Act of Apr. 20, 1871, 17 Stat. 13.

Evening Post, Feb. 8, 1904, reprinted in R. Ginzburg, 100 Years of Lynchings 63 (1988); Negro Shot Dead for Kissing His White Girlfriend, Chi. Defender, Feb. 31, 1915, in *id.*, at 95 (reporting incident in Florida); La. Negro Is Burned Alive Screaming "I Didn't Do It," Cleveland Gazette, Dec. 13, 1914, in *id.*, at 93 (reporting incident in Louisiana).

The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence. As Eli Cooper, one target of such violence, is said to have explained, "'[t]he Negro has been run over for fifty years, but it must stop now, and pistols and shotguns are the only weapons to stop a mob.'" Church Burnings Follow Negro Agitator's Lynching, Chicago Defender, Sept. 6, 1919, in *id.*, at 124. Sometimes, as in Cooper's case, self-defense did not succeed. He was dragged from his home by a mob and killed as his wife looked on. *Ibid.* But at other times, the use of firearms allowed targets of mob violence to survive. One man recalled the night during his childhood when his father stood armed at a jail until morning to ward off lynchers. See Cottrol, 354. The experience left him with a sense, "not 'of powerlessness, but of the "possibilities of salvation"'" that came from standing up to intimidation. *Ibid.*

In my view, the record makes plain that the Framers of the Privileges or Immunities Clause and the ratifying-era public understood—just as the Framers of the Second Amendment did—that the right to keep and bear arms was essential to the preservation of liberty. The record makes equally plain that they deemed this right necessary to include in the minimum baseline of federal rights that the Privileges or Immunities Clause established in the wake of the War over slavery. There is nothing about *Cruikshank*'s contrary holding that warrants its retention.

\* \* \*

I agree with the Court that the Second Amendment is

fully applicable to the States.  I do so because the right to keep and bear arms is guaranteed by the Fourteenth Amendment as a privilege of American citizenship.

# SUPREME COURT OF THE UNITED STATES

————————

No. 08–1521

————————

## OTIS McDONALD, ET AL., PETITIONERS *v.* CITY OF CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE STEVENS, dissenting.

In *District of Columbia* v. *Heller*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 1), the Court answered the question whether a federal enclave's "prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution." The question we should be answering in this case is whether the Constitution "guarantees individuals a fundamental right," enforceable against the States, "to possess a functional, personal firearm, including a handgun, within the home." Complaint ¶34, App. 23. That is a different—and more difficult—inquiry than asking if the Fourteenth Amendment "incorporates" the Second Amendment. The so-called incorporation question was squarely and, in my view, correctly resolved in the late 19th century.[1]

Before the District Court, petitioners focused their pleadings on the special considerations raised by domestic possession, which they identified as the core of their asserted right. In support of their claim that the city of Chicago's handgun ban violates the Constitution, they now rely primarily on the Privileges or Immunities Clause of

————————

[1] See *United States* v. *Cruikshank*, 92 U. S. 542, 553 (1876); *Presser* v. *Illinois*, 116 U. S. 252, 265 (1886); *Miller* v. *Texas*, 153 U. S. 535, 538 (1894). This is not to say that I agree with all other aspects of these decisions.

the Fourteenth Amendment. See Brief for Petitioners 9–
65. They rely secondarily on the Due Process Clause of
that Amendment. See *id.,* at 66–72. Neither submission
requires the Court to express an opinion on whether the
Fourteenth Amendment places any limit on the power of
States to regulate possession, use, or carriage of firearms
outside the home.

I agree with the plurality's refusal to accept petitioners'
primary submission. *Ante*, at 10. Their briefs marshal an
impressive amount of historical evidence for their argu-
ment that the Court interpreted the Privileges or Immuni-
ties Clause too narrowly in the *Slaughter-House Cases*, 16
Wall. 36 (1873). But the original meaning of the Clause is
not as clear as they suggest[2]—and not nearly as clear as it
would need to be to dislodge 137 years of precedent. The

––––––––––

[2] Cf., *e.g.,* Currie, The Reconstruction Congress, 75 U. Chi. L. Rev.
383, 406 (2008) (finding "some support in the legislative history for no
fewer than four interpretations" of the Privileges or Immunities Clause,
two of which contradict petitioners' submission); Green, The Original
Sense of the (Equal) Protection Clause: Subsequent Interpretation and
Application, 19 Geo. Mason U. Civ. Rights L. J. 219, 255–277 (2009)
(providing evidence that the Clause was originally conceived of as an
antidiscrimination measure, guaranteeing equal rights for black
citizens); Rosenthal, The New Originalism Meets the Fourteenth
Amendment: Original Public Meaning and the Problem of Incorpora-
tion, 18 J. Contemporary Legal Issues 361 (2009) (detailing reasons to
doubt that the Clause was originally understood to apply the Bill of
Rights to the States); Hamburger, Privileges or Immunities, 105 Nw. U.
L. Rev. (forthcoming 2011), online at http://ssrn.com/abstract=1557870
(as visited June 25, 2010, and available in Clerk of Court's case file)
(arguing that the Clause was meant to ensure freed slaves were af-
forded "the Privileges and Immunities" specified in Article IV, §2, cl. 1
of the Constitution). Although he urges its elevation in our doctrine,
JUSTICE THOMAS has acknowledged that, in seeking to ascertain the
original meaning of the Privileges or Immunities Clause, "[l]egal
scholars agree on little beyond the conclusion that the Clause does not
mean what the Court said it meant in 1873." *Saenz* v. *Roe*, 526 U. S.
489, 522, n. 1 (1999) (dissenting opinion); accord, *ante*, at 10 (plurality
opinion).

burden is severe for those who seek radical change in such an established body of constitutional doctrine.[3] Moreover, the suggestion that invigorating the Privileges or Immunities Clause will reduce judicial discretion, see Reply Brief for Petitioners 22, n. 8, 26; Tr. of Oral Arg. 64–65, strikes me as implausible, if not exactly backwards. "For the very reason that it has so long remained a clean slate, a revitalized Privileges or Immunities Clause holds special hazards for judges who are mindful that their proper task is not to write their personal views of appropriate public policy into the Constitution."[4]

I further agree with the plurality that there are weighty arguments supporting petitioners' second submission, insofar as it concerns the possession of firearms for lawful self-defense in the home. But these arguments are less compelling than the plurality suggests; they are much less compelling when applied outside the home; and their validity does not depend on the Court's holding in *Heller*. For that holding sheds no light on the meaning of the Due Process Clause of the Fourteenth Amendment. Our decisions construing that Clause to render various procedural guarantees in the Bill of Rights enforceable against the

―――――――

[3] It is no secret that the desire to "displace" major "portions of our equal protection and substantive due process jurisprudence" animates some of the passion that attends this interpretive issue. *Saenz*, 526 U. S., at 528 (THOMAS, J., dissenting).

[4] Wilkinson, The Fourteenth Amendment Privileges or Immunities Clause, 12 Harv. J. L. & Pub. Pol'y 43, 52 (1989). Judge Wilkinson's point is broader than the privileges or immunities debate. As he observes, "there may be more structure imposed by provisions subject to generations of elaboration and refinement than by a provision in its pristine state. The fortuities of uneven constitutional development must be respected, not cast aside in the illusion of reordering the landscape anew." *Id.,* at 51–52; see also *Washington* v. *Glucksberg*, 521 U. S. 702, 759, n. 6 (1997) (Souter, J., concurring in judgment) (acknowledging that, "[t]o a degree," the *Slaughter-House* "decision may have led the Court to look to the Due Process Clause as a source of substantive rights").

States likewise tell us little about the meaning of the word "liberty" in the Clause or about the scope of its protection of nonprocedural rights.

This is a substantive due process case.

## I

Section 1 of the Fourteenth Amendment decrees that no State shall "deprive any person of life, liberty, or property, without due process of law." The Court has filled thousands of pages expounding that spare text. As I read the vast corpus of substantive due process opinions, they confirm several important principles that ought to guide our resolution of this case. The principal opinion's lengthy summary of our "incorporation" doctrine, see *ante*, at 5–9, 11–19 (majority opinion), 10–11 (plurality opinion), and its implicit (and untenable) effort to wall off that doctrine from the rest of our substantive due process jurisprudence, invite a fresh survey of this old terrain.

*Substantive Content*

The first, and most basic, principle established by our cases is that the rights protected by the Due Process Clause are not merely procedural in nature. At first glance, this proposition might seem surprising, given that the Clause refers to "process." But substance and procedure are often deeply entwined. Upon closer inspection, the text can be read to "impos[e] nothing less than an obligation to give substantive content to the words 'liberty' and 'due process of law,'" *Washington* v. *Glucksberg*, 521 U. S. 702, 764 (1997) (Souter, J., concurring in judgment), lest superficially fair procedures be permitted to "destroy the enjoyment" of life, liberty, and property, *Poe* v. *Ullman*, 367 U. S. 497, 541 (1961) (Harlan, J., dissenting), and the Clause's prepositional modifier be permitted to swallow its primary command. Procedural guarantees are hollow unless linked to substantive interests; and no

amount of process can legitimize some deprivations.

I have yet to see a persuasive argument that the Framers of the Fourteenth Amendment thought otherwise. To the contrary, the historical evidence suggests that, at least by the time of the Civil War if not much earlier, the phrase "due process of law" had acquired substantive content as a term of art within the legal community.[5] This understanding is consonant with the venerable "notion that governmental authority has implied limits which

———————

[5] See, *e.g.,* Ely, The Oxymoron Reconsidered: Myth and Reality in the Origins of Substantive Due Process, 16 Const. Commentary 315, 326–327 (1999) (concluding that founding-era "American statesmen accustomed to viewing due process through the lens of [Sir Edward] Coke and [William] Blackstone could [not] have failed to understand due process as encompassing substantive as well as procedural terms"); Gedicks, An Originalist Defense of Substantive Due Process: Magna Carta, Higher-Law Constitutionalism, and the Fifth Amendment, 58 Emory L. J. 585, 594 (2009) (arguing "that one widely shared understanding of the Due Process Clause of the Fifth Amendment in the late eighteenth century encompassed judicial recognition and enforcement of unenumerated substantive rights"); Maltz, Fourteenth Amendment Concepts in the Antebellum Era, 32 Am. J. Legal Hist. 305, 317–318 (1988) (explaining that in the antebellum era a "substantial number of states," as well as antislavery advocates, "imbued their [constitutions'] respective due process clauses with a substantive content"); Tribe, Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221, 1297, n. 247 (1995) ("[T]he *historical* evidence points strongly toward the conclusion that, at least by 1868 even if not in 1791, any state legislature voting to ratify a constitutional rule banning government deprivations of 'life, liberty, or property, without due process of law' would have understood that ban as having substantive as well as procedural content, given that era's premise that, to qualify as 'law,' an enactment would have to meet substantive requirements of rationality, non-oppressiveness, and evenhandedness"); see also Stevens, The Third Branch of Liberty, 41 U. Miami L. Rev. 277, 290 (1986) ("In view of the number of cases that have given substantive content to the term liberty, the burden of demonstrating that this consistent course of decision was unfaithful to the intent of the Framers is surely a heavy one").

preserve private autonomy,"[6] a notion which predates the founding and which finds reinforcement in the Constitution's Ninth Amendment, see *Griswold* v. *Connecticut*, 381 U. S. 479, 486–493 (1965) (Goldberg, J., concurring).[7]  The Due Process Clause cannot claim to be the source of our basic freedoms—no legal document ever could, see *Meachum* v. *Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting)—but it stands as one of their foundational guarantors in our law.

If text and history are inconclusive on this point, our precedent leaves no doubt: It has been "settled" for well over a century that the Due Process Clause "applies to matters of substantive law as well as to matters of procedure."  *Whitney* v. *California*, 274 U. S. 357, 373 (1927) (Brandeis, J., concurring).  Time and again, we have recognized that in the Fourteenth Amendment as well as the Fifth, the "Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint."  *Glucksberg*, 521 U. S., at 719.  "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"  *Troxel* v. *Granville*, 530 U. S. 57, 65 (2000) (opinion of O'Connor, J., joined by Rehnquist, C. J., and GINSBURG and BREYER, JJ.) (quoting *Glucksberg*, 521 U. S., at 720).  Some of our most enduring precedents, accepted today by virtually everyone, were substantive due process decisions.  See, *e.g., Loving* v. *Virginia*, 388 U. S. 1, 12 (1967) (recognizing due-process- as well as equal-protection-based right to marry person of another race); *Bolling* v. *Sharpe*, 347 U. S. 497, 499–500 (1954)

———————

[6] 1 L. Tribe, American Constitutional Law §8–1, p. 1335 (3d ed. 2000).

[7] The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

(outlawing racial segregation in District of Columbia public schools); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925) (vindicating right of parents to direct upbringing and education of their children); *Meyer* v. *Nebraska*, 262 U. S. 390, 399–403 (1923) (striking down prohibition on teaching of foreign languages).

*Liberty*

   The second principle woven through our cases is that substantive due process is fundamentally a matter of personal liberty. For it is the liberty clause of the Fourteenth Amendment that grounds our most important holdings in this field. It is the liberty clause that enacts the Constitution's "promise" that a measure of dignity and self-rule will be afforded to all persons. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 847 (1992). It is the liberty clause that reflects and renews "the origins of the American heritage of freedom [and] the abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable." *Fitzgerald* v. *Porter Memorial Hospital*, 523 F. 2d 716, 720 (CA7 1975) (Stevens, J.). Our substantive due process cases have episodically invoked values such as privacy and equality as well, values that in certain contexts may intersect with or complement a subject's liberty interests in profound ways. But as I have observed on numerous occasions, "most of the significant [20th-century] cases raising Bill of Rights issues have, in the final analysis, actually interpreted the word 'liberty' in the Fourteenth Amendment."[8]

   It follows that the term "incorporation," like the term "unenumerated rights," is something of a misnomer.

---

   [8] Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L. Rev. 13, 20 (1992); see *Fitzgerald*, 523 F. 2d, at 719–720; Stevens, 41 U. Miami L. Rev., at 286–289; see also Greene, The So-Called Right to Privacy, 43 U. C. D. L. Rev. 715, 725–731 (2010).

Whether an asserted substantive due process interest is explicitly named in one of the first eight Amendments to the Constitution or is not mentioned, the underlying inquiry is the same: We must ask whether the interest is "comprised within the term liberty." *Whitney*, 274 U. S., at 373 (Brandeis, J., concurring). As the second Justice Harlan has shown, ever since the Court began considering the applicability of the Bill of Rights to the States, "the Court's usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments." *Malloy* v. *Hogan*, 378 U. S. 1, 24 (1964) (dissenting opinion); see also Frankfurter, Memorandum on "Incorporation" of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, 78 Harv. L. Rev. 746, 747–750 (1965). In the pathmarking case of *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925), for example, both the majority and dissent evaluated petitioner's free speech claim not under the First Amendment but as an aspect of "the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."[9]

———————

[9] See also *Gitlow*, 268 U. S., at 672 (Holmes, J., dissenting) ("The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States"). Subsequent decisions repeatedly reaffirmed that persons hold free speech rights against the States on account of the Fourteenth Amendment's liberty clause, not the First Amendment *per se*. See, *e.g., NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 460, 466 (1958); *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940); *Thornhill* v. *Alabama*, 310 U. S. 88, 95, and n. 7 (1940); see also *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 336, n. 1 (1995) ("The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States"). Classic opinions written by Justice Cardozo and Justice Frankfurter endorsed the

In his own classic opinion in *Griswold*, 381 U. S., at 500 (concurring in judgment), Justice Harlan memorably distilled these precedents' lesson: "While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not dependent on them or any of their radiations.  The Due Process Clause of the Fourteenth Amendment stands . . . on its own bottom."[10] Inclusion in the Bill of Rights is neither necessary nor sufficient for an interest to be judicially enforceable under the Fourteenth Amendment.  This Court's "'selective incorporation'" doctrine, *ante*, at 15, is not simply "related" to substantive due process, *ante*, at 19; it is a subset thereof.

*Federal / State Divergence*

The third precept to emerge from our case law flows from the second: The rights protected against state infringement by the Fourteenth Amendment's Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights.  As drafted, the Bill of

———————

same basic approach to "incorporation," with the Fourteenth Amendment taken as a distinct source of rights independent from the first eight Amendments.  *Palko* v. *Connecticut*, 302 U. S. 319, 322–328 (1937) (opinion for the Court by Cardozo, J.); *Adamson* v. *California*, 332 U. S. 46, 59–68 (1947) (Frankfurter, J., concurring).

[10] See also *Wolf* v. *Colorado*, 338 U. S. 25, 26 (1949) ("The notion that the 'due process of law' guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution . . . has been rejected by this Court again and again, after impressive consideration. . . . The issue is closed").  *Wolf*'s holding on the exclusionary rule was overruled by *Mapp* v. *Ohio*, 367 U. S. 643 (1961), but the principle just quoted has never been disturbed.  It is notable that *Mapp*, the case that launched the modern "doctrine of *ad hoc*," "'jot-for-jot'" incorporation, *Williams* v. *Florida*, 399 U. S. 78, 130–131 (1970) (Harlan, J., concurring in result), expressly held "that the exclusionary rule is an essential part of both the Fourth *and Fourteenth* Amendments."  367 U. S., at 657 (emphasis added).

Rights directly constrained only the Federal Government. See *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243 (1833). Although the enactment of the Fourteenth Amendment profoundly altered our legal order, it "did not unstitch the basic federalist pattern woven into our constitutional fabric." *Williams* v. *Florida*, 399 U. S. 78, 133 (1970) (Harlan, J., concurring in result). Nor, for that matter, did it expressly alter the Bill of Rights. The Constitution still envisions a system of divided sovereignty, still "establishes a federal republic where local differences are to be cherished as elements of liberty" in the vast run of cases, *National Rifle Assn. of Am. Inc.* v. *Chicago*, 567 F. 3d 856, 860 (CA7 2009) (Easterbrook, C. J.), still allocates a general "police power . . . to the States and the States alone," *United States* v. *Comstock*, 560 U. S. ___, ___ (2010) (slip op., at 4) (KENNEDY, J., concurring in judgment). Elementary considerations of constitutional text and structure suggest there may be legitimate reasons to hold state governments to different standards than the Federal Government in certain areas.[11]

It is true, as the Court emphasizes, *ante*, at 15–19, that we have made numerous provisions of the Bill of Rights fully applicable to the States. It is settled, for instance, that the Governor of Alabama has no more power than the President of the United States to authorize unreasonable searches and seizures. *Ker* v. *California*, 374 U. S. 23 (1963). But we have never accepted a "total incorporation" theory of the Fourteenth Amendment, whereby the Amendment is deemed to subsume the provisions of the Bill of Rights en masse. See *ante*, at 15. And we have declined to apply several provisions to the States in any

---

[11] I can hardly improve upon the many passionate defenses of this position that Justice Harlan penned during his tenure on the Court. See *Williams*, 399 U. S., at 131, n. 14 (opinion concurring in result) (cataloguing opinions).

measure. See, *e.g., Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211 (1916) (Seventh Amendment); *Hurtado* v. *California*, 110 U. S. 516 (1884) (Grand Jury Clause). We have, moreover, resisted a uniform approach to the Sixth Amendment's criminal jury guarantee, demanding 12-member panels and unanimous verdicts in federal trials, yet not in state trials. See *Apodaca* v. *Oregon*, 406 U. S. 404 (1972) (plurality opinion); *Williams*, 399 U. S. 78. In recent years, the Court has repeatedly declined to grant certiorari to review that disparity.[12] While those denials have no precedential significance, they confirm the proposition that the "incorporation" of a provision of the Bill of Rights into the Fourteenth Amendment does not, in itself, mean the provision must have precisely the same meaning in both contexts.

It is true, as well, that during the 1960's the Court decided a number of cases involving procedural rights in which it treated the Due Process Clause as if it transplanted language from the Bill of Rights into the Fourteenth Amendment. See, *e.g., Benton* v. *Maryland*, 395 U. S. 784, 795 (1969) (Double Jeopardy Clause); *Pointer* v. *Texas*, 380 U. S. 400, 406 (1965) (Confrontation Clause). "Jot-for-jot" incorporation was the norm in this expansionary era. Yet at least one subsequent opinion suggests that these precedents require perfect state/federal congruence only on matters "'at the core'" of the relevant constitutional guarantee. *Crist* v. *Bretz*, 437 U. S. 28, 37 (1978); see also *id.,* at 52–53 (Powell, J., dissenting). In my judgment, this line of cases is best understood as having concluded that, to ensure a criminal trial satisfies essential standards of

———————

[12] See, *e.g.,* Pet. for Cert. in *Bowen* v. *Oregon*, O. T. 2009, No. 08–1117, p. i, cert. denied, 558 U. S. ___ (2009) (request to overrule *Apodaca*); Pet. for Cert. in *Lee* v. *Louisiana*, O. T. 2008, No. 07–1523, p. i, cert. denied, 555 U. S. ___ (2008) (same); Pet. for Cert. in *Logan* v. *Florida*, O. T. 2007, No. 07–7264, pp. 14–19, cert. denied, 552 U. S. 1189 (2008) (request to overrule *Williams*).

fairness, some procedures should be the same in state and federal courts: The need for certainty and uniformity is more pressing, and the margin for error slimmer, when criminal justice is at issue. That principle has little relevance to the question whether a *non*procedural rule set forth in the Bill of Rights qualifies as an aspect of the liberty protected by the Fourteenth Amendment.

Notwithstanding some overheated dicta in *Malloy*, 378 U. S., at 10–11, it is therefore an overstatement to say that the Court has "abandoned," *ante*, at 16, 17 (majority opinion), 39 (plurality opinion), a "two-track approach to incorporation," *ante*, at 37 (plurality opinion). The Court moved away from that approach in the area of criminal procedure. But the Second Amendment differs in fundamental respects from its neighboring provisions in the Bill of Rights, as I shall explain in Part V, *infra;* and if some 1960's opinions purported to establish a general method of incorporation, that hardly binds us in this case. The Court has not hesitated to cut back on perceived Warren Court excesses in more areas than I can count.

I do not mean to deny that there can be significant practical, as well as esthetic, benefits from treating rights symmetrically with regard to the State and Federal Governments. Jot-for-jot incorporation of a provision may entail greater protection of the right at issue and therefore greater freedom for those who hold it; jot-for-jot incorporation may also yield greater clarity about the contours of the legal rule. See *Johnson* v. *Louisiana*, 406 U. S. 356, 384–388 (1972) (Douglas, J., dissenting); *Pointer*, 380 U. S., at 413–414 (Goldberg, J., concurring). In a federalist system such as ours, however, this approach can carry substantial costs. When a federal court insists that state and local authorities follow its dictates on a matter not critical to personal liberty or procedural justice, the latter may be prevented from engaging in the kind of beneficent "experimentation in things social and economic" that

ultimately redounds to the benefit of all Americans. *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). The costs of federal courts' imposing a uniform national standard may be especially high when the relevant regulatory interests vary significantly across localities, and when the ruling implicates the States' core police powers.

Furthermore, there is a real risk that, by demanding the provisions of the Bill of Rights apply identically to the States, federal courts will cause those provisions to "be watered down in the needless pursuit of uniformity." *Duncan* v. *Louisiana*, 391 U. S. 145, 182, n. 21 (1968) (Harlan, J., dissenting). When one legal standard must prevail across dozens of jurisdictions with disparate needs and customs, courts will often settle on a relaxed standard. This watering-down risk is particularly acute when we move beyond the narrow realm of criminal procedure and into the relatively vast domain of substantive rights. So long as the requirements of fundamental fairness are always and everywhere respected, it is not clear that greater liberty results from the jot-for-jot application of a provision of the Bill of Rights to the States. Indeed, it is far from clear that proponents of an individual right to keep and bear arms ought to celebrate today's decision.[13]

---

[13] The vast majority of States already recognize a right to keep and bear arms in their own constitutions, see Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Pol. 191 (2006) (cataloguing provisions); Brief for Petitioners 69 (observing that "[t]hese Second Amendment analogs are effective and consequential"), but the States vary widely in their regulatory schemes, their traditions and cultures of firearm use, and their problems relating to gun violence. If federal and state courts must harmonize their review of gun-control laws under the Second Amendment, the resulting jurisprudence may prove significantly more deferential to those laws than the *status quo ante*. Once it has been established that a single legal standard must govern nationwide, federal courts will face a profound pressure to reconcile that standard with the diverse interests of the States and

## II

So far, I have explained that substantive due process analysis generally requires us to consider the term "liberty" in the Fourteenth Amendment, and that this inquiry may be informed by but does not depend upon the content of the Bill of Rights. How should a court go about the analysis, then? Our precedents have established, not an exact methodology, but rather a framework for decision-making. In this respect, too, the Court's narrative fails to capture the continuity and flexibility in our doctrine.

The basic inquiry was described by Justice Cardozo more than 70 years ago. When confronted with a substantive due process claim, we must ask whether the allegedly unlawful practice violates values "implicit in the concept of ordered liberty." *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937).[14] If the practice in question lacks any "oppressive and arbitrary" character, if judicial enforcement of the asserted right would not materially contribute to "a fair and enlightened system of justice," then the claim is un-

_____

their long history of regulating in this sensitive area. Cf. *Williams*, 399 U. S., at 129–130 (Harlan, J., concurring in result) (noting "'backlash'" potential of jot-for-jot incorporation); Grant, Felix Frankfurter: A Dissenting Opinion, 12 UCLA L. Rev. 1013, 1038 (1965) ("If the Court will not reduce the requirements of the fourteenth amendment below the federal gloss that now overlays the Bill of Rights, then it will have to reduce that gloss to the point where the states can live with it"). *Amici* argue persuasively that, post-"incorporation," federal courts will have little choice but to fix a highly flexible standard of review if they are to avoid leaving federalism and the separation of powers—not to mention gun policy—in shambles. See Brief for Brady Center to Prevent Gun Violence et al. as *Amici Curiae* (hereinafter Brady Center Brief).

[14]Justice Cardozo's test itself built upon an older line of decisions. See, *e.g., Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 237 (1897) (discussing "limitations on [state] power, which grow out of the essential nature of all free governments [and] implied reservations of individual rights, . . . and which are respected by all governments entitled to the name" (internal quotation marks omitted)).

suitable for substantive due process protection. *Id.,* at 327, 325. Implicit in Justice Cardozo's test is a recognition that the postulates of liberty have a universal character. Liberty claims that are inseparable from the customs that prevail in a certain region, the idiosyncratic expectations of a certain group, or the personal preferences of their champions, may be valid claims in some sense; but they are not of constitutional stature. Whether conceptualized as a "rational continuum" of legal precepts, *Poe*, 367 U. S., at 543 (Harlan, J., dissenting), or a seamless web of moral commitments, the rights embraced by the liberty clause transcend the local and the particular.

Justice Cardozo's test undeniably requires judges to apply their own reasoned judgment, but that does not mean it involves an exercise in abstract philosophy. In addition to other constraints I will soon discuss, see Part III, *infra*, historical and empirical data of various kinds ground the analysis. Textual commitments laid down elsewhere in the Constitution, judicial precedents, English common law, legislative and social facts, scientific and professional developments, practices of other civilized societies,[15] and, above all else, the "'traditions and conscience of our people,'" *Palko*, 302 U. S., at 325 (quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934)), are critical variables. They can provide evidence about which rights really are vital to ordered liberty, as well as a spur to judicial action.

The Court errs both in its interpretation of *Palko* and in its suggestion that later cases rendered *Palko*'s methodology defunct. Echoing *Duncan*, the Court advises that Justice Cardozo's test will not be satisfied "'if a civilized system could be imagined that would not accord the par-

---

[15] See *Palko*, 302 U. S., at 326, n. 3; see also, *e.g., Lawrence* v. *Texas*, 539 U. S. 558, 572–573, 576–577 (2003); *Glucksberg*, 521 U. S., at 710–711, and n. 8.

ticular protection.'" *Ante*, at 12 (quoting 391 U. S., at 149, n. 14). *Palko* does contain some language that could be read to set an inordinate bar to substantive due process recognition, reserving it for practices without which "neither liberty nor justice would exist." 302 U. S., at 326. But in view of Justice Cardozo's broader analysis, as well as the numerous cases that have upheld liberty claims under the *Palko* standard, such readings are plainly over-readings. We have never applied *Palko* in such a draconian manner.

Nor, as the Court intimates, see *ante*, at 16, did *Duncan* mark an irreparable break from *Palko*, swapping out liberty for history. *Duncan* limited its discussion to "particular procedural safeguard[s]" in the Bill of Rights relating to "criminal processes," 391 U. S., at 149, n. 14; it did not purport to set a standard for other types of liberty interests. Even with regard to procedural safeguards, *Duncan* did not jettison the *Palko* test so much as refine it: The judge is still tasked with evaluating whether a practice "is fundamental . . . to ordered liberty," within the context of the "Anglo-American" system. *Duncan*, 391 U. S., at 149–150, n. 14. Several of our most important recent decisions confirm the proposition that substantive due process analysis—from which, once again, "incorporation" analysis derives—must not be wholly backward looking. See, *e.g., Lawrence* v. *Texas*, 539 U. S. 558, 572 (2003) ("[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry" (internal quotation marks omitted)); *Michael H.* v. *Gerald D.*, 491 U. S. 110, 127–128, n. 6 (1989) (garnering only two votes for history-driven methodology that "consult[s] the most specific tradition available"); see also *post*, at 6–7 (BREYER, J., dissenting) (explaining that post-*Duncan* "incorporation" cases continued

to rely on more than history).[16]

The Court's flight from *Palko* leaves its analysis, careful and scholarly though it is, much too narrow to provide a satisfying answer to this case. The Court hinges its entire decision on one mode of intellectual history, culling selected pronouncements and enactments from the 18th and 19th centuries to ascertain what Americans thought about firearms. Relying on *Duncan* and *Glucksberg*, the plurality suggests that only interests that have proved "fundamental from an American perspective," *ante*, at 37, 44, or "'deeply rooted in this Nation's history and tradition,'" *ante*, at 19 (quoting *Glucksberg*, 521 U. S., at 721), to the Court's satisfaction, may qualify for incorporation into the Fourteenth Amendment. To the extent the Court's opinion could be read to imply that the historical pedigree of a right is the exclusive or dispositive determinant of its status under the Due Process Clause, the opinion is seriously mistaken.

A rigid historical test is inappropriate in this case, most basically, because our substantive due process doctrine has never evaluated substantive rights in purely, or even predominantly, historical terms. When the Court applied many of the *procedural* guarantees in the Bill of Rights to the States in the 1960's, it often asked whether the guarantee in question was "fundamental in the context of the criminal processes maintained by the American States."[17]

––––––––––

[16] I acknowledge that some have read the Court's opinion in *Glucksberg* as an attempt to move substantive due process analysis, for all purposes, toward an exclusively historical methodology—and thereby to debilitate the doctrine. If that were ever *Glucksberg*'s aspiration, *Lawrence* plainly renounced it. As between *Glucksberg* and *Lawrence*, I have little doubt which will prove the more enduring precedent.

[17] The Court almost never asked whether the guarantee in question was deeply rooted in founding-era practice. See Brief for Respondent City of Chicago et al. 31, n. 17 (hereinafter Municipal Respondents' Brief) (noting that only two opinions extensively discussed such history).

*Duncan*, 391 U. S., at 150, n. 14.  That inquiry could extend back through time, but it was focused not so much on historical conceptions of the guarantee as on its functional significance within the States' regimes.  This contextualized approach made sense, as the choice to employ any given trial-type procedure means little in the abstract.  It is only by inquiring into how that procedure intermeshes with other procedures and practices in a criminal justice system that its relationship to "liberty" and "due process" can be determined.

Yet when the Court has used the Due Process Clause to recognize rights distinct from the trial context—rights relating to the primary conduct of free individuals—Justice Cardozo's test has been our guide.  The right to free speech, for instance, has been safeguarded from state infringement not because the States have always honored it, but because it is "essential to free government" and "to the maintenance of democratic institutions"—that is, because the right to free speech is implicit in the concept of ordered liberty.  *Thornhill* v. *Alabama*, 310 U. S. 88, 95, 96 (1940); see also, *e.g., Loving*, 388 U. S., at 12 (discussing right to marry person of another race); *Mapp* v. *Ohio*, 367 U. S. 643, 650, 655–657 (1961) (discussing right to be free from arbitrary intrusion by police); *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 161 (1939) (discussing right to distribute printed matter).[18]  While the verbal formula has varied, the Court has largely been consistent in its liberty-based approach to substantive interests outside of the adjudicatory system.  As the question before

_____

[18] Cf. *Robinson* v. *California*, 370 U. S. 660, 666–668 (1962) (invalidating state statute criminalizing narcotics addiction as "cruel and unusual punishment in violation of the Fourteenth Amendment" based on nature of the alleged "'crime,'" without historical analysis); Brief for Respondent National Rifle Association of America, Inc., et al. 29 (noting that "lynchpin" of incorporation test has always been "the importance of the right in question to . . . 'liberty'" and to our "system of government").

us indisputably concerns such an interest, the answer cannot be found in a granular inspection of state constitutions or congressional debates.

More fundamentally, a rigid historical methodology is unfaithful to the Constitution's command. For if it were really the case that the Fourteenth Amendment's guarantee of liberty embraces only those rights "so rooted in our history, tradition, and practice as to require special protection," *Glucksberg*, 521 U. S., at 721, n. 17, then the guarantee would serve little function, save to ratify those rights that state actors have *already* been according the most extensive protection.[19] Cf. *Duncan*, 391 U. S., at 183 (Harlan, J., dissenting) (critiquing "circular[ity]" of historicized test for incorporation). That approach is unfaithful to the expansive principle Americans laid down when they ratified the Fourteenth Amendment and to the level of generality they chose when they crafted its language; it promises an objectivity it cannot deliver and masks the value judgments that pervade any analysis of what customs, defined in what manner, are sufficiently "'rooted'"; it countenances the most revolting injustices in the name of continuity,[20] for we must never forget that not only slavery but also the subjugation of women and other rank forms of discrimination are part of our history; and it effaces this Court's distinctive role in saying what the law is, leaving the development and safekeeping of liberty to majoritarian political processes. It is judicial abdication in

_____

[19] I do not mean to denigrate this function, or to imply that only "*new* rights"—whatever one takes that term to mean—ought to "get in" the substantive due process door. *Ante*, at 5 (SCALIA, J., concurring).

[20] See *Bowers* v. *Hardwick*, 478 U. S. 186, 199 (1986) (Blackmun, J., dissenting) ("Like Justice Holmes, I believe that '[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past'" (quoting Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897))).

the guise of judicial modesty.

No, the liberty safeguarded by the Fourteenth Amendment is not merely preservative in nature but rather is a "dynamic concept." Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L. Rev. 13, 38 (1972). Its dynamism provides a central means through which the Framers enabled the Constitution to "endure for ages to come," *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819), a central example of how they "wisely spoke in general language and left to succeeding generations the task of applying that language to the unceasingly changing environment in which they would live," Rehnquist, The Notion of a Living Constitution, 54 Tex. L. Rev. 693, 694 (1976). "The task of giving concrete meaning to the term 'liberty,'" I have elsewhere explained at some length, "was a part of the work assigned to future generations." Stevens, The Third Branch of Liberty, 41 U. Miami L. Rev. 277, 291 (1986).[21] The judge who would outsource the interpretation of "liberty" to historical sentiment has turned his back on a task the Constitution assigned to him and drained the document of its intended vitality.[22]

_____

[21] JUSTICE KENNEDY has made the point movingly:

"Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Lawrence*, 539 U. S., at 578–579.

[22] Contrary to JUSTICE SCALIA's suggestion, I emphatically do not believe that "only we judges" can interpret the Fourteenth Amendment, *ante*, at 4, or any other constitutional provision. All Americans can; all Americans should. I emphatically do believe that we judges must exercise—indeed, cannot help but exercise—our own reasoned judgment in so doing. JUSTICE SCALIA and I are on common ground in maintaining that courts should be "guided by what the American

## III

At this point a difficult question arises. In considering such a majestic term as "liberty" and applying it to present circumstances, how are we to do justice to its urgent call and its open texture—and to the grant of interpretive discretion the latter embodies—without injecting excessive subjectivity or unduly restricting the States' "broad latitude in experimenting with possible solutions to problems of vital local concern," *Whalen* v. *Roe*, 429 U. S. 589, 597 (1977)? One part of the answer, already discussed, is that we must ground the analysis in historical experience and reasoned judgment, and never on "merely personal and private notions." *Rochin* v. *California*, 342 U. S. 165, 170 (1952). Our precedents place a number of additional constraints on the decisional process. Although "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992), significant guideposts do exist.[23]

———————

people throughout our history have thought." *Ibid.* Where we part ways is in his view that courts should be guided *only* by historical considerations.

There is, moreover, a tension between JUSTICE SCALIA's concern that "courts have the last word" on constitutional questions, *ante*, at 3, n. 2, on the one hand, and his touting of the Constitution's Article V amendment process, *ante*, at 3, on the other. The American people can of course reverse this Court's rulings through that same process.

[23] In assessing concerns about the "open-ended[ness]" of this area of law, *Collins*, 503 U. S., at 125, one does well to keep in view the malleability not only of the Court's "deeply rooted"/fundamentality standard but also of substantive due process' constitutional cousin, "equal protection" analysis. Substantive due process is sometimes accused of entailing an insufficiently "restrained methodology." *Glucksberg*, 521 U. S., at 721. Yet "the word 'liberty' in the Due Process Clause seems to provide at least as much meaningful guidance as does the word 'equal' in the Equal Protection Clause." Post, The Supreme Court 2002 Term—Foreword: Fashioning the Legal Constitution: Culture, Courts, and Law, 117 Harv. L. Rev. 4, 94, n. 440 (2003). And "[i]f the objection

The most basic is that we have eschewed attempts to provide any all-purpose, top-down, totalizing theory of "liberty."[24] That project is bound to end in failure or worse. The Framers did not express a clear understanding of the term to guide us, and the now-repudiated *Lochner* line of cases attests to the dangers of judicial overconfidence in using substantive due process to advance a broad theory of the right or the good. See, *e.g., Lochner* v. *New York*, 198 U. S. 45 (1905). In its most durable precedents, the Court "has not attempted to define with exactness the liberty . . . guaranteed" by the Fourteenth Amendment. *Meyer*, 262 U. S., at 399; see also, *e.g., Bolling,* 347 U. S, at 499. By its very nature, the meaning of liberty cannot be "reduced to any formula; its content cannot be determined by reference to any code." *Poe*, 367 U. S., at 542 (Harlan, J., dissenting).

Yet while "the 'liberty' specially protected by the Fourteenth Amendment" is "perhaps not capable of being fully clarified," *Glucksberg*, 521 U. S., at 722, it is capable of being refined and delimited. We have insisted that only certain types of especially significant personal interests may qualify for especially heightened protection. Ever since "the deviant economic due process cases [were] repudiated," *id.,* at 761 (Souter, J., concurring in judg-

_____

is that the text of the [Due Process] Clause warrants providing only protections of process rather than protections of substance," "it is striking that even those Justices who are most theoretically opposed to substantive due process, like Scalia and Rehnquist, are also nonetheless enthusiastic about applying the equal protection component of the Due Process Clause of the Fifth Amendment to the federal government." *Ibid.* (citing *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 213–231 (1995)).

[24] That one eschews a comprehensive theory of liberty does not, *pace* JUSTICE SCALIA, mean that one lacks "a coherent theory of the Due Process Clause," *ante*, at 5. It means that one lacks the hubris to adopt a rigid, context-independent definition of a constitutional guarantee that was deliberately framed in open-ended terms.

ment), our doctrine has steered away from "laws that touch economic problems, business affairs, or social conditions," *Griswold*, 381 U. S., at 482, and has instead centered on "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education," *Paul* v. *Davis*, 424 U. S. 693, 713 (1976). These categories are not exclusive. Government action that shocks the conscience, pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, perpetrates gross injustice, or simply lacks a rational basis will always be vulnerable to judicial invalidation. Nor does the fact that an asserted right falls within one of these categories end the inquiry. More fundamental rights may receive more robust judicial protection, but the strength of the individual's liberty interests and the State's regulatory interests must always be assessed and compared. No right is absolute.

Rather than seek a categorical understanding of the liberty clause, our precedents have thus elucidated a conceptual core. The clause safeguards, most basically, "the ability independently to define one's identity," *Roberts* v. *United States Jaycees*, 468 U. S. 609, 619 (1984), "the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny," *Fitzgerald*, 523 F. 2d, at 719, and the right to be respected as a human being. Self-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity and respect—these are the central values we have found implicit in the concept of ordered liberty.

Another key constraint on substantive due process analysis is respect for the democratic process. If a particular liberty interest is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate. When the Court declined to establish a general right to

physician-assisted suicide, for example, it did so in part because "the States [were] currently engaged in serious, thoughtful examinations of physician-assisted suicide and other similar issues," rendering judicial intervention both less necessary and potentially more disruptive. *Glucksberg*, 521 U. S., at 719, 735. Conversely, we have long appreciated that more "searching" judicial review may be justified when the rights of "discrete and insular minorities"—groups that may face systematic barriers in the political system—are at stake. *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938). Courts have a "comparative . . . advantage" over the elected branches on a limited, but significant, range of legal matters. *Post*, at 8.

Recognizing a new liberty right is a momentous step. It takes that right, to a considerable extent, "outside the arena of public debate and legislative action." *Glucksberg*, 521 U. S., at 720. Sometimes that momentous step must be taken; some fundamental aspects of personhood, dignity, and the like do not vary from State to State, and demand a baseline level of protection. But sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society provides an important tool for guiding judicial discretion.

This sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution. Because the relevant constitutional language is so "spacious," *Duncan*, 391 U. S., at 148, I have emphasized that "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins*, 503 U. S., at 125. Many of my colleagues and predecessors have stressed the same point, some with great eloquence. See, *e.g., Casey*, 505 U. S., at 849; *Moore* v. *East Cleveland*, 431 U. S. 494, 502–503 (1977) (plurality opinion); *Poe*, 367 U. S., at 542–545 (Harlan, J., dissenting); *Adamson* v. *California*, 332 U. S.

46, 68 (1947) (Frankfurter, J., concurring). Historical study may discipline as well as enrich the analysis. But the inescapable reality is that no serious theory of Section 1 of the Fourteenth Amendment yields clear answers in every case, and "[n]o formula could serve as a substitute, in this area, for judgment and restraint." *Poe*, 367 U. S., at 542 (Harlan, J., dissenting).

Several rules of the judicial process help enforce such restraint. In the substantive due process field as in others, the Court has applied both the doctrine of *stare decisis*—adhering to precedents, respecting reliance interests, prizing stability and order in the law—and the common-law method—taking cases and controversies as they present themselves, proceeding slowly and incrementally, building on what came before. This restrained methodology was evident even in the heyday of "incorporation" during the 1960's. Although it would have been much easier for the Court simply to declare certain Amendments in the Bill of Rights applicable to the States *in toto*, the Court took care to parse each Amendment into its component guarantees, evaluating them one by one. This piecemeal approach allowed the Court to scrutinize more closely the right at issue in any given dispute, reducing both the risk and the cost of error.

Relatedly, rather than evaluate liberty claims on an abstract plane, the Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U. S., at 721 (quoting *Reno* v. *Flores*, 507 U. S. 292, 302 (1993); *Collins*, 503 U. S., at 125; *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 277–278 (1990)). And just as we have required such careful description from the litigants, we have required of ourselves that we "focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake." *Collins*, 503 U. S., at 125; see also Stevens, Judicial Restraint, 22 San

Diego L. Rev. 437, 446–448 (1985). This does not mean that we must define the asserted right at the most specific level, thereby sapping it of a universal valence and a moral force it might otherwise have.[25] It means, simply, that we must pay close attention to the precise liberty interest the litigants have asked us to vindicate.

Our holdings should be similarly tailored. Even if the most expansive formulation of a claim does not qualify for substantive due process recognition, particular components of the claim might. Just because there may not be a categorical right to physician-assisted suicide, for example, does not "'foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge.'" *Glucksberg*, 521 U. S., at 735, n. 24 (quoting *id.,* at 750 (STEVENS, J., concurring in judgments)); see also *Vacco* v. *Quill*, 521 U. S. 793, 809, n. 13 (1997) (leaving open "'the possibility that some applications of the [New York prohibition on assisted suicide] may impose an intolerable intrusion on the patient's freedom'"). Even if a State's interest in regulating a certain matter must be permitted, in the general course, to trump the individual's countervailing liberty interest, there may

─────────

[25] The notion that we should define liberty claims at the most specific level available is one of JUSTICE SCALIA's signal contributions to the theory of substantive due process. See, *e.g., Michael H.* v. *Gerald D.*, 491 U. S. 110, 127–128, n. 6 (1989) (opinion of SCALIA, J.); *ante*, at 7 (opinion of SCALIA, J.). By so narrowing the asserted right, this approach "loads the dice" against its recognition, Roosevelt, Forget the Fundamentals: Fixing Substantive Due Process, 8 U. Pa. J. Const. L. 983, 1002, n. 73 (2006): When one defines the liberty interest at issue in *Lawrence* as the freedom to perform specific sex acts, *ante*, at 2, the interest starts to look less compelling. The Court today does not follow JUSTICE SCALIA's "particularizing" method, *Katzenbach* v. *Morgan*, 384 U. S. 641, 649 (1966), as it relies on general historical references to keeping and bearing arms, without any close study of the States' practice of regulating especially dangerous weapons.

still be situations in which the latter "is entitled to constitutional protection." *Glucksberg*, 521 U. S., at 742 (STEVENS, J., concurring in judgments).

As this discussion reflects, to acknowledge that the task of construing the liberty clause requires judgment is not to say that it is a license for unbridled judicial lawmaking. To the contrary, only an honest reckoning with our discretion allows for honest argumentation and meaningful accountability.

## IV

The question in this case, then, is not whether the Second Amendment right to keep and bear arms (whatever that right's precise contours) applies to the States because the Amendment has been incorporated into the Fourteenth Amendment. It has not been. The question, rather, is whether the particular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom. And to answer that question, we need to determine, first, the nature of the right that has been asserted and, second, whether that right is an aspect of Fourteenth Amendment "liberty." Even accepting the Court's holding in *Heller*, it remains entirely possible that the right to keep and bear arms identified in that opinion is not judicially enforceable against the States, or that only part of the right is so enforceable.[26] It is likewise possible for the Court to find

––––––––

[26] In *District of Columbia* v. *Heller*, 554 U. S. ___, ___ (slip op., at 22), the Court concluded, over my dissent, that the Second Amendment confers "an individual right to keep and bear arms" disconnected from militia service. If that conclusion were wrong, then petitioners' "incorporation" claim clearly would fail, as they would hold no right against the Federal Government to be free from regulations such as the ones they challenge. Cf. *post*, at 8. I do not understand petitioners or any of their *amici* to dispute this point. Yet even if *Heller* had never been decided—indeed, even if the Second Amendment did not exist—we would still have an obligation to address petitioners' Fourteenth

in this case that some part of the *Heller* right applies to
the States, and then to find in later cases that other parts
of the right also apply, or apply on different terms.

As noted at the outset, the liberty interest petitioners
have asserted is the "right to possess a functional, per-
sonal firearm, including a handgun, within the home."
Complaint ¶34, App. 23. The city of Chicago allows resi-
dents to keep functional firearms, so long as they are
registered, but it generally prohibits the possession of
handguns, sawed-off shotguns, machine guns, and short-
barreled rifles. See Chicago, Ill., Municipal Code §8–20–
050 (2009).[27] Petitioners' complaint centered on their
desire to keep a handgun at their domicile—it references
the "home" in nearly every paragraph, see Complaint ¶¶3–
4, 11–30, 32, 34, 37, 42, 44, 46, App. 17, 19–26—as did
their supporting declarations, see, *e.g.,* App. 34, 36, 40, 43,
49–52, 54–56. Petitioners now frame the question that
confronts us as "[w]hether the Second Amendment right to
keep and bear arms is incorporated as against the States
by the Fourteenth Amendment's Privileges or Immunities
or Due Process Clauses." Brief for Petitioners, p. i. But it
is our duty "to focus on the allegations in the complaint to
determine how petitioner describes the constitutional
right at stake," *Collins*, 503 U. S., at 125, and the
gravamen of this complaint is plainly an appeal to keep a
handgun or other firearm of one's choosing in the home.

Petitioners' framing of their complaint tracks the
Court's ruling in *Heller*. The majority opinion contained
some dicta suggesting the possibility of a more expansive

––––––––

Amendment claim.

[27]The village of Oak Park imposes more stringent restrictions that
may raise additional complications. See *ante*, at 2 (majority opinion)
(quoting Oak Park, Ill., Municipal Code §§27–2–1 (2007), 27–1–1
(2009)). The Court, however, declined to grant certiorari on the Na-
tional Rifle Association's challenge to the Oak Park restrictions.
Chicago is the only defendant in this case.

arms-bearing right, one that would travel with the individual to an extent into public places, as "in case of confrontation." 554 U. S., at \_\_\_ (slip op., at 19). But the *Heller* plaintiff sought only dispensation to keep an operable firearm in his home for lawful self-defense, see *id.,* at \_\_\_ (slip op., at 2, and n. 2), and the Court's opinion was bookended by reminders that its holding was limited to that one issue, *id.,* at \_\_\_, \_\_\_ (slip op., at 1, 64); accord, *ante,* at 44 (plurality opinion). The distinction between the liberty right these petitioners have asserted and the Second Amendment right identified in *Heller* is therefore evanescent. Both are rooted to the home. Moreover, even if both rights have the logical potential to extend further, upon "future evaluation," *Heller,* 554 U. S., at \_\_\_ (slip op., at 63), it is incumbent upon us, as federal judges contemplating a novel rule that would bind all 50 States, to proceed cautiously and to decide only what must be decided.

Understood as a plea to keep their preferred type of firearm in the home, petitioners' argument has real force.[28] The decision to keep a loaded handgun in the house is often motivated by the desire to protect life, liberty, and property. It is comparable, in some ways, to decisions about the education and upbringing of one's children. For it is the kind of decision that may have profound consequences for every member of the family, and for the world beyond. In considering whether to keep a handgun, heads of households must ask themselves whether the desired safety benefits outweigh the risks of deliberate or accidental misuse that may result in death or serious injury, not only to residents of the home but to

─────────

[28] To the extent that petitioners contend the city of Chicago's registration requirements for firearm possessors also, and separately, violate the Constitution, that claim borders on the frivolous. Petitioners make no effort to demonstrate that the requirements are unreasonable or that they impose a severe burden on the underlying right they have asserted.

others as well. Millions of Americans have answered this
question in the affirmative, not infrequently because they
believe they have an inalienable right to do so—because
they consider it an aspect of "the supreme human dignity
of being master of one's fate rather than a ward of the
State," *Indiana* v. *Edwards*, 554 U. S. 164, 186 (2008)
(SCALIA, J., dissenting). Many such decisions have been
based, in part, on family traditions and deeply held beliefs
that are an aspect of individual autonomy the government
may not control.[29]

Bolstering petitioners' claim, our law has long recog-
nized that the home provides a kind of special sanctuary
in modern life. See, *e.g.,* U. S. Const., Amdts. 3, 4; *Law-
rence*, 539 U. S., at 562, 567; *Payton* v. *New York*, 445
U. S. 573, 585–590 (1980); *Stanley* v. *Georgia*, 394 U. S.
557, 565–568 (1969); *Griswold*, 381 U. S., at 484–485.
Consequently, we have long accorded special deference to
the privacy of the home, whether a humble cottage or a
magnificent manse. This veneration of the domestic hark-
ens back to the common law. William Blackstone recog-
nized a "right of habitation," 4 Commentaries *223, and
opined that "every man's house is looked upon by the law
to be his castle of defence and asylum," 3 *id.,* at *288.
*Heller* carried forward this legacy, observing that "the
need for defense of self, family, and property is most
acute" in one's abode, and celebrating "the right of law-
abiding, responsible citizens to use arms in defense of
hearth and home." 554 U. S., at ___, ___ (slip op., at 56,
63).

While the individual's interest in firearm possession is
thus heightened in the home, the State's corresponding
interest in regulation is somewhat weaker. The State

───────────

[29] Members of my generation, at least, will recall the many passionate
statements of this view made by the distinguished actor, Charlton
Heston.

generally has a lesser basis for regulating private as com-
pared to public acts, and firearms kept inside the home
generally pose a lesser threat to public welfare as com-
pared to firearms taken outside. The historical case for
regulation is likewise stronger outside the home, as many
States have for many years imposed stricter, and less
controversial, restrictions on the carriage of arms than on
their domestic possession. See, *e.g., id.,* at ___ (slip op., at
54) (noting that "the majority of the 19th-century courts to
consider the question held that prohibitions on carrying
concealed weapons were lawful under the Second Amend-
ment or state analogues"); *English* v. *State,* 35 Tex. 473,
478–479 (1871) (observing that "almost, if not every one of
the States of this Union have [a prohibition on the carry-
ing of deadly weapons] upon their statute books," and
lambasting claims of a right to carry such weapons as
"little short of ridiculous"); Miller, Guns as Smut: Defend-
ing the Home-Bound Second Amendment, 109 Colum.
L. Rev. 1278, 1321–1336 (2009).

It is significant, as well, that a rule limiting the federal
constitutional right to keep and bear arms to the home
would be less intrusive on state prerogatives and easier to
administer. Having unleashed in *Heller* a tsunami of legal
uncertainty, and thus litigation,[30] and now on the cusp of
imposing a national rule on the States in this area for the
first time in United States history, the Court could at least
moderate the confusion, upheaval, and burden on the
States by adopting a rule that is clearly and tightly

_____

[30] See Municipal Respondents' Brief 20, n. 11 (stating that at least
156 Second Amendment challenges were brought in time between
*Heller*'s issuance and brief's filing); Brady Center Brief 3 (stating that
over 190 Second Amendment challenges were brought in first 18
months since *Heller*); Brief for Villages of Winnetka and Skokie, Illi-
nois, et al. as *Amici Curiae* 15 (stating that, in wake of *Heller*, munici-
palities have "repealed longstanding handgun laws to avoid costly
litigation").

bounded in scope.

In their briefs to this Court, several *amici* have sought to bolster petitioners' claim still further by invoking a right to individual self-defense.[31] As petitioners note, the *Heller* majority discussed this subject extensively and remarked that "[t]he inherent right of self-defense has been central to the Second Amendment right." 554 U. S., at ___ (slip op., at 56). And it is true that if a State were to try to deprive its residents of any reasonable means of defending themselves from imminent physical threats, or to deny persons any ability to assert self-defense in response to criminal prosecution, that might pose a significant constitutional problem. The argument that there is a substantive due process right to be spared such untenable dilemmas is a serious one.[32]

––––––––––

[31] See, *e.g.,* Brief for Professors of Philosophy, Criminology, Law, and Other Fields as *Amici Curiae;* Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* 29–45; Brief for 34 California District Attorneys et al. as *Amici Curiae* 12–31.

[32] The argument that this Court should establish any such right, however, faces steep hurdles. All 50 States already recognize self-defense as a defense to criminal prosecution, see 2 P. Robinson, Criminal Law Defenses §132, p. 96 (1984 and Supp. 2009), so this is hardly an interest to which the democratic process has been insensitive. And the States have always diverged on how exactly to implement this interest, so there is wide variety across the Nation in the types and amounts of force that may be used, the necessity of retreat, the rights of aggressors, the availability of the "castle doctrine," and so forth. See Brief for Oak Park Citizens Committee for Handgun Control as *Amicus Curiae* 9–21; Brief for American Cities et al. as *Amici Curiae* 17–19; 2 W. LaFave, Substantive Criminal Law §10.4, pp. 142–160 (2d ed. 2003). Such variation is presumed to be a healthy part of our federalist system, as the States and localities select different rules in light of different priorities, customs, and conditions.

As a historical and theoretical matter, moreover, the legal status of self-defense is far more complicated than it might first appear. We have generally understood Fourteenth Amendment "liberty" as something one holds against direct state interference, whereas a personal right of self-defense runs primarily against other individuals; absent

But that is not the case before us. Petitioners have not asked that we establish a constitutional right to individual self-defense; neither their pleadings in the District Court nor their filings in this Court make any such request. Nor do petitioners contend that the city of Chicago—which, recall, allows its residents to keep most rifles and shotguns, and to keep them loaded—has unduly burdened any such right. What petitioners have asked is that we "incorporate" the Second Amendment and thereby establish a constitutional entitlement, enforceable against the States, to keep a handgun in the home.

Of course, owning a handgun may be useful for practicing self-defense. But the right to take a certain type of action is analytically distinct from the right to acquire and utilize specific instrumentalities in furtherance of that action. And while some might favor handguns, it is not

_____

government tyranny, it is only when the state has *failed* to interfere with (violent) private conduct that self-help becomes potentially necessary. Moreover, it was a basic tenet of founding-era political philosophy that, in entering civil society and gaining "the advantages of mutual commerce" and the protections of the rule of law, one had to relinquish, to a significant degree, "that wild and savage liberty" one possessed in the state of nature. 1 W. Blackstone, Commentaries *125; see also, *e.g.,* J. Locke, Second Treatise of Civil Government §128, pp. 63–64 (J. Gough ed. 1947) (in state of nature man has power "to do whatever he thinks fit for the preservation of himself and others," but this "he gives up when he joins in a . . . particular political society"); *Green* v. *Biddle*, 8 Wheat. 1, 63 (1823) ("It is a trite maxim, that man gives up a part of his natural liberty when he enters into civil society, as the price of the blessings of that state: and it may be said, with truth, that this liberty is well exchanged for the advantages which flow from law and justice"). Some strains of founding-era thought took a very narrow view of the right to armed self-defense. See, *e.g.,* Brief of Historians on Early American Legal, Constitutional, and Pennsylvania History as *Amici Curiae* 6–13 (discussing Whig and Quaker theories). Just because there may be a natural or common-law right to some measure of self-defense, it hardly follows that States may not place substantial restrictions on its exercise or that this Court should recognize a constitutional right to the same.

clear that they are a superior weapon for lawful self-defense, and nothing in petitioners' argument turns on that being the case. The notion that a right of self-defense *implies* an auxiliary right to own a certain type of firearm presupposes not only controversial judgments about the strength and scope of the (posited) self-defense right, but also controversial assumptions about the likely effects of making that type of firearm more broadly available. It is a very long way from the proposition that the Fourteenth Amendment protects a basic individual right of self-defense to the conclusion that a city may not ban handguns.[33]

In short, while the utility of firearms, and handguns in particular, to the defense of hearth and home is certainly relevant to an assessment of petitioners' asserted right, there is no freestanding self-defense claim in this case. The question we must decide is whether the interest in keeping in the home a firearm of one's choosing—a handgun, for petitioners—is one that is "comprised within the term liberty" in the Fourteenth Amendment. *Whitney*, 274 U. S., at 373 (Brandeis, J., concurring).

––––––––––

[33] The Second Amendment right identified in *Heller* is likewise clearly distinct from a right to protect oneself. In my view, the Court badly misconstrued the Second Amendment in linking it to the value of personal self-defense above and beyond the functioning of the state militias; as enacted, the Second Amendment was concerned with tyrants and invaders, and paradigmatically with the federal military, not with criminals and intruders. But even still, the Court made clear that self-defense plays a limited role in determining the scope and substance of the Amendment's guarantee. The Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose. See 554 U. S., at ___ (slip op., at 57–58). And the Court's common-use gloss on the Second Amendment right, see *id.,* at ___ (slip op., at 55), as well as its discussion of permissible limitations on the right, *id.,* at ___ (slip op., at 54–55), had little to do with self-defense.

## V

While I agree with the Court that our substantive due process cases offer a principled basis for holding that petitioners have a constitutional right to possess a usable fiream in the home, I am ultimately persuaded that a better reading of our case law supports the city of Chicago. I would not foreclose the possibility that a particular plaintiff—say, an elderly widow who lives in a dangerous neighborhood and does not have the strength to operate a long gun—may have a cognizable liberty interest in possessing a handgun. But I cannot accept petitioners' broader submission. A number of factors, taken together, lead me to this conclusion.

First, firearms have a fundamentally ambivalent relationship to liberty. Just as they can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims. The threat that firearms will be misused is far from hypothetical, for gun crime has devastated many of our communities. *Amici* calculate that approximately one million Americans have been wounded or killed by gunfire in the last decade.[34] Urban areas such as Chicago suffer disproportionately from this epidemic of violence. Handguns contribute disproportionately to it. Just as some homeowners may prefer handguns because of their small size, light weight, and ease of operation, some criminals will value them for the same reasons. See *Heller*, 554 U. S., at ___ (BREYER, J., dissenting) (slip op., at 32–33). In recent years, handguns were reportedly used in more than four-fifths of firearm murders and more than half of

---

[34] Brady Center Brief 11 (extrapolating from Government statistics); see also Brief for American Public Health Association et al. as *Amici Curiae* 6–7 (reporting estimated social cost of firearm-related violence of $100 billion per year).

all murders nationwide.[35]

Hence, in evaluating an asserted right to be free from particular gun-control regulations, liberty is on both sides of the equation. Guns may be useful for self-defense, as well as for hunting and sport, but they also have a unique potential to facilitate death and destruction and thereby to destabilize ordered liberty. *Your* interest in keeping and bearing a certain firearm may diminish *my* interest in being and feeling safe from armed violence. And while granting you the right to own a handgun might make you safer on any given day—assuming the handgun's marginal contribution to self-defense outweighs its marginal contribution to the risk of accident, suicide, and criminal mischief—it may make you and the community you live in less safe overall, owing to the increased number of handguns in circulation. It is at least reasonable for a democratically elected legislature to take such concerns into account in considering what sorts of regulations would best serve the public welfare.

The practical impact of various gun-control measures may be highly controversial, but this basic insight should not be. The idea that deadly weapons pose a distinctive threat to the social order—and that reasonable restrictions on their usage therefore impose an acceptable burden on one's personal liberty—is as old as the Republic. As THE CHIEF JUSTICE observed just the other day, it is a foundational premise of modern government that the State holds a monopoly on legitimate violence: "A basic step in organizing a civilized society is to take [the] sword out of private hands and turn it over to an organized government, acting on behalf of all the people." *Robertson*

--------

[35] Bogus, Gun Control and America's Cities: Public Policy and Politics, 1 Albany Govt. L. Rev. 440, 447 (2008) (drawing on FBI data); see also *Heller*, 554 U. S., at ___ (slip op., at 18–19) (BREYER, J., dissenting) (providing additional statistics on handgun violence); Municipal Respondents' Brief 13–14 (same).

v. *United States ex rel. Watson*, *ante*, at \_\_\_ (slip op., at 11)
(dissenting opinion). The same holds true for the hand-
gun. The power a man has in the state of nature "of doing
whatsoever he thought fit for the preservation of himself
and the rest of mankind, he gives up," to a significant
extent, "to be regulated by laws made by the society."
J. Locke, Second Treatise of Civil Government §129, p. 64
(J. Gough ed. 1947).

Limiting the federal constitutional right to keep and
bear arms to the home complicates the analysis but does
not dislodge this conclusion. Even though the Court has
long afforded special solicitude for the privacy of the home,
we have never understood that principle to "infring[e]
upon" the authority of the States to proscribe certain
inherently dangerous items, for "[i]n such cases, compel-
ling reasons may exist for overriding the right of the indi-
vidual to possess those materials." *Stanley*, 394 U. S., at
568, n. 11. And, of course, guns that start out in the home
may not stay in the home. Even if the government has a
weaker basis for restricting domestic possession of fire-
arms as compared to public carriage—and even if a blan-
ket, statewide prohibition on domestic possession might
therefore be unconstitutional—the line between the two is
a porous one. A state or local legislature may determine
that a prophylactic ban on an especially portable weapon
is necessary to police that line.

Second, the right to possess a firearm of one's choosing
is different in kind from the liberty interests we have
recognized under the Due Process Clause. Despite the
plethora of substantive due process cases that have been
decided in the post-*Lochner* century, I have found none
that holds, states, or even suggests that the term "liberty"
encompasses either the common-law right of self-defense
or a right to keep and bear arms. I do not doubt for a
moment that many Americans feel deeply passionate
about firearms, and see them as critical to their way of life

as well as to their security.  Nevertheless, it does not
appear to be the case that the ability to own a handgun, or
any particular type of firearm, is critical to leading a life of
autonomy, dignity, or political equality: The marketplace
offers many tools for self-defense, even if they are imper-
fect substitutes, and neither petitioners nor their *amici*
make such a contention.  Petitioners' claim is not the kind
of substantive interest, accordingly, on which a uniform,
judicially enforced national standard is presumptively
appropriate.[36]

Indeed, in some respects the substantive right at issue
may be better viewed as a property right.  Petitioners wish
to *acquire* certain types of firearms, or to *keep* certain
firearms they have previously acquired.  Interests in the
possession of chattels have traditionally been viewed as
property interests subject to definition and regulation by
the States.  Cf. *Stop the Beach Renourishment, Inc.* v.
*Florida Dept. of Environmental Protection*, 560 U. S. ___,
___ (2010) (slip op., at 1) (opinion of SCALIA, J.) ("Gener-
ally speaking, state law defines property interests").

————————

[36] JUSTICE SCALIA worries that there is no "objective" way to decide
what is essential to a "liberty-filled" existence: Better, then, to ignore
such messy considerations as how an interest actually affects people's
lives.  *Ante*, at 10.  Both the constitutional text and our cases use the
term "liberty," however, and liberty is not a purely objective concept.
Substantive due process analysis does not require any "political"
judgment, *ibid.*  It does require some amount of practical and norma-
tive judgment.  The only way to assess what is essential to fulfilling the
Constitution's guarantee of "liberty," in the present day, is to provide
reasons that apply to the present day.  I have provided many; JUSTICE
SCALIA and the Court have provided virtually none.

JUSTICE SCALIA also misstates my argument when he refers to "the
right to keep and bear arms," without qualification.  *Ante*, at 9.  That is
what the Second Amendment protects against Federal Government
infringement.  I have taken pains to show why the Fourteenth Amend-
ment liberty interest asserted by petitioners—the interest in keeping a
firearm of one's choosing in the home—is not necessarily coextensive
with the Second Amendment right.

Under that tradition, Chicago's ordinance is unexceptional.[37]

The liberty interest asserted by petitioners is also dissimilar from those we have recognized in its capacity to undermine the security of others. To be sure, some of the Bill of Rights' procedural guarantees may place "restrictions on law enforcement" that have "controversial public safety implications." *Ante*, at 36 (plurality opinion); see also *ante*, at 9 (opinion of SCALIA, J.). But those implications are generally quite attenuated. A defendant's invocation of his right to remain silent, to confront a witness, or to exclude certain evidence cannot directly cause any threat. The defendant's liberty interest is constrained by (and is itself a constraint on) the adjudicatory process. The link between handgun ownership and public safety is much tighter. The handgun is itself a tool for crime; the handgun's bullets *are* the violence.

Similarly, it is undeniable that some may take profound offense at a remark made by the soapbox speaker, the practices of another religion, or a gay couple's choice to have intimate relations. But that offense is moral, psychological, or theological in nature; the actions taken by the

_____

[37] It has not escaped my attention that the Due Process Clause refers to "property" as well as "liberty." Cf. *ante*, at 2, n. 1, 9–10, n. 6 (opinion of SCALIA, J.). Indeed, in *Moore* v. *East Cleveland*, 431 U. S. 494 (1977) (plurality opinion), I alone viewed "the critical question" as "whether East Cleveland's housing ordinance [was] a permissible restriction on appellant's right to use her own property as she sees fit," *id.,* at 513 (opinion concurring in judgment). In that case, unlike in this case, the asserted property right was coextensive with a right to organize one's family life, and I could find "no precedent" for the ordinance at issue, which "exclude[d] any of an owner's relatives from the group of persons who may occupy his residence on a permanent basis." *Id.,* at 520. I am open to property claims under the Fourteenth Amendment. This case just involves a weak one. And ever since the Court "incorporated" the more specific property protections of the Takings Clause in 1897, see *Chicago, B. & Q. R. Co.*, 166 U. S. 226, substantive due process doctrine has focused on liberty.

rights-bearers do not actually threaten the physical safety of any other person.[38]  Firearms may be used to kill another person.  If a legislature's response to dangerous weapons ends up impinging upon the liberty of any individuals in pursuit of the greater good, it invariably does so on the basis of more than the majority's "'own moral code,'" *Lawrence*, 539 U. S., at 571 (quoting *Casey*, 505 U. S., at 850).  While specific policies may of course be misguided, gun control is an area in which it "is quite wrong . . . to assume that regulation and liberty occupy mutually exclusive zones—that as one expands, the other must contract."  Stevens, 41 U. Miami L. Rev., at 280.

Third, the experience of other advanced democracies, including those that share our British heritage, undercuts the notion that an expansive right to keep and bear arms is intrinsic to ordered liberty.  Many of these countries place restrictions on the possession, use, and carriage of firearms far more onerous than the restrictions found in this Nation.  See Municipal Respondents' Brief 21–23 (discussing laws of England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand).  That the United States is an international outlier in the permissiveness of its approach to guns does not suggest that our laws are bad laws.  It does suggest that this Court may not need to assume responsibility for making our laws still more permissive.

Admittedly, these other countries differ from ours in many relevant respects, including their problems with violent crime and the traditional role that firearms have played in their societies.  But they are not so different from the United States that we ought to dismiss their experience entirely.  Cf. *ante*, at 34–35 (plurality opinion); *ante*, at 10–11 (opinion of SCALIA, J.).  The fact that our

---

[38] Cf. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 913–914 (1992) (STEVENS, J., concurring in part and dissenting in part).

oldest allies have almost uniformly found it appropriate to regulate firearms extensively tends to weaken petitioners' submission that the right to possess a gun of one's choosing is fundamental to a life of liberty. While the "American perspective" must always be our focus, *ante,* at 37, 44 (plurality opinion), it is silly—indeed, arrogant—to think we have nothing to learn about liberty from the billions of people beyond our borders.

Fourth, the Second Amendment differs in kind from the Amendments that surround it, with the consequence that its inclusion in the Bill of Rights is not merely unhelpful but positively harmful to petitioners' claim. Generally, the inclusion of a liberty interest in the Bill of Rights points toward the conclusion that it is of fundamental significance and ought to be enforceable against the States. But the Second Amendment plays a peculiar role within the Bill, as announced by its peculiar opening clause.[39] Even accepting the *Heller* Court's view that the Amendment protects an individual right to keep and bear arms disconnected from militia service, it remains undeniable that "the purpose for which the right was codified" was "to prevent elimination of the militia." *Heller,* 554 U. S., at ___ (slip op., at 26); see also *United States* v. *Miller,* 307 U. S. 174, 178 (1939) (Second Amendment was enacted "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces"). It was the States, not private persons, on whose immediate behalf the Second Amendment was adopted. Notwithstanding the *Heller* Court's efforts to write the Second Amendment's preamble out of the Constitution, the Amendment still serves the structural function of protecting the States from encroachment by an overreaching Federal Government.

———————

[39] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The Second Amendment, in other words, "is a federal-ism provision," *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 45 (2004) (THOMAS, J., concurring in judg-ment). It is directed at preserving the autonomy of the sovereign States, and its logic therefore "resists" incorpo-ration by a federal court *against* the States. *Ibid.* No one suggests that the Tenth Amendment, which provides that powers not given to the Federal Government remain with "the States," applies to the States; such a reading would border on incoherent, given that the Tenth Amendment exists (in significant part) to safeguard the vitality of state governance. The Second Amendment is no different.[40]

The Court is surely correct that Americans' conceptions of the Second Amendment right evolved over time in a more individualistic direction; that Members of the Recon-struction Congress were urgently concerned about the safety of the newly freed slaves; and that some Members believed that, following ratification of the Fourteenth Amendment, the Second Amendment would apply to the States. But it is a giant leap from these data points to the conclusion that the Fourteenth Amendment "incorporated" the Second Amendment as a matter of original meaning or postenactment interpretation. Consider, for example, that the text of the Fourteenth Amendment says nothing about the Second Amendment or firearms; that there is substan-tial evidence to suggest that, when the Reconstruction Congress enacted measures to ensure newly freed slaves

———————————

[40] Contrary to JUSTICE SCALIA's suggestion, this point is perfectly compatible with my opinion for the Court in *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1 (2004). Cf. *ante*, at 11. Like the Court itself, I have never agreed with JUSTICE THOMAS' view that the Estab-lishment Clause is a federalism provision. But I agree with his under-lying logic: If a clause in the Bill of Rights exists to safeguard federal-ism interests, then it makes little sense to "incorporate" it. JUSTICE SCALIA's further suggestion that I ought to have revisited the Estab-lishment Clause debate in this opinion, *ibid.*, is simply bizarre.

and Union sympathizers in the South enjoyed the right to possess firearms, it was motivated by antidiscrimination and equality concerns rather than arms-bearing concerns *per se;*[41] that many contemporaneous courts and commentators did not understand the Fourteenth Amendment to have had an "incorporating" effect; and that the States heavily regulated the right to keep and bear arms both before and after the Amendment's passage. The Court's narrative largely elides these facts. The complications they raise show why even the most dogged historical inquiry into the "fundamentality" of the Second Amendment right (or any other) necessarily entails judicial judgment—and therefore judicial discretion—every step of the way.

I accept that the evolution in Americans' understanding of the Second Amendment may help shed light on the question whether a right to keep and bear arms is comprised within Fourteenth Amendment "liberty." But the reasons that motivated the Framers to protect the ability of militiamen to keep muskets available for military use when our Nation was in its infancy, or that motivated the Reconstruction Congress to extend full citizenship to the freedmen in the wake of the Civil War, have only a limited bearing on the question that confronts the homeowner in a crime-infested metropolis today. The many episodes of

———————

[41] See *post*, at 24–25; Municipal Respondents' Brief 62–69; Brief for 34 Professional Historians and Legal Historians as *Amici Curiae* 22–26; Rosenthal, Second Amendment Plumbing After *Heller:* Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs, 41 Urb. Law. 1, 73–75 (2009). The plurality insists that the Reconstruction-era evidence shows the right to bear arms was regarded as "a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner." *Ante*, at 33. That may be so, but it does not resolve the question whether the Fourteenth Amendment's Due Process Clause was originally understood to encompass a right to keep and bear arms, or whether it ought to be so construed now.

brutal violence against African-Americans that blight our
Nation's history, see *ante*, at 23–29 (majority opinion);
*ante*, at 41–44, 53–55 (THOMAS, J., concurring in part and
concurring in judgment), do not suggest that every Ameri-
can must be allowed to own whatever type of firearm he or
she desires—just that no group of Americans should be
systematically and discriminatorily disarmed and left to
the mercy of racial terrorists. And the fact that some
Americans may have thought or hoped that the Four-
teenth Amendment would nationalize the Second Amend-
ment hardly suffices to justify the conclusion that it did.

Fifth, although it may be true that Americans' interest
in firearm possession and state-law recognition of that
interest are "deeply rooted" in some important senses,
*ante*, at 19 (internal quotation marks omitted), it is
equally true that the States have a long and unbroken
history of regulating firearms. The idea that States may
place substantial restrictions on the right to keep and bear
arms short of complete disarmament is, in fact, far more
entrenched than the notion that the Federal Constitution
protects any such right. Federalism is a far "older and
more deeply rooted tradition than is a right to carry," or to
own, "any particular kind of weapon." 567 F. 3d 856, 860
(CA7 2009) (Easterbrook, C. J.).

From the early days of the Republic, through the Recon-
struction era, to the present day, States and municipali-
ties have placed extensive licensing requirements on
firearm acquisition, restricted the public carriage of weap-
ons, and banned altogether the possession of especially
dangerous weapons, including handguns. See *Heller*, 554
U. S., at ___ (BREYER, J., dissenting) (slip op., at 4–7)
(reviewing colonial laws); Cornell & DeDino, A Well Regu-
lated Right: The Early American Origins of Gun Control,
73 Fordham L. Rev. 487, 502–516 (2004) (reviewing pre-
Civil War laws); Brief for 34 Professional Historians and
Legal Historians as *Amici Curiae* 4–22 (reviewing Recon-

struction-era laws); Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 711–712, 716–726 (2007) (reviewing 20th-century laws); see generally *post*, at 21–31.[42]  After the 1860's just as before, the state courts almost uniformly upheld these measures: Apart from making clear that all regulations had to be constructed and applied in a nondiscriminatory manner, the Fourteenth Amendment hardly made a dent.  And let us not forget that this Court did not recognize *any* non-militia-related interests under the Second Amendment until two Terms ago, in *Heller*.  Petitioners do not dispute the city of Chicago's observation that "[n]o other substantive Bill of Rights protection has been regulated nearly as intrusively" as the right to keep and bear arms.  Municipal Respondents' Brief 25.[43]

This history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for regulation,[44] and the ability to respond to the social

---

[42] I am unclear what the plurality means when it refers to "the paucity of precedent sustaining bans comparable to those at issue here." *Ante*, at 39.  There is only one ban at issue here—the city of Chicago's handgun prohibition—and the municipal respondents cite far more than "one case," *ibid.*, from the post-Reconstruction period.  See Municipal Respondents' Brief 24–30.  The evidence adduced by respondents and their *amici* easily establishes their contentions that the "consensus in States that recognize a firearms right is that arms possession, even in the home, is . . . subject to interest-balancing," *id.,* at 24; and that the practice of "[b]anning weapons routinely used for self-defense," when deemed "necessary for the public welfare," "has ample historical pedigree," *id.,* at 28.  Petitioners do not even try to challenge these contentions.

[43] I agree with JUSTICE SCALIA that a history of regulation hardly proves a right is not "of fundamental character."  *Ante*, at 12.  An unbroken history of extremely intensive, carefully considered regulation does, however, tend to suggest that it is not.

[44] The *Heller* majority asserted that "the adjective 'well-regulated'" in the Second Amendment's preamble "implies nothing more than the imposition of proper discipline and training."  554 U. S., at ___ (slip op., at 23).  It is far from clear that this assertion is correct.  See, *e.g.,* U. S.

ills associated with dangerous weapons goes to the very core of the States' police powers. Our precedent is crystal-clear on this latter point. See, *e.g., Gonzales* v. *Oregon*, 546 U. S. 243, 270 (2006) ("[T]he structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted)); *United States* v. *Morrison*, 529 U. S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *Kelley* v. *Johnson*, 425 U. S. 238, 247 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power"); *Automobile Workers* v. *Wisconsin Employment Relations Bd.*, 351 U. S. 266, 274 (1956) ("The dominant interest of the State in preventing violence and property damage cannot be questioned. It is a matter of genuine local concern"). Compared with today's ruling, most if not all of this Court's decisions requiring the States to comply with other provisions in the Bill of Rights did not exact nearly

--------

Const., Art. 1, §4, cl. 1; §8, cls. 3, 5, 14; §9, cl. 6; Art. 3, §2, cl. 2; Art. 4, §2, cl. 3; §3, cl. 2 (using "regulate" or "Regulation" in manner suggestive of broad, discretionary governmental authority); Art. 1, §8, cl. 16 (invoking powers of "disciplining" and "training" Militia in manner suggestive of narrower authority); *Heller*, 554 U. S., at ___ (slip op., at 6–7) (investigating Constitution's separate references to "people" as clue to term's meaning in Second Amendment); cf. Cornell & DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 504 (2004) ("The authors of this curious interpretation of the Second Amendment have constructed a fantasy world where words mean their opposite, and regulation is really anti-regulation"). But even if the assertion were correct, the point would remain that the preamble envisions an active state role in overseeing how the right to keep and bear arms is utilized, and in ensuring that it is channeled toward productive ends.

so heavy a toll in terms of state sovereignty.

Finally, even apart from the States' long history of firearms regulation and its location at the core of their police powers, this is a quintessential area in which federalism ought to be allowed to flourish without this Court's meddling. Whether or not we *can* assert a plausible constitutional basis for intervening, there are powerful reasons why we *should not* do so.

Across the Nation, States and localities vary significantly in the patterns and problems of gun violence they face, as well as in the traditions and cultures of lawful gun use they claim. Cf. *post*, at 16–17. The city of Chicago, for example, faces a pressing challenge in combating criminal street gangs. Most rural areas do not. The city of Chicago has a high population density, which increases the potential for a gunman to inflict mass terror and casualties. Most rural areas do not.[45] The city of Chicago offers little in the way of hunting opportunities. Residents of rural communities are, one presumes, much more likely to stock the dinner table with game they have personally felled.

Given that relevant background conditions diverge so much across jurisdictions, the Court ought to pay particular heed to state and local legislatures' "right to experiment." *New State Ice*, 285 U. S., at 311 (Brandeis, J., dissenting). So long as the regulatory measures they have chosen are not "arbitrary, capricious, or unreasonable," we should be allowing them to "try novel social and economic" policies. *Ibid.* It "is more in keeping . . . with our status as a court in a federal system," under these circumstances, "to avoid imposing a single solution . . . from the top down." *Smith* v. *Robbins*, 528 U. S. 259, 275 (2000).

_____

[45] Cf. *Heller*, 554 U. S., at ___ (slip op., at 19) (BREYER, J., dissenting) (detailing evidence showing that a "disproportionate amount of violent and property crimes occur in urban areas, and urban criminals are more likely than other offenders to use a firearm during the commission of a violent crime").

It is all the more unwise for this Court to limit experi-
mentation in an area "where the best solution is far from
clear." *United States* v. *Lopez*, 514 U. S. 549, 581 (1995)
(KENNEDY, J., concurring). Few issues of public policy are
subject to such intensive and rapidly developing empirical
controversy as gun control. See *Heller*, 554 U. S., at ___
(slip op., at 20–25) (BREYER, J., dissenting). Chicago's
handgun ban, in itself, has divided researchers. Compare
Brief for Professors of Criminal Justice as *Amici Curiae*
(arguing that ordinance has been effective at reducing gun
violence), with Brief for International Law Enforcement
Educators and Trainers Association et al. as *Amici Curiae*
17–26 (arguing that ordinance has been a failure).[46]  Of
course, on some matters the Constitution requires that we
ignore such pragmatic considerations. But the Constitu-
tion's text, history, and structure are not so clear on the
matter before us—as evidenced by the groundbreaking
nature of today's fractured decision—and this Court lacks
both the technical capacity and the localized expertise to
assess "the wisdom, need, and propriety" of most gun-
control measures. *Griswold*, 381 U. S., at 482.[47]

---

[46] The fact that Chicago's handgun murder rate may have "actually
increased since the ban was enacted," *ante*, at 2 (majority opinion),
means virtually nothing in itself. Countless factors unrelated to the
policy may have contributed to that trend. Without a sophisticated
regression analysis, we cannot even begin to speculate as to the efficacy
or effects of the handgun ban. Even with such an analysis, we could
never be certain as to the determinants of the city's murder rate.

[47] In some sense, it is no doubt true that the "best" solution is elusive
for many "serious social problems." *Ante*, at 12 (opinion of SCALIA, J.).
Yet few social problems have raised such heated empirical controversy
as the problem of gun violence. And few, if any, of the liberty interests
we have recognized under the Due Process Clause have raised as many
complications for judicial oversight as the interest that is recognized
today. See *post*, at 11–16.

I agree with the plurality that for a right to be eligible for substantive
due process recognition, there need not be "a 'popular consensus' that
the right is fundamental." *Ante*, at 42. In our remarkably diverse,

STEVENS, J., dissenting

Nor will the Court's intervention bring any clarity to this enormously complex area of law. Quite to the contrary, today's decision invites an avalanche of litigation that could mire the federal courts in fine-grained determinations about which state and local regulations comport with the *Heller* right—the precise contours of which are far from pellucid—under a standard of review we have not even established. See *post*, at 12–15. The plurality's "assuranc[e]" that "incorporation does not imperil every law regulating firearms," *ante*, at 40, provides only modest comfort. For it is also an admission of just how many different types of regulations are potentially implicated by today's ruling, and of just how ad hoc the Court's initial attempt to draw distinctions among them was in *Heller*. The practical significance of the proposition that "the Second Amendment right is fully applicable to the States," *ante*, at 1 (majority opinion), remains to be worked out by this Court over many, many years.

Furthermore, and critically, the Court's imposition of a national standard is still more unwise because the elected branches have shown themselves to be perfectly capable of safeguarding the interest in keeping and bearing arms. The strength of a liberty claim must be assessed in connection with its status in the democratic process. And in this case, no one disputes "that opponents of [gun] control have considerable political power and do not seem to be at a systematic disadvantage in the democratic process," or that "the widespread commitment to an individual right to own guns . . . operates as a safeguard against excessive or

---

pluralistic society, there will almost never be such uniformity of opinion. But to the extent that popular consensus is relevant, I do not agree with the Court that the *amicus* brief filed in this case by numerous state attorneys general constitutes evidence thereof. *Ante*, at 42–43. It is puzzling that so many state lawmakers have asked us to limit their *option* to regulate a dangerous item. Cf. *post*, at 9–10.

unjustified gun control laws."[48]    Sunstein, Second Amendment Minimalism: *Heller* as *Griswold*, 122 Harv. L. Rev. 246, 260 (2008).  Indeed, there is a good deal of evidence to suggest that, if anything, American lawmakers tend to *under*regulate guns, relative to the policy views expressed by majorities in opinion polls.  See K. Goss, Disarmed: The Missing Movement for Gun Control in America 6 (2006).  If a particular State or locality has enacted some "improvident" gun-control measures, as petitioners believe Chicago has done, there is no apparent reason to infer that the mistake will not "eventually be rectified by the democratic process."  *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979).

This is not a case, then, that involves a "special condition" that "may call for a correspondingly more searching judicial inquiry."  *Carolene Products*, 304 U. S., at 153, n. 4.  Neither petitioners nor those most zealously committed to their views represent a group or a claim that is liable to receive unfair treatment at the hands of the majority.  On the contrary, petitioners' views are supported by powerful participants in the legislative process.  Petitioners have given us no reason to believe that the interest in keeping and bearing arms entails any special need for judicial lawmaking, or that federal judges are more qualified to craft appropriate rules than the people's elected representatives.  Having failed to show why their asserted interest is intrinsic to the concept of ordered liberty or vulnerable to maltreatment in the political arena, they have failed to show why "the word liberty in the Fourteenth Amendment" should be "held to prevent the natural outcome of a dominant opinion" about how to

---

[48] Likewise, no one contends that those interested in personal self-defense—every American, presumably—face any particular disadvantage in the political process.  All 50 States recognize self-defense as a defense to criminal prosecution.  See n. 32, *supra*.

deal with the problem of handgun violence in the city of Chicago. *Lochner*, 198 U. S., at 76 (Holmes, J., dissenting).

## VI

The preceding sections have already addressed many of the points made by JUSTICE SCALIA in his concurrence. But in light of that opinion's fixation on this one, it is appropriate to say a few words about JUSTICE SCALIA's broader claim: that his preferred method of substantive due process analysis, a method "that makes the traditions of our people paramount," *ante*, at 1, is both more restrained and more facilitative of democracy than the method I have outlined. Colorful as it is, JUSTICE SCALIA's critique does not have nearly as much force as does his rhetoric. His theory of substantive due process, moreover, comes with its own profound difficulties.

Although JUSTICE SCALIA aspires to an "objective," "neutral" method of substantive due process analysis, *ante*, at 10, his actual method is nothing of the sort. Under the "historically focused" approach he advocates, *ante*, at 13, numerous threshold questions arise before one ever gets to the history. At what level of generality should one frame the liberty interest in question? See n. 25, *supra*. What does it mean for a right to be "'deeply rooted in this Nation's history and tradition,'" *ante*, at 3 (quoting *Glucksberg*, 521 U. S., at 721)? By what standard will that proposition be tested? Which types of sources will count, and how will those sources be weighed and aggregated? There is no objective, neutral answer to these questions. There is not even a theory—at least, JUSTICE SCALIA provides none—of how to go about answering them.

Nor is there any escaping *Palko*, it seems. To qualify for substantive due process protection, JUSTICE SCALIA has stated, an asserted liberty right must be not only deeply

rooted in American tradition, "but it must *also* be implicit in the concept of ordered liberty." *Lawrence*, 539 U. S., at 593, n. 3 (dissenting opinion) (internal quotation marks omitted). Applying the latter, *Palko*-derived half of that test requires precisely the sort of reasoned judgment—the same multifaceted evaluation of the right's contours and consequences—that JUSTICE SCALIA mocks in his concurrence today.

So does applying the first half. It is hardly a novel insight that history is not an objective science, and that its use can therefore "point in any direction the judges favor," *ante*, at 14 (opinion of SCALIA, J.). Yet 21 years after the point was brought to his attention by Justice Brennan, JUSTICE SCALIA remains "oblivious to the fact that [the concept of 'tradition'] can be as malleable and elusive as 'liberty' itself." *Michael H.*, 491 U. S., at 137 (dissenting opinion). Even when historical analysis is focused on a discrete proposition, such as the original public meaning of the Second Amendment, the evidence often points in different directions. The historian must choose which pieces to credit and which to discount, and then must try to assemble them into a coherent whole. In *Heller*, JUSTICE SCALIA preferred to rely on sources created much earlier and later in time than the Second Amendment itself, see, *e.g.,* 554 U. S., at ___ (slip op., at 4–5) (consulting late 19th-century treatises to ascertain how Americans would have read the Amendment's preamble in 1791); I focused more closely on sources contemporaneous with the Amendment's drafting and ratification.[49]  No mechanical

––––––––––

[49] See *Heller*, 554 U. S., at ___ (slip op., at 27) (STEVENS, J., dissenting) ("Although it gives short shrift to the drafting history of the Second Amendment, the Court dwells at length on four other sources: the 17th-century English Bill of Rights; Blackstone's Commentaries on the Laws of England; postenactment commentary on the Second Amendment; and post-Civil War legislative history"); see also *post*, at 2–5 (discussing professional historians' criticisms of *Heller*).

STEVENS, J., dissenting

yardstick can measure which of us was correct, either with respect to the materials we chose to privilege or the insights we gleaned from them.

The malleability and elusiveness of history increase exponentially when we move from a pure question of original meaning, as in *Heller*, to JUSTICE SCALIA's theory of substantive due process. At least with the former sort of question, the judge can focus on a single legal provision; the temporal scope of the inquiry is (or should be) relatively bounded; and there is substantial agreement on what sorts of authorities merit consideration. With JUSTICE SCALIA's approach to substantive due process, these guideposts all fall away. The judge must canvas the entire landscape of American law as it has evolved through time, and perhaps older laws as well, see, *e.g., Lawrence*, 539 U. S., at 596 (SCALIA, J., dissenting) (discussing "'ancient roots'" of proscriptions against sodomy (quoting *Bowers* v. *Hardwick*, 478 U. S. 186, 192 (1986)), pursuant to a standard (deeply rootedness) that has never been defined. In conducting this rudderless, panoramic tour of American legal history, the judge has more than ample opportunity to "look over the heads of the crowd and pick out [his] friends," *Roper* v. *Simmons*, 543 U. S. 551, 617 (2005) (SCALIA, J., dissenting).

My point is not to criticize judges' use of history in general or to suggest that it always generates indeterminate answers; I have already emphasized that historical study can discipline as well as enrich substantive due process analysis. My point is simply that JUSTICE SCALIA's defense of his method, which holds out objectivity and restraint as its cardinal—and, it seems, only—virtues, is unsatisfying on its own terms. For a limitless number of subjective judgments may be smuggled into his historical analysis. Worse, they may be *buried* in the analysis. At least with my approach, the judge's cards are laid on the table for all to see, and to critique. The judge must

exercise judgment, to be sure. When answering a constitutional question to which the text provides no clear answer, there is always some amount of discretion; our constitutional system has always depended on judges' filling in the document's vast open spaces.[50] But there is also transparency.

JUSTICE SCALIA's approach is even less restrained in another sense: It would effect a major break from our case law outside of the "incorporation" area. JUSTICE SCALIA does not seem troubled by the fact that his method is largely inconsistent with the Court's canonical substantive due process decisions, ranging from *Meyer*, 262 U. S. 390, and *Pierce*, 268 U. S. 510, in the 1920's, to *Griswold*, 381 U. S. 479, in the 1960's, to *Lawrence*, 539 U. S. 558, in the 2000's. To the contrary, he seems to embrace this dissonance. My method seeks to synthesize dozens of cases on which the American people have relied for decades. JUSTICE SCALIA's method seeks to vaporize them. So I am left to wonder, which of us is more faithful to this Nation's constitutional history? And which of us is more faithful to the values and commitments of the American people, as they stand today? In 1967, when the Court held in *Loving*, 388 U. S. 1, that adults have a liberty-based as well as equality-based right to wed persons of another race, interracial marriage was hardly "deeply rooted" in American tradition. Racial segregation and subordination were deeply rooted. The Court's substantive due process holding was nonetheless correct—and we should be wary of any interpretive theory that implies, emphatically, that it was not.

Which leads me to the final set of points I wish to make: JUSTICE SCALIA's method invites not only bad history, but also bad constitutional law. As I have already explained, in evaluating a claimed liberty interest (or any constitu-

---

[50] Indeed, this is truly one of our most deeply rooted legal traditions.

tional claim for that matter), it makes perfect sense to give history significant weight: JUSTICE SCALIA's position is closer to my own than he apparently feels comfortable acknowledging. But it makes little sense to give history dispositive weight in every case. And it makes *especially* little sense to answer questions like whether the right to bear arms is "fundamental" by focusing only on the past, given that both the practical significance and the public understandings of such a right often change as society changes. What if the evidence had shown that, whereas at one time firearm possession contributed substantially to personal liberty and safety, nowadays it contributes nothing, or even tends to undermine them? Would it still have been reasonable to constitutionalize the right?

The concern runs still deeper. Not only can historical views be less than completely clear or informative, but they can also be wrong. Some notions that many Americans deeply believed to be true, at one time, turned out not to be true. Some practices that many Americans believed to be consistent with the Constitution's guarantees of liberty and equality, at one time, turned out to be inconsistent with them. The fact that we have a written Constitution does not consign this Nation to a static legal existence. Although we should always "pa[y] a decent regard to the opinions of former times," it "is not the glory of the people of America" to have "suffered a blind veneration for antiquity." The Federalist No. 14, p. 99, 104 (C. Rossiter ed. 1961) (J. Madison). It is not the role of federal judges to be amateur historians. And it is not fidelity to the Constitution to ignore its use of deliberately capacious language, in an effort to transform foundational legal commitments into narrow rules of decision.

As for "the democratic process," *ante*, at 14, 15, a method that looks exclusively to history can easily do more harm than good. Just consider this case. The net result of JUSTICE SCALIA's supposedly objective analysis is to vest

federal judges—ultimately a majority of the judges on this Court—with unprecedented lawmaking powers in an area in which they have no special qualifications, and in which the give-and-take of the political process has functioned effectively for decades.  Why this "intrudes much less upon the democratic process," *ante*, at 14, than an approach that would defer to the democratic process on the regulation of firearms is, to say the least, not self-evident.  I cannot even tell what, under JUSTICE SCALIA's view, constitutes an "intrusion."

It is worth pondering, furthermore, the vision of democracy that underlies JUSTICE SCALIA's critique.  Because very few of us would welcome a system in which majorities or powerful interest groups always get their way.  Under our constitutional scheme, I would have thought that a judicial approach to liberty claims such as the one I have outlined—an approach that investigates both the intrinsic nature of the claimed interest and the practical significance of its judicial enforcement, that is transparent in its reasoning and sincere in its effort to incorporate constraints, that is guided by history but not beholden to it, and that is willing to protect some rights even if they have not already received uniform protection from the elected branches—has the capacity to improve, rather than "[im]peril," *ante*, at 15, our democracy.  It all depends on judges' exercising careful, reasoned judgment.  As it always has, and as it always will.

## VII

The fact that the right to keep and bear arms appears in the Constitution should not obscure the novelty of the Court's decision to enforce that right against the States. By its terms, the Second Amendment does not apply to the States; read properly, it does not even apply to individuals outside of the militia context.  The Second Amendment was adopted to protect the *States* from federal encroach-

ment. And the Fourteenth Amendment has never been understood by the Court to have "incorporated" the entire Bill of Rights. There was nothing foreordained about today's outcome.

Although the Court's decision in this case might be seen as a mere adjunct to its decision in *Heller*, the consequences could prove far more destructive—quite literally—to our Nation's communities and to our constitutional structure. Thankfully, the Second Amendment right identified in *Heller* and its newly minted Fourteenth Amendment analogue are limited, at least for now, to the home. But neither the "assurances" provided by the plurality, *ante*, at 40, nor the many historical sources cited in its opinion should obscure the reality that today's ruling marks a dramatic change in our law—or that the Justices who have joined it have brought to bear an awesome amount of discretion in resolving the legal question presented by this case.

I would proceed more cautiously. For the reasons set out at length above, I cannot accept either the methodology the Court employs or the conclusions it draws. Although impressively argued, the majority's decision to overturn more than a century of Supreme Court precedent and to unsettle a much longer tradition of state practice is not, in my judgment, built "upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." *Griswold*, 381 U. S., at 501 (Harlan, J., concurring in judgment).

Accordingly, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 08–1521

OTIS MᴄDONALD, ᴇᴛ ᴀʟ., PETITIONERS *v.* CITY OF
CHICAGO, ILLINOIS, ᴇᴛ ᴀʟ.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE BREYER, with whom JUSTICE GINSBURG and
JUSTICE SOTOMAYOR join, dissenting.

In my view, JUSTICE STEVENS has demonstrated that
the Fourteenth Amendment's guarantee of "substantive
due process" does not include a general right to keep and
bear firearms for purposes of private self-defense.  As he
argues, the Framers did not write the Second Amendment
with this objective in view.  See *ante,* at 41–44 (dissenting
opinion).  Unlike other forms of substantive liberty, the
carrying of arms for that purpose often puts others' lives
at risk.  See *ante,* at 35–37.  And the use of arms for pri-
vate self-defense does not warrant federal constitutional
protection from state regulation.  See *ante,* at 44–51.

The Court, however, does not expressly rest its opinion
upon "substantive due process" concerns.  Rather, it di-
rects its attention to this Court's "incorporation" prece-
dents and asks whether the Second Amendment right to
private self-defense is "fundamental" so that it applies to
the States through the Fourteenth Amendment.  See *ante,*
at 11–19.

I shall therefore separately consider the question of
"incorporation."  I can find nothing in the Second Amend-
ment's text, history, or underlying rationale that could
warrant characterizing it as "fundamental" insofar as it
seeks to protect the keeping and bearing of arms for pri-

vate self-defense purposes.  Nor can I find any justification
for interpreting the Constitution as transferring ultimate
regulatory authority over the private uses of firearms from
democratically elected legislatures to courts or from the
States to the Federal Government.  I therefore conclude
that the Fourteenth Amendment does not "incorporate"
the Second Amendment's right "to keep and bear Arms."
And I consequently dissent.

## I

The Second Amendment says: "A well regulated Militia,
being necessary to the security of a free State, the right of
the people to keep and bear Arms, shall not be infringed."
Two years ago, in *District of Columbia* v. *Heller*, 554 U. S.
___ (2008), the Court rejected the pre-existing judicial
consensus that the Second Amendment was primarily
concerned with the need to maintain a "well regulated
Militia."  See *id.,* at ___ (STEVENS, J., dissenting) (slip op.,
at 2–3, and n. 2, 38–45); *United States* v. *Miller*, 307 U. S.
174, 178 (1939).  Although the Court acknowledged that
"the threat that the new Federal Government would de-
stroy the citizens' militia by taking away their arms *was
the reason* that right . . . was codified in a written Consti-
tution," the Court asserted that "individual self defense
. . . was the *central component* of the right itself."  *Heller,
supra*, at ___ (slip op., at 26) (first emphasis added).  The
Court went on to hold that the Second Amendment re-
stricted Congress' power to regulate handguns used for
self-defense, and the Court found unconstitutional the
District of Columbia's ban on the possession of handguns
in the home.  *Id.*, at ___ (slip op., at 64).

The Court based its conclusions almost exclusively upon
its reading of history.  But the relevant history in *Heller*
was far from clear: Four dissenting Justices disagreed
with the majority's historical analysis.  And subsequent
scholarly writing reveals why disputed history provides

treacherous ground on which to build decisions written by judges who are not expert at history.

Since *Heller,* historians, scholars, and judges have continued to express the view that the Court's historical account was flawed. See, *e.g.,* Konig, Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America, 56 UCLA L. Rev. 1295 (2009); Finkelman, It Really Was About a Well Regulated Militia, 59 Syracuse L. Rev. 267 (2008); P. Charles, The Second Amendment: The Intent and Its Interpretation by the States and the Supreme Court (2009); Merkel, *The District of Columbia v. Heller* and Antonin Scalia's Perverse Sense of Originalism, 13 Lewis & Clark L. Rev. 349 (2009); Kozuskanich, Originalism in a Digital Age: An Inquiry into the Right to Bear Arms, 29 J. Early Republic 585 (2009); Cornell, St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology, 103 Nw. U. L. Rev. 1541 (2009); Posner, In Defense of Looseness: The Supreme Court and Gun Control, New Republic, Aug. 27, 2008, pp. 32–35; see also Epstein, A Structural Interpretation of the Second Amendment: Why *Heller* is (Probably) Wrong on Originalist Grounds, 59 Syracuse L. Rev. 171 (2008).

Consider as an example of these critiques an *amici* brief filed in this case by historians who specialize in the study of the English Civil Wars. They tell us that *Heller* misunderstood a key historical point. See Brief for English/Early American Historians as *Amici Curiae* (hereinafter English Historians' Brief) (filed by 21 professors at leading universities in the United States, United Kingdom, and Australia). *Heller*'s conclusion that "individual self-defense" was "the *central component*" of the Second Amendment's right "to keep and bear Arms" rested upon its view that the Amendment "codified a *pre-existing* right" that had "nothing whatever to do with service in a mili-

tia." 554 U. S., at ___ (slip op., at 26, 19–20). That view in turn rested in significant part upon Blackstone having described the right as "'the right of having and using arms for self-preservation and defence,'" which reflected the provision in the English Declaration of Right of 1689 that gave the King's Protestant "'subjects'" the right to "'have Arms for their defence suitable to their Conditions, and as allowed by law.'" *Id.*, at ___ (slip op., at 19–20) (quoting 1 W. Blackstone, Commentaries on the Laws of England 140 (1765) (hereinafter Blackstone) and 1 W. & M., c. 2, §7, in 3 Eng. Stat. at Large 441 (1689)). The Framers, said the majority, understood that right "as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" 554 U. S., at ___ (slip op., at 21) (quoting St. George Tucker, 1 Blackstone's Commentaries 145–146, n. 42 (1803)).

The historians now tell us, however, that the right to which Blackstone referred had, not *nothing*, but *everything*, to do with the militia. As properly understood at the time of the English Civil Wars, the historians claim, the right to bear arms "ensured that *Parliament* had the power" to arm the citizenry: "to defend the realm" in the case of a foreign enemy, and to "secure the right of 'self-preservation,'" or "self-defense," should *the sovereign* usurp the English Constitution." English Historians' Brief 3, 8–13, 23–24 (emphasis added). Thus, the Declaration of Right says that private persons can possess guns only "as allowed by law." See *id.,* at 20–24. Moreover, when Blackstone referred to "'the right of having and using arms for self-preservation and defence,'" he was referring to the right of the people *to take part in the militia* to defend their political liberties*,"* and *to the right of Parliament* (which represented the people) to *raise a militia* even when the King sought to deny it that power. *Id.,* at 4, 24–27 (emphasis added) (quoting 1 Blackstone 140). Nor can the historians find any convincing reason to believe that

the Framers had something different in mind than what Blackstone himself meant. Compare *Heller, supra,* at \_\_\_ (slip op., at 21–22) with English Historians' Brief 28–40. The historians concede that at least one historian takes a different position, see *id.,* at 7, but the Court, they imply, would lose a poll taken among professional historians of this period, say, by a vote of 8 to 1.

If history, and history alone, is what matters, why would the Court not now reconsider *Heller* in light of these more recently published historical views? See *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 923–924 (2007) (BREYER, J., dissenting) (noting that *stare decisis* interests are at their lowest with respect to recent and erroneous constitutional decisions that create unworkable legal regimes); *Citizens United* v. *Federal Election Comm'n*, 558 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 47) (listing similar factors); see also *Wallace* v. *Jaffree*, 472 U. S. 38, 99 (1985) (Rehnquist, J., dissenting) ("*[S]tare decisis* may bind courts as to matters of law, but it cannot bind them as to matters of history"). At the least, where *Heller*'s historical foundations are so uncertain, why extend its applicability?

My aim in referring to this history is to illustrate the reefs and shoals that lie in wait for those nonexpert judges who place virtually determinative weight upon historical considerations. In my own view, the Court should not look to history alone but to other factors as well—above all, in cases where the history is so unclear that the experts themselves strongly disagree. It should, for example, consider the basic values that underlie a constitutional provision and their contemporary significance. And it should examine as well the relevant consequences and practical justifications that might, or might not, warrant removing an important question from the democratic decisionmaking process. See *ante*, at 16–20 (STEVENS, J., dissenting) (discussing shortcomings of an exclusively

historical approach).

## II
### A

In my view, taking *Heller* as a given, the Fourteenth Amendment does not incorporate the Second Amendment right to keep and bear arms for purposes of private self-defense. Under this Court's precedents, to incorporate the private self-defense right the majority must show that the right is, *e.g.*, "fundamental to the American scheme of justice," *Duncan* v. *Louisiana*, 391 U. S. 145, 149 (1968); see *ibid.*, n. 14; see also *ante,* at 44 (plurality opinion) (finding that the right is "fundamental" and therefore incorporated). And this it fails to do.

The majority here, like that in *Heller,* relies almost exclusively upon history to make the necessary showing. *Ante,* at 20–33. But to do so for incorporation purposes is both wrong and dangerous. As JUSTICE STEVENS points out, our society has historically made mistakes—for example, when considering certain 18th- and 19th-century property rights to be fundamental. *Ante,* at 19 (dissenting opinion). And in the incorporation context, as elsewhere, history often is unclear about the answers. See Part I, *supra;* Part III, *infra.*

Accordingly, this Court, in considering an incorporation question, has never stated that the historical status of a right is the only relevant consideration. Rather, the Court has either explicitly or implicitly made clear in its opinions that the right in question has remained fundamental over time. See, *e.g., Apodaca* v. *Oregon*, 406 U. S. 404, 410 (1972) (plurality opinion) (stating that the incorporation "inquiry must focus upon the function served" by the right in question in "*contemporary society*" (emphasis added)); *Duncan* v. *Louisiana*, 391 U. S. 145, 154 (1968) (noting that the right in question "continues to receive strong support"); *Klopfer* v. *North Carolina*, 386 U. S. 213, 226

(1967) (same). And, indeed, neither of the parties before us in this case has asked us to employ the majority's history-constrained approach. See Brief for Petitioners 67–69 (arguing for incorporation based on trends in contemporary support for the right); Brief for Respondents City of Chicago et al. 23–31 (hereinafter Municipal Respondents) (looking to current state practices with respect to the right).

I thus think it proper, above all where history provides no clear answer, to look to other factors in considering whether a right is sufficiently "fundamental" to remove it from the political process in every State. I would include among those factors the nature of the right; any contemporary disagreement about whether the right is fundamental; the extent to which incorporation will further other, perhaps more basic, constitutional aims; and the extent to which incorporation will advance or hinder the Constitution's structural aims, including its division of powers among different governmental institutions (and the people as well). Is incorporation needed, for example, to further the Constitution's effort to ensure that the government treats each individual with equal respect? Will it help maintain the democratic form of government that the Constitution foresees? In a word, will incorporation prove consistent, or inconsistent, with the Constitution's efforts to create governmental institutions well suited to the carrying out of its constitutional promises?

Finally, I would take account of the Framers' basic reason for believing the Court ought to have the power of judicial review. Alexander Hamilton feared granting that power to Congress alone, for he feared that Congress, acting as judges, would not overturn as unconstitutional a popular statute that it had recently enacted, as legislators. The Federalist No. 78, p. 405 (G. Carey & J. McClellan eds. 2001) (A. Hamilton) ("This independence of the judges is equally requisite to guard the constitution and the

rights of individuals from the effects of those ill humours,
which" can, at times, lead to "serious oppressions of the
minor part in the community"). Judges, he thought, may
find it easier to resist popular pressure to suppress the
basic rights of an unpopular minority. See *United States*
v. *Carolene Products Co.*, 304 U. S. 144, 152, n. 4 (1938).
That being so, it makes sense to ask whether that particu-
lar comparative judicial advantage is relevant to the case
at hand. See, *e.g.,* J. Ely, Democracy and Distrust (1980).

B

How do these considerations apply here? For one thing,
I would apply them only to the private self-defense right
directly at issue. After all, the Amendment's militia-
related purpose is primarily to protect *States* from *federal*
regulation, not to protect individuals from militia-related
regulation. *Heller*, 554 U. S., at ___ (slip op., at 26); see
also *Miller*, 307 U. S., at 178. Moreover, the Civil War
Amendments, the electoral process, the courts, and nu-
merous other institutions today help to safeguard the
States and the people from any serious threat of federal
tyranny. How are state militias additionally necessary?
It is difficult to see how a right that, as the majority con-
cedes, has "largely faded as a popular concern" could
possibly be so fundamental that it would warrant incorpo-
ration through the Fourteenth Amendment. *Ante*, at 22.
Hence, the incorporation of the Second Amendment cannot
be based on the militia-related aspect of what *Heller* found
to be more extensive Second Amendment rights.

For another thing, as *Heller* concedes, the private self-
defense right that the Court would incorporate has noth-
ing to do with "the *reason*" the Framers "codified" the right
to keep and bear arms "in a written Constitution." 554
U. S., at ___ (slip op., at 26) (emphasis added). *Heller*
immediately adds that the self-defense right was nonethe-
less "the *central component* of the right." *Ibid.* In my

view, this is the historical equivalent of a claim that water runs uphill. See Part I, *supra.* But, taking it as valid, the Framers' basic *reasons* for including language in the Constitution would nonetheless seem more pertinent (in deciding about the contemporary *importance* of a right) than the particular *scope* 17th- or 18th-century listeners would have then assigned to the words they used. And examination of the Framers' motivation tells us they did not think the private armed self-defense right was of paramount importance. See Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1164 (1991) ("[T]o see the [Second] Amendment as primarily concerned with an individual right to hunt, or protect one's home," would be "like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge"); see also, *e.g.,* Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L. Rev. 103, 127–128 (2000); Brief for Historians on Early American Legal, Constitutional, and Pennsylvania History as *Amici Curiae* 22–33.

Further, there is no popular consensus that the private self-defense right described in *Heller* is fundamental. The plurality suggests that two *amici* briefs filed in the case show such a consensus, see *ante*, at 42–43, but, of course, numerous *amici* briefs have been filed opposing incorporation as well. Moreover, every State regulates firearms extensively, and public opinion is sharply divided on the appropriate level of regulation. Much of this disagreement rests upon empirical considerations. One side believes the right essential to protect the lives of those attacked in the home; the other side believes it essential to regulate the right in order to protect the lives of others attacked with guns. It seems unlikely that definitive evidence will develop one way or the other. And the appropriate level of firearm regulation has thus long been, and continues to be, a hotly contested matter of political debate. See, *e.g.,* Siegel, Dead or Alive: Originalism as Popular Constitu-

tionalism in *Heller*, 122 Harv. L. Rev. 191, 201–246 (2008). (Numerous sources supporting arguments and data in Part II–B can be found in the Appendix, *infra.*)

Moreover, there is no reason here to believe that incorporation of the private self-defense right will further any other or broader constitutional objective. We are aware of no argument that gun-control regulations target or are passed with the purpose of targeting "discrete and insular minorities." *Carolene Products Co., supra,* at 153, n. 4; see, *e.g., ante,* at 49–51 (STEVENS, J., dissenting). Nor will incorporation help to assure equal respect for individuals. Unlike the First Amendment's rights of free speech, free press, assembly, and petition, the private self-defense right does not comprise a necessary part of the democratic process that the Constitution seeks to establish. See, *e.g., Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring). Unlike the First Amendment's religious protections, the Fourth Amendment's protection against unreasonable searches and seizures, the Fifth and Sixth Amendments' insistence upon fair criminal procedure, and the Eighth Amendment's protection against cruel and unusual punishments, the private self-defense right does not significantly seek to protect individuals who might otherwise suffer unfair or inhumane treatment at the hands of a majority. Unlike the protections offered by many of these same Amendments, it does not involve matters as to which judges possess a comparative expertise, by virtue of their close familiarity with the justice system and its operation. And, unlike the Fifth Amendment's insistence on just compensation, it does not involve a matter where a majority might unfairly seize for itself property belonging to a minority.

Finally, incorporation of the right *will* work a significant disruption in the constitutional allocation of decisionmaking authority, thereby interfering with the Constitution's ability to further its objectives.

*First,* on any reasonable accounting, the incorporation of the right recognized in *Heller* would amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the States and the Federal Government. Private gun regulation is the quintessential exercise of a State's "police power"—*i.e.,* the power to "protec[t] . . . the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State," by enacting "all kinds of restraints and burdens" on both "persons and property." *Slaughter-House Cases,* 16 Wall. 36, 62 (1873) (internal quotation marks omitted). The Court has long recognized that the Constitution grants the States special authority to enact laws pursuant to this power. See, *e.g., Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 475 (1996) (noting that States have "great latitude" to use their police powers (internal quotation marks omitted)); *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 756 (1985). A decade ago, we wrote that there is "no better example of the police power" than "the suppression of violent crime." *United States* v. *Morrison,* 529 U. S. 598, 618 (2000). And examples in which the Court has deferred to state legislative judgments in respect to the exercise of the police power are legion. See, *e.g., Gonzales* v. *Oregon,* 546 U. S. 243, 270 (2006) (assisted suicide); *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997) (same); *Berman* v. *Parker,* 348 U. S. 26, 32 (1954) ("We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless . . .").

*Second,* determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make. See, *e.g., Los Angeles* v. *Alameda Books, Inc.,* 535 U. S. 425, 440 (2002) (plurality opinion); *Turner Broadcasting System, Inc.* v. *FCC,* 520

U. S. 180, 195–196 (1997).  And it may require this kind of analysis in virtually every case.

Government regulation of the right to bear arms normally embodies a judgment that the regulation will help save lives.  The determination whether a gun regulation is constitutional would thus almost always require the weighing of the constitutional right to bear arms against the "primary concern of every government—a concern for the safety and indeed the lives of its citizens."  *United States* v. *Salerno*, 481 U. S. 739, 755 (1987).  With respect to other incorporated rights, this sort of inquiry is *sometimes* present.  See, *e.g., Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)* (free speech); *Sherbert* v. *Verner*, 374 U. S. 398, 403 (1963) (religion); *Brigham City* v. *Stuart*, 547 U. S. 398, 403–404 (2006) (Fourth Amendment); *New York* v. *Quarles*, 467 U. S. 649, 655 (1984) (Fifth Amendment); *Salerno, supra*, at 755 (bail).  But here, this inquiry—calling for the fine tuning of protective rules—is likely to be part of a daily judicial diet.

Given the competing interests, courts will have to try to answer empirical questions of a particularly difficult kind.  Suppose, for example, that after a gun regulation's adoption the murder rate went up.  Without the gun regulation would the murder rate have risen even faster?  How is this conclusion affected by the local recession which has left numerous people unemployed?  What about budget cuts that led to a downsizing of the police force?  How effective was that police force to begin with?  And did the regulation simply take guns from those who use them for lawful purposes without affecting their possession by criminals?

Consider too that countless gun regulations of many shapes and sizes are in place in every State and in many local communities.  Does the right to possess weapons for self-defense extend outside the home?  To the car?  To work?  What sort of guns are necessary for self-defense?  Handguns?  Rifles?  Semiautomatic weapons?  When is a

gun semi-automatic? Where are different kinds of weapons likely needed? Does time-of-day matter? Does the presence of a child in the house matter? Does the presence of a convicted felon in the house matter? Do police need special rules permitting patdowns designed to find guns? When do registration requirements become severe to the point that they amount to an unconstitutional ban? Who can possess guns and of what kind? Aliens? Prior drug offenders? Prior alcohol abusers? How would the right interact with a state or local government's ability to take special measures during, say, national security emergencies? As the questions suggest, state and local gun regulation can become highly complex, and these "are only a few uncertainties that quickly come to mind." *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. \_\_\_, \_\_\_ (2009) (ROB-ERTS, C. J., dissenting) (slip op., at 10).

The difficulty of finding answers to these questions is exceeded only by the importance of doing so. Firearms cause well over 60,000 deaths and injuries in the United States each year. Those who live in urban areas, police officers, women, and children, all may be particularly at risk. And gun regulation may save their lives. Some experts have calculated, for example, that Chicago's handgun ban has saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983. Other experts argue that stringent gun regulations "can help protect police officers operating on the front lines against gun violence," have reduced homicide rates in Washington, D. C., and Baltimore, and have helped to lower New York's crime and homicide rates.

At the same time, the opponents of regulation cast doubt on these studies. And who is right? Finding out may require interpreting studies that are only indirectly related to a particular regulatory statute, say one banning handguns in the home. Suppose studies find more accidents and suicides where there is a handgun in the home

than where there is a long gun in the home or no gun at
all? To what extent do such studies justify a ban? What if
opponents of the ban put forth counter studies?

In answering such questions judges cannot simply refer
to judicial homilies, such as Blackstone's 18th-century
perception that a man's home is his castle. See 4 Black-
stone 223. Nor can the plurality so simply reject, by mere
assertion, the fact that "incorporation will require judges
to assess the costs and benefits of firearms restrictions."
*Ante*, at 44. How can the Court assess the strength of the
government's regulatory interests without addressing
issues of empirical fact? How can the Court determine if a
regulation is appropriately tailored without considering its
impact? And how can the Court determine if there are
less restrictive alternatives without considering what will
happen if those alternatives are implemented?

Perhaps the Court could lessen the difficulty of the
mission it has created for itself by adopting a jurispruden-
tial approach similar to the many state courts that admin-
ister a state constitutional right to bear arms. See *infra*,
at 19–20 (describing state approaches). But the Court has
not yet done so. Cf. *Heller,* 544 U. S., at ___ (slip op., at
57–64) (rejecting an "'interest-balancing' approach" simi-
lar to that employed by the States); *ante*, at 44 (plurality
opinion). Rather, the Court has haphazardly created a few
simple rules, such as that it will not touch "prohibitions on
the possession of firearms by felons and the mentally ill,"
"laws forbidding the carrying of firearms in sensitive
places such as schools and government buildings," or "laws
imposing conditions and qualifications on the commercial
sale of arms." *Heller*, 544 U. S., at ___ (slip op., at 54–55);
*Ante,* at 39 (plurality opinion). But why these rules and
not others? Does the Court know that these regulations
are justified by some special gun-related risk of death? In
fact, the Court does not know. It has simply invented
rules that sound sensible without being able to explain

why or how Chicago's handgun ban is different.

The fact is that judges do not know the answers to the kinds of empirically based questions that will often determine the need for particular forms of gun regulation. Nor do they have readily available "tools" for finding and evaluating the technical material submitted by others. *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 21); see also *Turner Broadcasting*, 520 U. S., at 195–196. Judges cannot easily make empirically based predictions; they have no way to gather and evaluate the data required to see if such predictions are accurate; and the nature of litigation and concerns about *stare decisis* further make it difficult for judges to change course if predictions prove inaccurate. Nor can judges rely upon local community views and values when reaching judgments in circumstances where prediction is difficult because the basic facts are unclear or unknown.

At the same time, there is no institutional need to send judges off on this "mission-almost-impossible." Legislators are able to "amass the stuff of actual experience and cull conclusions from it." *United States* v. *Gainey*, 380 U. S. 63, 67 (1965). They are far better suited than judges to uncover facts and to understand their relevance. And legislators, unlike Article III judges, can be held democratically responsible for their empirically based and value-laden conclusions. We have thus repeatedly affirmed our preference for "legislative not judicial solutions" to this kind of problem, see, *e.g., Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 513 (1982), just as we have repeatedly affirmed the Constitution's preference for democratic solutions legislated by those whom the people elect.

In *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 310–311 (1932), Justice Brandeis stated in dissent:

"Some people assert that our present plight is due, in

part, to the limitations set by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. I cannot believe that the framers of the Fourteenth Amendment, or the States which ratified it, intended to deprive us of the power to correct [the social problems we face]."

There are 50 state legislatures. The fact that this Court may already have refused to take this wise advice with respect to Congress in *Heller* is no reason to make matters worse here.

*Third,* the ability of States to reflect local preferences and conditions—both key virtues of federalism—here has particular importance. The incidence of gun ownership varies substantially as between crowded cities and uncongested rural communities, as well as among the different geographic regions of the country. Thus, approximately 60% of adults who live in the relatively sparsely populated Western States of Alaska, Montana, and Wyoming report that their household keeps a gun, while fewer than 15% of adults in the densely populated Eastern States of Rhode Island, New Jersey, and Massachusetts say the same.

The nature of gun violence also varies as between rural communities and cities. Urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents. And idiosyncratic local factors can lead to two cities finding themselves in dramatically different circumstances: For example, in 2008, the murder rate was 40 times higher in New Orleans than it was in Lincoln, Nebraska.

It is thus unsurprising that States and local communities have historically differed about the need for gun regulation as well as about its proper level.  Nor is it surprising that "primarily, and historically," the law has treated the exercise of police powers, including gun control, as "matter[s] of local concern."  *Medtronic,* 518 U. S., at 475 (internal quotation marks omitted).

*Fourth,* although incorporation of any right removes decisions from the democratic process, the incorporation of this particular right does so without strong offsetting justification—as the example of Oak Park's handgun ban helps to show.  See Oak Park, Ill., Municipal Code, §27–2–1 (1995).  Oak Park decided to ban handguns in 1983, after a local attorney was shot to death with a handgun that his assailant had smuggled into a courtroom in a blanket.  Brief for Oak Park Citizens Committee for Handgun Control as *Amicus Curiae* 1, 21 (hereinafter Oak Park Brief).  A citizens committee spent months gathering information about handguns.  *Id.,* at 21.  It secured 6,000 signatures from community residents in support of a ban.  *Id.,* at 21–22.  And the village board enacted a ban into law.  *Id.,* at 22.

Subsequently, at the urging of ban opponents the Board held a community referendum on the matter.  *Ibid.*  The citizens committee argued strongly in favor of the ban.  *Id.,* at 22–23.  It pointed out that most guns owned in Oak Park were handguns and that handguns were misused more often than citizens used them in self-defense.  *Id.,* at 23.  The ban opponents argued just as strongly to the contrary.  *Ibid.*  The public decided to keep the ban by a vote of 8,031 to 6,368.  *Ibid.*  And since that time, Oak Park now tells us, crime has decreased and the community has seen no accidental handgun deaths.  *Id.,* at 2.

Given the empirical and local value-laden nature of the questions that lie at the heart of the issue, why, in a Nation whose Constitution foresees democratic decisionmak-

ing, is it so *fundamental* a matter as to require taking that power from the people?  What is it here that the people did not know?  What is it that a judge knows better?

\*     \*     \*

In sum, the police power, the superiority of legislative decisionmaking, the need for local decisionmaking, the comparative desirability of democratic decisionmaking, the lack of a manageable judicial standard, and the life-threatening harm that may flow from striking down regulations all argue against incorporation.  Where the incorporation of other rights has been at issue, *some* of these problems have arisen.  But in this instance *all* these problems are present, *all* at the same time, and *all* are likely to be present in most, perhaps nearly all, of the cases in which the constitutionality of a gun regulation is at issue.  At the same time, the important factors that favor incorporation in other instances—*e.g.*, the protection of broader constitutional objectives—are not present here.  The upshot is that all factors militate against incorporation—with the possible exception of historical factors.

### III

I must, then, return to history.  The plurality, in seeking to justify incorporation, asks whether the interests the Second Amendment protects are "'deeply rooted in this Nation's history and tradition.'"  *Ante*, at 19 (quoting *Glucksberg*, 521 U. S., at 721; internal quotation marks omitted).  It looks to selected portions of the Nation's history for the answer.  And it finds an affirmative reply.

As I have made clear, I do not believe history is the only pertinent consideration.  Nor would I read history as broadly as the majority does.  In particular, since we here are evaluating a more particular right—namely, the right to bear arms for purposes of private self-defense—general historical references to the "right to keep and bear arms"

are not always helpful. Depending upon context, early historical sources may mean to refer to a militia-based right—a matter of considerable importance 200 years ago—which has, as the majority points out, "largely faded as a popular concern." *Ante*, at 22. There is no reason to believe that matters of such little contemporary importance should play a significant role in answering the incorporation question. See *Apodaca*, 406 U. S., at 410 (incorporation "inquiry must focus upon the function served" by the right in question in "contemporary society"); *Wolf* v. *Colorado*, 338 U. S. 25, 27 (1949) (incorporation must take into account "the movements of a free society" and "the gradual and empiric process of inclusion and exclusion" (internal quotation marks omitted)); cf. U. S. Const., Art. I, §910 (prohibiting federal officeholders from accepting a "Title, of any kind whatever, from [a] foreign State"—presumably a matter of considerable importance 200 years ago).

That said, I can find much in the historical record that shows that some Americans in some places at certain times thought it important to keep and bear arms for private self-defense. For instance, the reader will see that many States have constitutional provisions protecting gun possession. But, as far as I can tell, those provisions typically do no more than guarantee that a gun regulation will be a *reasonable* police power regulation. See Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 686, 716–717 (2007) (the "courts of every state to consider the question apply a deferential 'reasonable regulation' standard") (hereinafter Winkler, Scrutinizing); see also *id.*, at 716–717 (explaining the difference between that standard and ordinary rational-basis review). It is thus altogether unclear whether such provisions would prohibit cities such as Chicago from enacting laws, such as the law before us, banning handguns. See *id.,* at 723. The majority, however, would incorporate a right that is likely

*inconsistent* with Chicago's law; and the majority would almost certainly *strike down* that law. Cf. *Heller,* 554 U. S., at ___ (slip op., at 57–64) (striking down the District of Columbia's handgun ban).

Thus, the specific question before us is not whether there are references to the right to bear arms for self-defense throughout this Nation's history—of course there are—or even whether the Court should incorporate a simple constitutional requirement that firearms regulations not unreasonably burden the right to keep and bear arms, but rather whether there is a consensus that *so substantial* a private self-defense right as the one described in *Heller* applies to the States. See, *e.g., Glucksberg*, *supra,* at 721 (requiring "a careful description" of the right at issue when deciding whether it is "deeply rooted in this Nation's history and tradition" (internal quotation marks omitted)). On this question, the reader will have to make up his or her own mind about the historical record that I describe in part below. In my view, that record is insufficient to say that the right to bear arms for private self-defense, as explicated by *Heller*, is fundamental in the sense relevant to the incorporation inquiry. As the evidence below shows, States and localities have consistently enacted firearms regulations, including regulations similar to those at issue here, throughout our Nation's history. Courts have repeatedly upheld such regulations. And it is, at the very least, possible, and perhaps likely, that incorporation will impose on every, or nearly every, State a different right to bear arms than they currently recognize—a right that threatens to destabilize settled state legal principles. Cf. 554 U. S., at ___ (slip op., at 57–64) (rejecting an "'interest-balancing' approach" similar to that employed by the States).

I thus cannot find a historical consensus with respect to whether the right described by *Heller* is "fundamental" as our incorporation cases use that term. Nor can I find

sufficient historical support for the majority's conclusion that that right is "deeply rooted in this Nation's history and tradition." Instead, I find no more than ambiguity and uncertainty that perhaps even expert historians would find difficult to penetrate. And a historical record that is so ambiguous cannot itself provide an adequate basis for incorporating a private right of self-defense and applying it against the States.

*The Eighteenth Century*

The opinions in *Heller* collect much of the relevant 18th-century evidence. See 554 U. S., at ___ (slip op., at 5–32); *id.*, at ___ (STEVENS, J., dissenting) (slip op., at 5–31); *id.,* at ___ (BREYER, J., dissenting) (slip op., at 4–7). In respect to the relevant question—the "deeply rooted nature" of a right to keep and bear arms for purposes of private self-defense—that evidence is inconclusive, particularly when augmented as follows:

*First*, as I have noted earlier in this opinion, and JUSTICE STEVENS argued in dissent, the history discussed in *Heller* shows that the Second Amendment was enacted primarily for the purpose of protecting militia-related rights. See *supra*, at 4; *Heller, supra,* at ___ (slip op., at 5–31). Many of the scholars and historians who have written on the subject apparently agree. See *supra*, at 2–5.

*Second*, historians now tell us that the right to which Blackstone referred, an important link in the *Heller* majority's historical argument, concerned the right of Parliament (representing the people) to form a militia to oppose a tyrant (the King) threatening to deprive the people of their traditional liberties (which did not include an unregulated right to possess guns). Thus, 18th-century language referring to a "right to keep and bear arms" does not *ipso facto* refer to a private right of self-defense—certainly not unambiguously so. See English Historians' Brief 3–27; see also *supra*, at 2–5.

*Third*, scholarly articles indicate that firearms were heavily regulated at the time of the framing—perhaps more heavily regulated than the Court in *Heller* believed. For example, one scholar writes that "[h]undreds of individual statutes regulated the possession and use of guns in colonial and early national America." Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms, 25 Law & Hist. Rev. 139, 143 (2007). Among these statutes was a ban on the private firing of weapons in Boston, as well as comprehensive restrictions on similar conduct in Philadelphia and New York. See Acts and Laws of Massachusetts, p. 208 (1746); 5 J. Mitchell, & H. Flanders, Statutes at Large of Pennsylvania From 1682 to 1801, pp. 108–109 (1898); 4 Colonial Laws of New York ch. 1233, p. 748 (1894); see also Churchill, *supra*, at 162–163 (discussing bans on the shooting of guns in Pennsylvania and New York).

*Fourth*, after the Constitution was adopted, several States continued to regulate firearms possession by, for example, adopting rules that would have prevented the carrying of loaded firearms in the city, *Heller*, 554 U. S., at ___ (slip op., at 5–7) (Bʀᴇʏᴇʀ, J., dissenting); see also *id.*, at ___ (slip op., at 59–60). Scholars have thus concluded that the primary Revolutionary era limitation on a State's police power to regulate guns appears to be only that regulations were "aimed at a legitimate public purpose" and "consistent with reason." Cornell, Early American Gun Regulation and the Second Amendment, 25 Law & Hist. Rev. 197, 198 (2007).

*The Pre-Civil War Nineteenth Century*

I would also augment the majority's account of this period as follows:

*First*, additional States began to regulate the discharge of firearms in public places. See, *e.g.,* Act of Feb. 17, 1831, §6, reprinted in 3 Statutes of Ohio and the Northwestern

Territory 1740 (S. Chase ed. 1835); Act of Dec. 3, 1825, ch. CCXCII, §3, 1825 Tenn. Priv. Acts 306.

*Second*, States began to regulate the possession of concealed weapons, which were both popular and dangerous. See, *e.g.,* C. Cramer, Concealed Weapon Laws of the Early Republic 143–152 (1999) (collecting examples); see also 1837–1838 Tenn. Pub. Acts ch. 137, pp. 200–201 (banning the wearing, sale, or giving of Bowie knives); 1847 Va. Acts ch. 7, §8, p. 110, ("Any free person who shall habitually carry about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, from the use of which the death of any person might probably ensue, shall for every offense be punished by [a] fine not exceed fifty dollars").

State courts repeatedly upheld the validity of such laws, finding that, even when the state constitution granted a right to bear arms, the legislature was permitted to, *e.g.*, "abolish" these small, inexpensive, "most dangerous weapons entirely from use," even in self-defense. *Day* v. *State*, 37 Tenn. 496, 500 (1857); see also, *e.g.*, *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (upholding concealed weapon ban because it "prohibited only a *particular mode* of bearing arms which is found dangerous to the peace of society"); *State* v. *Chandler*, 5 La. Ann. 489, 489–490 (1850) (upholding concealed weapon ban and describing the law as "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons"); *State* v. *Reid*, 1 Ala. 612, 616–617 (1840).

*The Post-Civil War Nineteenth Century*

It is important to read the majority's account with the following considerations in mind:

*First,* the Court today properly declines to revisit our interpretation of the Privileges or Immunities Clause. See *ante*, at 10. The Court's case for incorporation must thus rest on the conclusion that the right to bear arms is "fun-

damental." But the very evidence that it advances in support of the conclusion that Reconstruction-era Americans strongly supported a private self-defense right shows with equal force that Americans wanted African-American citizens to have the *same* rights to possess guns as did white citizens. *Ante,* at 22–33. Here, for example is what Congress said when it enacted a Fourteenth Amendment predecessor, the Second Freedman's Bureau Act. It wrote that the statute, in order to secure "the constitutional right to bear arms . . . for all citizens," would assure that each citizen:

> "shall have . . . *full and equal benefit* of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, [by securing] . . . to . . . all the citizens of [every] . . . State or district without *respect to race or color, or previous condition of slavery."* §14, 14 Stat. 176–177 (emphasis added).

This sounds like an *antidiscrimination* provision. See Rosenthal, The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation, 18 J. Contemp. Legal Issues 361, 383–384 (2009) (discussing evidence that the Freedmen's Bureau was focused on discrimination).

Another Fourteenth Amendment predecessor, the Civil Rights Act of 1866, also took aim at *discrimination.* See §1, 14 Stat. 27 (citizens of "every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right [to engage in various activities] and to full and equal benefit of all laws . . . as is enjoyed by white citizens"). And, of course, the Fourteenth Amendment itself insists that all States guarantee their citizens the "equal protection of the laws."

There is thus every reason to believe that the *funda-*

*mental* concern of the Reconstruction Congress was the eradication of discrimination, not the provision of a new substantive right to bear arms free from reasonable state police power regulation. See, *e.g.,* Brief for Municipal Respondents 62–69 (discussing congressional record evidence that Reconstruction Congress was concerned about discrimination). Indeed, why would those who wrote the Fourteenth Amendment have wanted to give such a right to Southerners who had so recently waged war against the North, and who continued to disarm and oppress recently freed African-American citizens? Cf. Act of Mar. 2, 1867, §6, 14 Stat. 487 (disbanding Southern militias because they were, *inter alia*, disarming the freedmen).

*Second,* firearms regulation in the later part of the 19th century was common. The majority is correct that the Freedmen's Bureau points to a right to bear arms, and it stands to reason, as the majority points out, that "[i]t would have been nonsensical for Congress to guarantee the . . . equal benefit of a . . . right that does not exist." *Ante*, at 32. But the majority points to no evidence that there existed during this period a fundamental right to bear arms for private self-defense immune to the reasonable exercise of the state police power. See Emberton, The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South, 17 Stan. L. & Pol'y Rev. 615, 621–622 (2006) (noting that history shows that "nineteenth-century Americans" were "not opposed to the idea that the state should be able to control the use of firearms").

To the contrary, in the latter half of the 19th century, a number of state constitutions adopted or amended after the Civil War explicitly recognized the legislature's general ability to limit the right to bear arms. See Tex. Const., Art. I, §13 (1869) (protecting "the right to keep and bear arms," "under such regulations as the legislature may prescribe"); Idaho Const., Art. I, §11 (1889) ("The

people have the right to bear arms . . .; but the Legislature
shall regulate the exercise of this right by law"); Utah
Const., Art. I, §6 (1896) (same). And numerous other state
constitutional provisions adopted during this period ex-
plicitly granted the legislature various types of regulatory
power over firearms. See Brief for Thirty-Four Profes-
sional Historians et al. as *Amici Curiae* 14–15 (hereinafter
Legal Historians' Brief).

Moreover, four States largely banned the possession of
all nonmilitary handguns during this period. See 1879
Tenn. Pub. Acts ch. 186, §1 (prohibiting citizens from
carrying "publicly or privately, any . . . belt or pocket
pistol, revolver, or any kind of pistol, except the army or
navy pistol, usually used in warfare, which shall be car-
ried openly in the hand"); 1876 Wyo. Comp. Laws ch. 52,
§1 (forbidding "concealed or ope[n]" bearing of "any fire
arm or other deadly weapon, within the limits of any city,
town or village"); Ark. Act of Apr. 1, 1881, ch. 96, §1 (pro-
hibiting the "wear[ing] or carry[ng]" of "any pistol . . .
except such pistols as are used in the army or navy,"
except while traveling or at home); Tex. Act of Apr. 12,
1871, ch. 34 (prohibiting the carrying of pistols unless
there are "immediate and pressing" reasonable grounds to
fear "immediate and pressing" attack or for militia ser-
vice). Fifteen States banned the concealed carry of pistols
and other deadly weapons. See Legal Historians' Brief 16,
n. 14. And individual municipalities enacted stringent
gun controls, often in response to local conditions—Dodge
City, Kansas, for example, joined many western cattle
towns in banning the carrying of pistols and other danger-
ous weapons in response to violence accompanying west-
ern cattle drives. See Brief for Municipal Respondents 30
(citing Dodge City, Kan., Ordinance No. 16, §XI (Sept. 22,
1876)); D. Courtwright, The Cowboy Subculture, in Guns
in America: A Reader 96 (J. Dizard et al. eds. 1999) (dis-
cussing how Western cattle towns required cowboys to

"check" their guns upon entering town).

Further, much as they had during the period before the Civil War, state courts routinely upheld such restrictions. See, *e.g., English* v. *State*, 35 Tex. 473 (1871); *Hill* v. *State*, 53 Ga. 472, 475 (1874); *Fife* v. *State*, 31 Ark. 455, 461 (1876); *State* v. *Workman*, 35 W. Va. 367, 373 (1891). The Tennessee Supreme Court, in upholding a ban on possession of nonmilitary handguns and certain other weapons, summarized the Reconstruction understanding of the states' police power to regulate firearms:

> "Admitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; *and where certain weapons are forbidden to be kept or used by the law of the land*, in order to the prevention of *[sic]* crime—a great public end—*no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or willful desire to use a particular weapon in his particular self-defense*. The law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully prescribed by this statute. The object being to banish these weapons from the community by an absolute prohibition for the prevention of crime, no man's particular safety, if such case could exist, ought to be allowed to defeat this end." *Andrews* v. *State*, 50 Tenn. 165, 188–189 (1871) (emphasis added).

### *The Twentieth and Twenty-First Centuries*

Although the majority does not discuss 20th- or 21st-century evidence concerning the Second Amendment at any length, I think that it is essential to consider the recent history of the right to bear arms for private self-defense when considering whether the right is "fundamen-

tal." To that end, many States now provide state constitu-
tional protection for an individual's right to keep and bear
arms. See Volokh, State Constitutional Rights to Keep
and Bear Arms, 11 Tex. Rev. L. & Pol. 191, 205 (2006)
(identifying over 40 States). In determining the impor-
tance of this fact, we should keep the following considera-
tions in mind:

*First*, by the end of the 20th century, in every State and
many local communities, highly detailed and complicated
regulatory schemes governed (and continue to govern)
nearly every aspect of firearm ownership: Who may sell
guns and how they must be sold; who may purchase guns
and what type of guns may be purchased; how firearms
must be stored and where they may be used; and so on.
See generally Legal Community Against Violence, Regu-
lating Guns In America (2008), available at http://
www.lcav.org/publications-briefs/regulating_guns. asp (all
Internet materials as visited June 24, 2010, and available
in Clerk of Court's case file) (detailing various arms regu-
lations in every State).

Of particular relevance here, some municipalities ban
handguns, even in States that constitutionally protect the
right to bear arms. See Chicago, Ill., Municipal Code, §8–
20–050(c) (2009); Oak Park, Ill., Municipal Code, §§27–2–
1, 27–1–1 (1995); Toledo, Ohio, Municipal Code, ch. 549.25
(2010). Moreover, at least seven States and Puerto Rico
ban assault weapons or semiautomatic weapons. See Cal.
Penal Code Ann. §12280(b) (West Supp. 2009); Conn. Gen.
Stat. Ann. §53–202c (2007); Haw. Rev. Stat. §134–8
(1993); Md. Crim. Law Code Ann. §4–303(a) (Lexis 2002);
Mass. Gen. Laws, ch. 140, §131M (West 2006); N. J. Stat.
Ann. §2C:39-5 (West Supp. 2010); N. Y. Penal Law Ann.
§265.02(7) (West Supp. 2008); 25 Laws P. R. Ann. §456m
(Supp. 2006); see also 18 U. S. C. §922*(o)* (federal ma-
chinegun ban).

Thirteen municipalities do the same. See Albany, N. Y.,

City Code §193–16(A) (2005); Aurora, Ill., Code of Ordi-
nances §29–49(a) (2009); Buffalo, N. Y., City Code §180–
1(F) (2000); Chicago, Ill., Municipal Code §8–24–025(a)
(2010); Cincinnati, Ohio, Municipal Code §708–37(a)
(2008); Cleveland, Ohio, Codified Ordinances §628.03(a)
(2008); Columbus, Ohio, City Code §2323.31 (2007); Den-
ver, Colo., Municipal Code §38–130(e) (2008); Morton
Grove, Ill., Village Code §6–2–3(A); N. Y. C. Admin. Code
§10–303.1 (2009); Oak Park, Ill., Village Code §27–2–1
(2009); Rochester, N. Y., City Code §47–5(F) (2008);
Toledo, Ohio, Municipal Code §549.23(a).  And two States,
Maryland and Hawaii, ban assault pistols.  See Haw. Rev.
Stat. Ann. §134–8; Md. Crim. Law Code Ann. §4–303
(Lexis 2002).

  *Second,* as I stated earlier, state courts in States with
constitutions that provide gun rights have almost uni-
formly interpreted those rights as providing protection
only against *unreasonable* regulation of guns.  See, *e.g.,*
Winkler, Scrutinizing 686 (the "courts of every state to
consider" a gun regulation apply the "'reasonable regula-
tion'" approach); *State* v. *McAdams*, 714 P. 2d 1236, 1238
(Wyo. 1986); *Robertson* v. *City & County of Denver*, 874
P. 2d 325, 328 (Colo. 1994).

  When determining reasonableness those courts have
normally adopted a highly deferential attitude towards
legislative determinations.  See Winkler, Scrutinizing 723
(identifying only six cases in the 60 years before the arti-
cle's publication striking down gun control laws: three that
banned "the transportation of any firearms for any pur-
pose whatsoever," a single "permitting law," and two as-
applied challenges in "unusual circumstances").  Hence, as
evidenced by the breadth of existing regulations, States
and local governments maintain substantial flexibility to
regulate firearms—much as they seemingly have through-
out the Nation's history—even in those States with an
arms right in their constitutions.

Although one scholar implies that state courts are less willing to permit total gun prohibitions, see Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1458 (2009), I am aware of no instances in the past 50 years in which a state court has struck down as unconstitutional a law banning a particular class of firearms, see Winkler, Scrutinizing 723.

Indeed, state courts have specifically upheld as constitutional (under their state constitutions) firearms regulations that have included handgun bans. See *Kalodimos* v. *Village of Morton Grove,* 103 Ill. 2d 483, 499, 470 N. E. 2d 266, 273 (1984) (upholding a handgun ban because the arms right is merely a right "to possess some form of weapon suitable for self-defense or recreation"); *Cleveland* v. *Turner,* No. 36126, 1977 WL 201393, *5 (Ohio Ct. App., Aug. 4, 1977) (handgun ban "does not absolutely interfere with the right of the people to bear arms, but rather proscribes possession of a specifically defined category of handguns"); *State* v. *Bolin* 378 S. C. 96, 99, 662 S. E. 2d 38, 39 (2008) (ban on handgun possession by persons under 21 did not infringe arms right because they can "posses[s] other types of guns"). Thus, the majority's decision to incorporate the private self-defense right recognized in *Heller* threatens to alter state regulatory regimes, at least as they pertain to handguns.

*Third*, the plurality correctly points out that *only a few* state courts, a "paucity" of state courts, have specifically upheld handgun bans. *Ante,* at 39. But which state courts have struck them down? The absence of supporting information does not help the majority find support. Cf. *United States* v. *Wells,* 519 U. S. 482, 496 (1997) (noting that it is "treacherous to find in congressional silence alone the adoption of a controlling rule of law" (internal quotation marks omitted)). Silence does not show or tend to show a consensus that a private self-defense right

(strong enough to strike down a handgun ban) is "deeply rooted in this Nation's history and tradition."

\* \* \*

In sum, the Framers did not write the Second Amendment in order to protect a private right of armed self-defense. There has been, and is, no consensus that the right is, or was, "fundamental." No broader constitutional interest or principle supports legal treatment of that right as fundamental. To the contrary, broader constitutional concerns of an institutional nature argue strongly against that treatment.

Moreover, nothing in 18th-, 19th-, 20th-, or 21st-century history shows a consensus that the right to private armed self-defense, as described in *Heller*, is "deeply rooted in this Nation's history or tradition" or is otherwise "fundamental." Indeed, incorporating the right recognized in *Heller* may change the law in many of the 50 States. Read in the majority's favor, the historical evidence is at most ambiguous. And, in the absence of any other support for its conclusion, ambiguous history cannot show that the Fourteenth Amendment incorporates a private right of self-defense against the States.

With respect, I dissent.

## APPENDIX
### Sources Supporting Data in Part II–B

*Popular Consensus*

Please see the following sources to support the paragraph on popular opinion on pages 9–10:

- Briefs filed in this case that argue against incorporation include: Brief for United States Conference of Mayors as *Amicus Curiae* 1, 17–33 (organization representing "all United States cities with populations of 30,000 or more"); Brief for American Cities et al. as *Amici Curiae* 1–3 (brief filed on behalf of many cities, *e.g.*, Philadelphia, Seattle, San Francisco, Oakland, Cleveland); Brief for Representative Carolyn McCarthy et al. as *Amici Curiae* 5–10; Brief for State of Illinois et al. as *Amici Curiae* 7–35.

- Wilkinson, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L. Rev. 253, 301 (2009) (discussing divided public opinion over the correct level of gun control).

*Data on Gun Violence*

Please see the following sources to support the sentences concerning gun violence on page 13:

- Dept. of Justice, Bureau of Justice Statistics, M. Zawitz & K. Strom, Firearm Injury and Death from Crime, 1993–1997, p. 2 (Oct. 2000) (over 60,000 deaths and injuries caused by firearms each year).

- Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study, 93 Am. J. of Pub. Health 1089, 1092 (2003) (noting that an abusive partner's access to a firearm increases the risk of homicide eightfold for

women in physically abusive relationship).

- American Academy of Pediatrics, Firearm-Related Injuries Affecting the Pediatric Population, 105 Pediatrics 888 (2000) (noting that in 1997 "firearm-related deaths accounted for 22.5% of all injury deaths" for individuals between 1 and 19).

- Dept. of Justice, Federal Bureau of Investigation, Law Enforcement Officers Killed & Assaulted, 2006, (Table) 27 (noting that firearms killed 93% of the 562 law enforcement officers feloniously killed in the line of duty between 1997 and 2006), online at http://www.fbi.gov/ucr/killed/2006/ table27.html.

- Dept. of Justice, Bureau of Justice Statistics, D. Duhart, Urban, Suburban, and Rural Victimization, 1993–1998, pp. 1, 9 (Oct. 2000) (those who live in urban areas particularly at risk of firearm violence).

- Wintemute, The Future of Firearm Violence Prevention, 281 JAMA 475 (1999) ("half of all homicides occurred in 63 cities with 16% of the nation's population").

*Data on the Effectiveness of Regulation*

Please see the following sources to support the sentences concerning the effectiveness of regulation on page 13:

- See Brief for Professors of Criminal Justice as *Amici Curiae* 13 (noting that Chicago's handgun ban saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983).

- Brief for Association of Prosecuting Attorneys et al. as *Amici Curiae* 13–16, 20 (arguing that stringent gun regulations "can help protect police officers op-

erating on the front lines against gun violence," and have reduced homicide rates in Washington, D. C., and Baltimore).

- Brief for United States Conference of Mayors as *Amici Curiae* 4–13 (arguing that gun regulations have helped to lower New York's crime and homicide rates).

*Data on Handguns in the Home*

Please see the following sources referenced in the sentences discussing studies concerning handguns *in the home* on pages 13–14:

- Brief for Organizations Committed to Protecting the Public's Health, Safety, and Well-Being as *Amici Curiae* in Support of Respondents 13–16 (discussing studies that show handgun ownership in the home is associated with increased risk of homicide).

- Wiebe, Firearms in US Homes as a Risk Factor for Unintentional Gunshot Fatality, 35 Accident Analysis and Prevention 711, 713–714 (2003) (showing that those who die in firearms accidents are nearly four times more likely than average to have a gun in their home).

- Kellerman et al., Suicide in the Home in Relation to Gun Ownership, 327 New England J. Medicine 467, 470 (1992) (demonstrating that "homes with one or more handguns were associated with a risk of suicide almost twice as high as that in homes containing only long guns").

*Data on Regional Views and Conditions*

Please see the following sources referenced in the section on the diversity of regional views and conditions on page 16:

Appendix to opinion of BREYER, J.

- Okoro, et al., Prevalence of Household Firearms and Firearm-Storage Practices in the 50 States and the District of Columbia: Findings From the Behavioral Risk Factor Surveillance System, 2002, 116 Pediatrics 370, 372 (2005) (presenting data on firearm ownership by State).

- *Heller,* 554 U. S., at ___ (BREYER, J., dissenting) (slip op., at 19–20) (discussing various sources showing that gun violence varies by state, including Wintemute, The Future of Firearm Violence Prevention, 281 JAMA 475 (1999)).

- *Heller, supra,* at ___ (BREYER, J., dissenting) (slip op., at 19–20) (citing Branas, Nance, Elliott, Richmond, & Schwab, Urban-Rural Shifts in Intentional Firearm Death, 94 Am. J. Public Health 1750, 1752 (2004)) (discussing the fact that urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents).

- Dept. of Justice, Federal Bureau of Investigation, 2008 Crime in the United States, tbl. 6 (noting that murder rate is 40 times higher in New Orleans than it is in Lincoln, Nebraska).